**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| MARIBEL MOSES, on behalf of herself and all others similarly situated,<br><br>             Plaintiff,<br>  v.<br><br>THE NEW YORK TIMES COMPANY, d/b/a *The New York Times*,<br><br>             Defendant. | Civil Action No.: 1:20-cv-04658-RA<br><br>Hon. Ronnie Abrams |

**DECLARATION OF FREDERICK J. KLORCZYK III IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

I, Frederick J. Klorczyk III, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am a Partner at Bursor & Fisher, P.A. ("Bursor & Fisher"), counsel of record for Plaintiff Maribel Moses ("Plaintiff" or the "Class Representative") and Class Counsel in this action. I am an attorney-at-law licensed to practice in the State of New York, and I am a member of the bar of this Court. I have personal knowledge of all matters set forth in this declaration, and, if called as a witness, could and would competently testify under oath thereto.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of the Parties' Class Action Settlement Agreement ("Settlement" or "Settlement Agreement"), and the exhibits attached thereto.

**<u>*The Litigation And Settlement History*</u>**

3.      On June 17, 2020, Plaintiff filed her initial Class Action Complaint and commenced this lawsuit. ECF No. 1.

4.      In response to the Complaint, on August 17, 2020, Defendant filed a Motion to Dismiss under Rule 12(b)(6), arguing, *inter alia*, that Plaintiff failed to state a claim upon which

relief could be granted.  ECF Nos. 16-18.

5.      On August 31, 2020, Plaintiff filed her First Amended Class Action Complaint ("FAC") as of right.  In addition to the claims for relief brought by Plaintiff's original Complaint, the FAC brought additional claims against Defendant for negligent misrepresentation and fraud. ECF No. 22.

6.      Thereafter, the Parties engaged in a planning conference pursuant to Fed. R. Civ. P. 26(f) and a scheduling conference pursuant to Fed. R. Civ. P. 16.  ECF No. 23.

7.      On September 21, 2020, Defendant filed a motion to dismiss Plaintiff's FAC for failure to state a claim upon which relief could be granted under Rule 12(b)(6).  ECF Nos. 28, 29.  Plaintiff filed her opposition brief on October 29, 2020.  ECF No. 32.

8.      From the outset of the case, including during the pendency of Defendant's motion to dismiss Plaintiff's FAC, the Parties engaged in direct communications, and as part of their obligations under Fed. R. Civ. P. 26, discussed the prospect of an early resolution.

9.      Those discussions eventually led to an agreement between the Parties to engage in a mediation, which the Parties agreed would take place before Jill R. Sperber, Esq., who is an experienced neutral affiliated with Judicate West.

10.      The mediation took place on November 10, 2020, was conducted by Zoom, and it lasted approximately nine hours.  The Parties engaged in good faith negotiations, which at all times were at arms' length.  At the conclusion of the mediation, the Parties reached an agreement to settle the case and executed a binding Settlement Term Sheet as to all material terms of a class-wide settlement.

11.      Following the mediation session, the Parties continued to engage in settlement negotiations, and Plaintiff sought and obtained an order staying all upcoming deadlines of the

litigation in order to accommodate those negotiations.  *See* ECF Nos. 33, 34.  As the negotiations

progressed, Plaintiff also prepared and filed multiple joint letters to the Court regarding the status

of the Parties' progress settlement negotiations.  *See* ECF Nos. 37, 38.  The Parties then

ultimately reached an agreement.

12.     After reaching an agreement in principle on the Settlement, my firm worked

extensively with defense counsel to finalize and memorialize the agreement into a formal Class

Action Settlement Agreement.

13.     After finalizing and executing the Class Action Settlement Agreement, my firm

prepared Plaintiff's Motion for Preliminary Approval and Certification of a Settlement Class,

which was filed on March 30, 2021.  ECF Nos. 40-42.

14.     On May 12, 2021, the Court granted Plaintiff's Motion for Preliminary Approval

and Certification of a Settlement Class.  ECF No. 43.

15.     The resulting Settlement, which consists of cash and non-cash benefits and has a

total value of approximately $5,563,000.00, secures extraordinary relief for the Class.  Under the

Settlement, every Settlement Class Member will be entitled to receive either an Automatic

Access Code for a free one-month NYT Subscription or, at their election, a *pro rata* cash

payment from the Settlement Fund.  Class Members wishing to receive cash must have made a

cash election by submitting a valid Claim Form to the Settlement Administrator.

16.     Class Members who do nothing (*i.e.*, neither submit a valid Claim Form nor

exclude themselves from the Settlement) will automatically receive codes for free access to

select NYT products and services that normally require a paid subscription, with no expectation

or obligation to continue using the services beyond the free period (the "Automatic Access

Codes").  "No payment or billing information will be required for a Settlement Class Member to

use the Automatic Access Code."  Ex. 1, Settlement Agreement ¶ 2.2(d).  Thus, "a class member

need not engage in any further business with [Defendant] to take advantage of the benefits[.]"

Transcript Of Final Approval Hearing in *Pearlman v. Cablevision Sys. Corp.*, Case No. 2:10-cv-

04992-JS-AKT (E.D.N.Y. Jun. 19, 2018), ECF No. 276 ("*Pearlman* Hearing Tr.) at 64, a true

and correct copy of which is attached hereto as **Exhibit 3**.

17.     Additionally, under the terms of the Settlement, Defendant has agreed to revise

the presentation and wording of the automatic renewal terms in its mobile and desktop platforms

and in its direct mail offers to be consistent with the requirements of Cal. Bus. & Prof. Code §

17602(a)(1)-(2).  Defendant has further agreed to provide consumers who submit an order for an

automatically renewing subscription with an acknowledgment that includes the automatic

renewal terms, cancellation policy, and information regarding how to cancel in a manner that is

capable of being retained by the consumer, consistent with Bus. & Prof. Code § 17602(c).

### *Factors Supporting Final Approval*

18.     The Parties agreed to the terms of the Settlement through experienced counsel

who possessed all the information necessary to evaluate the case, determined all the contours of

the proposed class, and reached a fair and reasonable compromise after negotiating the terms of

the Settlement at arms' length and with the assistance of a neutral mediator.

19.     Plaintiff and Class Counsel recognize that, despite our belief in the strength of

Plaintiff's claims and our confidence in Plaintiff's and the Class's ability to secure a favorable

judgment at trial, the expense, duration, and complexity of protracted litigation would be

substantial and the outcome of trial uncertain.  Thus, the Settlement secures a more proximate

and more certain monetary benefit to the Class than continued litigation.

20.     Plaintiff and Class Counsel are also mindful that absent a settlement, the success

of Defendant's various defenses in this case could deprive the Plaintiff and the Settlement Class Members of any potential relief whatsoever.  This is especially true in light of the sparse case law concerning application of the ARL.  Indeed, to date, we are only aware of one court has issued an opinion on a contested class certification motion based on ARL violations, *see Robinson v. OnStar, LLC*, 2020 WL 364221 (S.D. Cal. Jan. 22, 2020), and only one ARL case has progressed through summary judgment, *see Ingalls v. Spotify USA, Inc.*, 2017 WL 3021037 (N.D. Cal. Jul. 17, 2017).  Defendant is also represented by highly experienced attorneys who have made clear that, absent a settlement, they were prepared to continue their vigorous defense of this case, including by filing a motion for summary judgment that would present significant risks to the Class.  Plaintiff and Class Counsel are also aware that Defendant would continue to challenge liability under the ARL, as well as to assert a number of defenses on the merits, including that Plaintiff's allegations are purportedly insufficient under Fed. R. Civ. P. 8 and 12(b)(6) and that NYT purportedly achieved a level of compliance sufficient to qualify for the good faith safe harbor under Section 17604(b) of the ARL.  Plaintiff is also aware Defendant will continue to challenge Plaintiff's standing under Article III of the Constitution as well as pursuant to California's consumer protection statutes, including Plaintiff's ability to show economic injury or causation and her ability to sue on behalf of unnamed class members.  Indeed, ARL litigation is in the nascent stages, and thus, the scope of the statute is in dispute.  Defendant would have also vigorously contested the certification of a litigation class.  Even if Plaintiff's claims were to proceed past class certification and summary judgment, this case would ultimately devolve into an uncertain "battle of the experts."  Defendant would surely present expert testimony and/or reports showing that the omissions at issue pertain to nonmaterial terms, and Plaintiff's expert evidence would indicate that the missing disclosures are indeed material to prospective

subscribers, giving rise to Defendant's duty to disclose such information.  Thus, although

Plaintiff had confidence in her claims, there could be no guarantee that the Class would be

certified or prevail at trial.  Looking beyond trial, Plaintiff is aware that Defendant could appeal

the merits of any adverse decision.  Simply put, a favorable outcome was not assured.

21.     Plaintiff and Class Counsel therefore believe that the relief provided by the

Settlement weighs heavily in favor of a finding that the Settlement is fair, reasonable, and

adequate, and well within the range of approval.

22.     Since the Court granted preliminary approval, my firm has worked with JND to

carry out the Court-ordered notice plan.  Specifically, my firm helped compile and review the

contents of the required notice to State Attorney Generals pursuant to 28 U.S.C. § 1715,

reviewed the final claim and notice forms, and reviewed and tested the settlement website before

it launched.

23.     The Parties selected JND Legal Administration ("JND") to act as the Settlement

Administrator.  Since the Court granted preliminary approval, my firm has worked with JND to

carry out the Court-ordered notice plan.  Specifically, my firm helped compile and review the

contents of the required notice to State Attorney Generals pursuant to 28 U.S.C. § 1715,

reviewed the final claim and notice forms, and reviewed and tested the settlement website before

it launched.

24.     Since class notice was disseminated, my firm has worked with JND on a weekly

basis to monitor settlement claims and any other issues that may arise.  My firm has also fielded

calls from Settlement Class Members and assisted them with filing claims.

25.     Attached hereto as **Exhibit 2** is a current firm resume for my firm, Bursor &

Fisher, P.A.

6

26.     My firm, Bursor & Fisher, P.A., has significant experience in litigating class

actions of similar size, scope, and complexity to the instant action.  *See* Ex. 2, Firm Resume of

Bursor & Fisher, P.A.  Indeed, my firm is currently serving as plaintiff's counsel in a number of

substantially similar putative class actions pursuant to the ARL.  *See*, *e.g.*, *Dutcher v. Google*

*LLC d/b/a YouTube, et al.*, No. 20CV366905 (Cal. Super. Ct.), filed June 5, 2020; *Jordan v. WP*

*Company LLC d/b/a The Washington Post*, No. 3:20-cv-05218-WHO (N.D. Cal.), filed July 29,

2020; *Morrell v. WW International, Inc.*, No. 1:20-cv-09912-JGK (S.D.N.Y.), filed November

11, 2020; *Mendez v. LinkedIn Corp.*, No. 21CV378575 (Cal. Super. Ct.), filed March 24, 2021;

and *Armstrong v. ZeniMax Media, Inc.*, No. 21STCV26988 (Cal. Super. Ct.), filed July 22, 2021.

27.     My firm has also been recognized by courts across the country, including in this

Circuit, for its expertise litigating Rule 23 class action claims to trial.  *See Ebin v. Kangadis*

*Food Inc.*, 297 F.R.D. 561, 566 (S.D.N.Y. Feb. 25, 2014) ("Bursor & Fisher, P.A., are class

action lawyers who have experience litigating consumer claims.  …  The firm has been

appointed class counsel in dozens of cases in both federal and state courts, and has won multi-

million dollar verdicts or recoveries in [six] class action jury trials since 2008."); *In re Welspun*

*Litigation*, No. 1L16-cv-06792-RJS (S.D.N.Y. January 26, 2017) (appointing Bursor & Fisher

interim lead counsel to represent a proposed nationwide class of purchasers of mislabeled

Egyptian cotton bedding products); *Williams v. Facebook, Inc.*, No. 3:18-cv-01881, ECF No. 51

(N.D. Cal June 26, 2018) ("[The] Bursor firm … ha[s] extensive experience in handling class

actions and complex litigation, including products liability and consumer protection cases;

appear[s] to have knowledge of applicable law; and ha[s] extensive resources.") (appointing

Bursor & Fisher class counsel to represent a putative nationwide class of all persons who

installed Facebook Messenger applications and granted Facebook permission to access their

contact list).

28.     Moreover, my firm has served as trial counsel for class action plaintiffs in six jury trials and has won all six, with recoveries ranging from $21 million to $299 million.

29.     Based on Class Counsel's experience litigating similar consumer class actions, Class Counsel is of the opinion that the Settlement is fair, reasonable, and adequate.  *See* Ex. 2, Firm Resume of Bursor & Fisher, P.A.

30.     As discussed above and throughout Plaintiff's Motion for Final Approval of Class Action Settlement, the Settlement reached in this case was the product of negotiations conducted at arms' length by experienced counsel representing adversarial parties, and there is absolutely no evidence of fraud or collusion.

I declare under penalty of perjury that the above and foregoing is true and accurate. Executed this 27th day of August, 2021, at New York, NY.

*/s Frederick J. Klorczyk III*
Frederick J. Klorczyk III

**EXHIBIT 1**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARIBEL MOSES, on behalf of herself and all others similarly situated,<br><br>                         Plaintiff,<br><br>    v.<br><br>THE NEW YORK TIMES COMPANY, d/b/a The New York Times.<br><br>                       Defendant. | Civil Action No.: 1:20-cv-04658-RA<br><br>Hon. Judge Ronnie Abrams |

## CLASS ACTION SETTLEMENT AGREEMENT

This Agreement ("Agreement" or "Settlement Agreement") is entered into by and among (i) Plaintiff Maribel Moses ("Plaintiff"); (ii) the Settlement Class (as defined herein); and (iii) Defendant The New York Times Company ("Defendant" or "NYT"). The Settlement Class and Plaintiff are collectively referred to as the "Plaintiffs" unless otherwise noted. The Plaintiffs and the Defendant are collectively referred to herein as the "Parties." This Agreement is intended by the Parties to fully, finally, and forever resolve, discharge, and settle the Released Claims (as defined herein), upon and subject to the terms and conditions of this Agreement, and subject to the final approval of the Court.

## RECITALS

A.  This putative class action was filed on June 17, 2020, in the United States District Court for the Southern District of New York. The material allegations of the action are that Defendant enrolled Plaintiff and other Class Members in automatic renewal newspaper subscriptions without first presenting the consumer with the automatic renewal offer terms in a clear and conspicuous manner; charged the consumer's credit card, debit card, or third party

payment account without first obtaining the consumer's affirmative consent to an agreement containing clear and conspicuous disclosure of the automatic renewal offer terms; and failed to provide the consumer with an acknowledgment that included clear and conspicuous disclosure of the automatic renewal offer terms, cancellation policy, and information regarding how to cancel. Based on Defendant's alleged conduct, the Complaint sought monetary and injunctive relief and brought claims for: (1) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (2) conversion; (3) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*; (4) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*; and (5) unjust enrichment. (Dkt. 1.)

B.      In response to the complaint, on August 17, 2020, Defendant filed a motion to dismiss under Rule 12(b)(6), arguing that Plaintiff failed to state a claim upon which relief could be granted.  (Dkt. 16, 17.)  Among its arguments, Defendant maintained that it had met all of the pre-purchase requirements under the ARL, including providing clear and conspicuous disclosures of all of the required ARL terms prior to purchase, and obtaining Plaintiff and other class members' consent to such terms at the time of purchase.

C.      On August 31, 2020, Plaintiff filed her First Amended Class Action Complaint ("FAC") as of right.  (Dkt. 22.)  In addition to claims for relief brought by Plaintiff's original Complaint, the FAC brought additional claims for negligent misrepresentation and fraud.

D.      After Plaintiff filed her FAC, the Parties engaged in a Rule 26(f) planning conference and a Rule 16 scheduling conference.  (Dkt. 23.)

E.      On September 21, 2020, Defendant filed a motion to dismiss Plaintiff's FAC for failure to state a claim upon which relief could be granted under Rule 12(b)(6).  (Dkt. 28, 29.) Defendant again argued that it had met all of the pre-purchase requirements under the ARL,

including providing clear and conspicuous disclosures of all of the required ARL terms prior to purchase, and obtaining Plaintiff and other class members' consent to such terms at the time of purchase, and further argued that Plaintiff had failed to set forth any basis for claims of fraud and negligent misrepresentation.  Plaintiff filed her opposition brief on October 29, 2020.  (Dkt. 32.)

      F.     From the outset of the case, including during the pendency of the motion to dismiss, the Parties engaged in direct communications, and as part of their obligations under Fed. R. Civ. P. 26, discussed the prospect of an early resolution.  Those discussions eventually led to an agreement between the Parties to engage in early mediation, which the Parties agreed would take place before Jill R. Sperber, Esq., who is an experienced neutral affiliated with Judicate West.

      G.     As part of the mediation, the Parties exchanged informal discovery, including on issues such as the size and scope of the putative class.  This information was sufficient for the Parties to assess the strengths and weakness of the claims and defenses.

      H.     The mediation took place on November 10, 2020, was conducted by Zoom, and it lasted approximately nine hours.  The Parties engaged in good faith negotiations, which at all times were at arms' length.  Towards the end of the mediation, the Parties reached an agreement to settle the case.

      I.     Following mediation, on November 13, 2020, the Parties filed a joint letter informing the Court that the Parties had reached agreement on all material terms of a class action settlement and requesting that the Court enter an order staying all upcoming deadlines, including Defendant's deadline to file a reply in support of its motion to dismiss, and the hearing thereon. The letter also requested that the Court adjourn the Case Management Conference scheduled for November 20, 2020.  On November 16, 2020, the Court entered an order granting the Parties' requests.

J.       At all times, Defendant has denied and continues to deny any wrongdoing whatsoever and has denied and continues to deny that it committed any wrongful act or violation of law or duty alleged in the Action, and has opposed and continues to oppose certification of a litigation class.  Defendant believes that the claims asserted in the Action do not have merit and that Defendant would have prevailed on its motion to dismiss, at summary judgment or at trial.  Nonetheless, taking into account the uncertainty and risks inherent in any litigation, Defendant has concluded it is desirable and beneficial that the Action be fully and finally settled and terminated in the manner and upon the terms and conditions set forth in this Agreement.  This Agreement is a compromise, and the Agreement, any related documents, and any negotiations resulting in it shall not be construed as or deemed to be evidence of or an admission or concession of liability or wrongdoing on the part of Defendant, or any of the Released Parties (defined below), with respect to any claim of any fault or liability or wrongdoing or damage whatsoever or with respect to the certifiability of a litigation class.

K.       Plaintiff believes that the claims asserted in the Action against Defendant have merit and that she would have prevailed at summary judgment and/or trial.  Nonetheless, Plaintiff and Class Counsel recognize that Defendant has raised factual and legal defenses that present a risk that Plaintiff may not prevail.  Plaintiff and Class Counsel also recognize the expense and delay associated with continued prosecution of the Action against Defendant through class certification, summary judgment, trial, and any subsequent appeals.  Plaintiff and Class Counsel also have taken into account the uncertain outcome and risks of litigation, especially in complex class actions, as well as the difficulties inherent in such litigation.  Therefore, Plaintiff believes it is desirable that the Released Claims be fully and finally compromised, settled, and resolved with prejudice.  Based on its evaluation, Class Counsel has concluded that the terms and conditions of this Agreement are fair, reasonable, and adequate to

the Settlement Class, and that it is in the best interests of the Settlement Class to settle the claims raised in the Action pursuant to the terms and provisions of this Agreement.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and among Plaintiff, the Settlement Class, and each of them, and Defendant, by and through its undersigned counsel that, subject to final approval of the Court after a hearing or hearings as provided for in this Settlement Agreement, in consideration of the benefits flowing to the Parties from the Agreement set forth herein, that the Action and the Released Claims will be finally and fully compromised, settled, and released, and the Action will be dismissed with prejudice, upon and subject to the terms and conditions of this Agreement.

## AGREEMENT

1. **DEFINITIONS.**

As used in this Settlement Agreement, the following terms have the meanings specified below:

1.1  **"Action"** means *Moses v. The New York Times Company*, Case No. l:20-cv-04658-RA, pending in the United States District Court for the Southern District of New York.

1.2  **"Active Class Members"** or **"Active Subscribers"** means Class Members with at least one NYT Subscription that is active as of the Preliminary Approval Date (defined below), but do not include Fully Active Class Members or Fully Active Subscribers (defined below).

1.3  **"Alternate Judgment"** means a form of final judgment that may be entered by the Court herein but in a form other than the form of Judgment provided for in this Agreement and where none of the Parties elects to terminate this Settlement by reason of such variance.

1.4  **"Approved Claim"** means a Claim Form submitted by a Settlement Class Member for cash payment from the Settlement Fund that is: (a) submitted timely and in

accordance with the directions on the Claim Form and the provisions of the Settlement Agreement, as determined by the Settlement Administrator; (b) fully and truthfully completed by a Settlement Class Member with all of the information requested in the Claim Form; (c) signed by the Settlement Class Member, physically or electronically under penalty of perjury; and (d) approved by the Settlement Administrator pursuant to the provisions of this Agreement.

1.5     **"Automatic Access Codes"** means codes for one month of free access to various NYT-branded subscription products automatically made available to Active, Inactive, and Fully Active Subscribers who do not submit an Approved Claim by the Claims Deadline.

1.6     **"Claimant"** means a Settlement Class Member who submits a Claim Form for cash payment as described in paragraph 2.2(e) of this Settlement Agreement.

1.7     **"Claim Form"** means the document substantially in the form attached hereto as **Exhibit A**, as approved by the Court.  The Claim Form shall be submitted by Settlement Class Members seeking a cash payment pursuant to this Settlement Agreement.  The Claim Form will be available online at the Settlement Website (defined at paragraph 1.47 below).

1.8     **"Claims Deadline"** means the date by which all Claim Forms must be postmarked or received, including by electronic submission via the Settlement Website, to be considered timely and will be set as a date no later than forty-five (45) days following the dissemination of Notice to the Settlement Class by the Settlement Administrator, pursuant to the terms herein.  The Claims Deadline will be clearly set forth in the Preliminary Approval Order, and will be stated on the Notice and the Claim Form.

1.9     **"Class Counsel"** means Frederick J. Klorczyk III of the law firm of Bursor & Fisher, P.A.

1.10    **"Class Period"** means the period of time from June 17, 2016, to and through the Preliminary Approval Date.

**1.11** **"Class Representative"** means the named Plaintiff in this Action, Maribel Moses.

**1.12** **"Court"** means the United States District Court for the Southern District of New York, the Honorable Ronnie Abrams presiding, or any judge who will succeed her as the Judge in this Action.

**1.13** **"Defendant"** or **"NYT"** means The New York Times Company.

**1.14** **"Defendant's Counsel"** means Sandra D. Hauser, Natalie J. Spears, and Kristen C. Rodriguez of the law firm of Dentons US LLP.

**1.15** **"Effective Date"** means the date ten (10) days after which all of the events and conditions specified in paragraph 9.1 have been met and have occurred.

**1.16** **"Escrow Account"** means the "Escrow Account" means the separate, interest-bearing escrow account to be established by the Settlement Administrator under terms acceptable to all Parties at a depository institution insured by the Federal Deposit Insurance Corporation. The Settlement Fund shall be deposited by Defendant into the Escrow Account in accordance with the terms of this Agreement and the money in the Escrow Account shall be invested in the following types of accounts and/or instruments and no other:  (i) demand deposit accounts and/or (ii) time deposit accounts and certificates of deposit, in either case with maturities of forty-five (45) days or less.  The costs of establishing and maintaining the Escrow Account shall be paid from the Settlement Fund.

**1.17** **"Fee Award"** means the amount of attorneys' fees and reimbursement of expenses awarded by the Court to Class Counsel, which will be paid out of the Settlement Fund.

**1.18** **"Final Approval Date"** means one (1) business day following the latest of the following events: (i) the date upon which the time expires for filing or noticing any appeal of the Court's Settlement Approval Order and Final Judgment approving the Settlement Agreement, if

no appeal has been filed; (ii) if there is an appeal or appeals, other than an appeal or appeals solely with respect to the Fee Award, the date of completion, in a manner that finally affirms and leaves in place the Final Judgment without any material modification, of all proceedings arising out of the appeal or appeals (including, but not limited to, the expiration of all deadlines for motions for reconsideration or petitions for review and/or *certiorari*, all proceedings ordered on remand, and all proceedings arising out of any subsequent appeal or appeals following decisions on remand); or (iii) the date of final dismissal of any appeal or the final dismissal of any proceeding on *certiorari*.

1.19    **"Final Approval Hearing"** means the hearing before the Court where the Parties will request the Final Judgment to be entered by the Court approving the Settlement Agreement, the Fee Award, and the Incentive Award to the Class Representative.

1.20    **"Final Judgment"** means the Final Judgment and Order to be entered by the Court approving the Agreement after the Final Approval Hearing, which is substantially in the form of **Exhibit H** attached hereto.

1.21    **"Fully Active Class Members"** or **"Fully Active Subscribers"** means Class Members who are currently active subscribers entitled to access to all of NYT's digital Subscription offerings as of the Preliminary Approval Date.

1.22    **"Inactive Class Members"** or **"Inactive Subscribers"** means Class Members who enrolled in any of Defendant's NYT Subscriptions during the Class Period but who do not currently have any active NYT Subscription as of the Preliminary Approval Date.

1.23    **"Incentive Award"** means any award approved by the Court that is payable to the Plaintiff from the Settlement Fund.

**1.24**    **"Notice Plan"** means the Settlement Administrator's plan to disseminate Notice to Settlement Class Members.  The Notice Plan will include a short form notice, email notice, long form notice, and internet notice.  *See also* paragraph 4.1.

**1.25**    **"Net Settlement Fund"** means the amount of the Settlement Fund remaining after payment of claims administration and notice costs, incentive award to the Class Representative, and the Fee Award.

**1.26**    **"Notice"** means the notice of this proposed Class Action Settlement Agreement and Final Approval Hearing, which is to be sent to the Settlement Class substantially in the manner set forth in this Agreement, consistent with the requirements of Due Process, Rule 23, and substantially in the form of **Exhibits A, B, C, D, and E** hereto.

**1.27**    **"Notice and Other Administrative Costs"** means all costs and expenses actually incurred by the Settlement Administrator in the publication of Class Notice, establishment of the Settlement Website, providing CAFA notice, the processing, handling, reviewing, and paying of claims made by Claimants, paying taxes and tax expenses related to the Settlement Fund (including all federal, state, or local taxes of any kind and interest or penalties thereon, as well as expenses incurred in connection with determining the amount of and paying any taxes owed and expenses related to any tax attorneys and accountants).

**1.28**    **"Notice Date"** means the publication of notice pursuant paragraph 4.1(b) of this Agreement, which shall be no later than twenty-eight (28) days after the Preliminary Approval Order.

**1.29**    **"NYT Basic Digital Access Subscription"** means the digital-only subscription offering for Defendant's *The New York Times* newspaper available on NYTimes.com and the NYT app, but which does not include e-reader editions, NYT Games or NYT Cooking.  One month access to a NYT Basic Digital Access Subscription is valued at $4.

**1.30** **"NYT Digital Product Subscription"** means Defendant's subscription offerings to its standalone digital subscriptions, namely, NYT Cooking and NYT Games, but does not include Defendant's primary subscription offerings for digital and print access to some or all of the published content of *The New York Times*, such as Defendant's monthly Basic Digital Access Subscription.  One month access to a NYT Digital Product Subscription has a value of $3-$5, depending on the subscription selected.

**1.31** **"NYT Subscriptions"** means all of Defendant's print and digital subscription offerings, including the NYT Basic Digital Access Subscription and NYT Digital Product Subscription.

**1.32** **"Objection/Exclusion Deadline"** means the date by which a written objection to this Settlement Agreement or a request for exclusion submitted by a Person within the Settlement Class must be made, which shall be designated as a date no later than forty-five (45) days after the Notice Date and no sooner than fourteen (14) days after papers supporting the Fee Award are filed with the Court and posted to the settlement website listed in paragraph 4.1(e), or such other date as ordered by the Court.

**1.33** **"Person"** shall mean, without limitation, any individual, corporation, partnership, limited partnership, limited liability company, association, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any business or legal entity and their spouse, parent, child, guardian, associate, co-owners, heirs, predecessors, successors, representatives, or assigns.  "Person" is not intended to include any governmental agencies or governmental actors, including, without limitation, any state Attorney General office.

**1.34** **"Plaintiff"** means Maribel Moses.

**1.35** **"Preliminary Approval"** means the Court's entry of an order preliminarily approving the terms and conditions of this Settlement Agreement, including the manner of providing, and content of, the notice to Settlement Class Members.

**1.36** **"Preliminary Approval Date"** means the date on which the Court enters an order granting Preliminary Approval.

**1.37** **"Preliminary Approval Order"** means the order preliminarily approving the Settlement Agreement, conditionally certifying the Settlement Class for settlement purposes, and directing notice thereof to the Settlement Class, which will be agreed upon by the Parties and submitted to the Court in conjunction with Plaintiffs' motion for preliminary approval of the Agreement.  The Parties' proposed form of Preliminary Approval Order is attached hereto as **Exhibit G**.

**1.38** **"Released Claims"** means any and all causes of action or claims for relief, whether in law or equity, including but not limited to injunctive relief, actual damages, nominal damages, statutory damages, punitive damages, exemplary or multiplied damages, restitution, disgorgement, expenses, attorneys' fees and costs, and/or any other form of consideration whatsoever (including "Unknown Claims" as defined below), whether in law or in equity, accrued or un-accrued, direct, individual or representative, of every nature and description whatsoever, that were brought or could have been brought in the Action relating to any and all Releasing Parties, any NYT Subscription associated with any of them, or that in any way relate to or arise out of Defendant's automatic renewal and/or continuous service programs in California from June 17, 2016 to date of entry of judgment in this action, including but not limited to any of the facts, transactions, events, matters, occurrences, acts, disclosures, statements, representations, omissions or failures to act related thereto.

**1.39**  **"Released Parties"** means The New York Times Company, as well as any and all of its respective present or past heirs, executors, estates, administrators, predecessors, successors, assigns, parent companies, subsidiaries, licensors, licensees, associates, affiliates, employers, agents, consultants, independent contractors, insurers, and customers, including without limitation employees of the foregoing, directors, managing directors, officers, partners, principals, members, attorneys, accountants, financial and other advisors, underwriters, shareholders, lenders, auditors, investment advisors, legal representatives, successors in interest, assigns and companies, firms, trusts, and corporations.

**1.40**  **"Releasing Parties"** means Plaintiff, those Settlement Class Members who do not timely opt out of the Settlement Class, each NYT Subscription associated with such Class Member, and all of their respective present or past heirs, executors, estates, administrators, predecessors, successors, assigns, parent companies, subsidiaries, associates, affiliates, employers, employees, agents, consultants, independent contractors, insurers, directors, managing directors, officers, partners, principals, members, attorneys, accountants, financial and other advisors, underwriters, shareholders, lenders, auditors, investment advisors, legal representatives, successors in interest, assigns and companies, firms, trusts, and corporations.

**1.41**  **"Settlement Administration Expenses"** means the expenses incurred by the Settlement Administrator in providing Notice (including CAFA notice), processing claims, responding to inquiries from members of the Settlement Class, mailing checks for Approved Claims, and related services, paying taxes and tax expenses related to the Settlement Fund (including all federal, state or local taxes of any kind and interest or penalties thereon, as well as expenses incurred in connection with determining the amount of and paying any taxes owed and expenses related to any tax attorneys and accountants), as well as all expenses related to the resolution of any disputed claims by Jill Sperber, Esq., as described below in paragraph 5.3.

**1.42** **"Settlement Administrator"** means a reputable administration company that has been selected jointly by the Parties and approved by the Court to perform the duties set forth in this Agreement, including but not limited to serving as Escrow Agent for the Settlement Fund, overseeing the distribution of Notice, as well as the processing and payment of Approved Claims to the Settlement Class as set forth in this Agreement, handing all approved payments out of the Settlement Fund, and handling the determination, payment and filing of forms related to all federal, state and/or local taxes of any kind (including any interest or penalties thereon) that may be owed on any income earned by the Settlement Fund.  Class Counsel's assent to this Agreement shall constitute consent on behalf of each and every member of the Settlement Class as defined herein to disclose all information required by the Settlement Administrator to perform the duties and functions ascribed to it herein.

**1.43** **"Settlement Class"** means all Persons who, from June 17, 2016, to and through the Preliminary Approval Date, enrolled in an automatically renewing NYT Subscription directly through NYT using a California billing and/or delivery address, and who were charged and paid an automatic renewal fee(s) in connection with such subscription.  Excluded from the Settlement Class are: (1) any Judge or Magistrate presiding over this Action and members of their families; (2) Defendant, Defendant's subsidiaries, parent companies, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and their current or former officers, directors, agents, attorneys, and employees; (3) Persons who properly execute and file a timely request for exclusion from the class; and (4) the legal representatives, successors or assigns of any excluded Persons.

**1.44** **"Settlement Class Member"** means a Person who falls within the definition of the Settlement Class.

**1.45**    **"Settlement Fund"** means the non-reversionary total cash fund that shall be established by Defendant for purposes of this settlement in the total amount of $1,650,000 USD to be deposited into the Escrow Account, according to the schedule set forth herein, plus all interest earned thereon.  The Settlement Fund represents the total extent of Defendant's monetary obligations under this Agreement.  The Settlement Fund shall be used for payment of the following: (i) Approved Claims for cash benefits submitted by Settlement Class Members pursuant to paragraph 2.2(e) below; (ii) the Notice and Other Administrative Costs actually incurred by the Settlement Administrator as described in paragraph 1.27 below;  (iii) the Fee Award, as described in paragraphs 1.17 and 8.1 below; and (iv) any Incentive Award to the Plaintiff, not to exceed $5,000, as may be ordered by the Court and as described in paragraphs 1.23 and 8.3 below.  The Settlement Fund shall be kept in the Escrow Account with permissions granted to the Settlement Administrator to access said funds until such time as the listed payments are made. The Settlement Administrator shall be responsible for all tax filings with respect to any earnings on the Settlement Fund and the payment of all taxes that may be due on such earnings.  The Settlement Fund represents the total extent of Defendant's monetary obligations under this Agreement.  The payment of the Settlement Amount by Defendant fully discharges the Defendant and the other Released Parties' financial obligations (if any) in connection with the Settlement, meaning that no Released Party shall have any other obligation to make any payment into the Escrow Account or to any Class Member, or any other Person, under this Agreement.  In no event shall the total monetary obligation with respect to this Agreement on behalf of Defendant exceed one million six hundred fifty thousand dollars ($1,650,000).

**1.46**    **"Settlement Value"** means the Settlement Fund ($1,650,000) plus the market value of the total amount of Automatic Access Codes made available to Active and Inactive

Settlement Class Members. The Settlement Value per this calculation as of March 12, 2021 is approximately $5,563,000.00.

**1.47** **"Settlement Website"** means a website to be established, operated, and maintained by the Settlement Administrator for purposes of providing notice and otherwise making available to the Settlement Class Members the documents, information, and online claims submission process referenced in paragraphs 2.2(a) through 2.2(g), below.

**1.48** **"Short Form Notice"** means the Court-approved form of notice for publication to Settlement Class Members, pursuant to the Notice Plan.

**1.49** **"Unknown Claims"** means claims that could have been raised in the Action and that any or all of the Releasing Parties do not know or suspect to exist, which, if known by him or her, might affect his or her agreement to release the Released Parties or the Released Claims or might affect his or her decision to agree, object, or not to object to the Settlement.  Upon the Effective Date, the Releasing Parties will be deemed to have, and will have, expressly waived and relinquished, to the fullest extent permitted by law, the provisions, rights, and benefits of § 1542 of the California Civil Code, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT
> TO EXIST IN HIS OR HER FAVOR AT THE TIME OF
> EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM
> OR HER MUST HAVE MATERIALLY AFFECTED HIS OR
> HER SETTLEMENT WITH THE DEBTOR.

Upon the Effective Date, the Releasing Parties also will be deemed to have, and will have, waived any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law, or the law of any jurisdiction outside of the United States, which is similar, comparable, or equivalent to § 1542 of the California Civil Code. The Releasing Parties acknowledge that they may discover facts in addition to or different from those that they now know or believe to be true with respect to the subject matter of this release,

but that it is their intention to finally and forever settle and release the Released Claims,

notwithstanding any Unknown Claims they may have, as that term is defined in this paragraph.

**2.      SETTLEMENT RELIEF.**

   **2.1**    Defendant shall cause to be paid into the Escrow Account the amount of the

   Settlement Fund ($1,650,000 USD), specified in paragraph 1.45 of this

   Agreement, within twenty-eight (28) business days after Preliminary Approval.

   **2.2**    **Benefits For Settlement Class Members**.  Class Members will be entitled to the

   following relief:

      **(a)**    Active Class Members may elect to either:

         1.   Do nothing and receive an Automatic Access Code for a free one-

         month subscription to a single NYT Digital Product Subscription

         to which the Active Class Member does not currently subscribe; or

         2.   File a valid claim and receive a *pro rata* cash payment from the

         Net Settlement Fund.

      **(b)**    Inactive Class Members may elect to either:

         1.   Do nothing and receive an Automatic Access Code for a free one-

         month NYT Basic Digital Access Subscription; or

         2.   File a valid claim and receive a *pro rata* cash payment from the

         Net Settlement Fund.

      **(c)**    Fully Active Class Members may elect to either:

         1.    Do nothing and receive an Automatic Access Code for a free one-

         month NYT Basic Digital Access Subscription to share with a

         friend or family member; or

> 2. File a valid claim and receive a *pro rata* cash payment from the Net Settlement Fund.

**(d)**     Settlement Class Members who do not submit a valid Claim Form electing to receive cash will receive an Automatic Access Code based on whether their NYT Subscription was active or inactive as of the Notice Date, as described in paragraph 1.28 above.  *See also* paragraphs 1.2 and 1.22.  Defendant shall make the Automatic Access Codes available to the Settlement Administrator within 60 days of the Effective Date.  Within 7 days of the Automatic Access Codes becoming available, the Settlement Administrator will send email notice to all Settlement Class Members who did not file a valid claim advising as to the availability of the Automatic Access Codes.  No payment or billing information will be required for a Settlement Class Member to use the Automatic Access Code.  The Automatic Access Codes will not expire for at least 50 years and may be freely transferred, but they may not be used to extend or pay for existing subscriptions.

**(e)**     Settlement Class Members wishing to receive cash must make an election to receive cash by submitting a valid Claim Form to the Settlement Administrator.  Settlement Class Members shall have until the Claims Deadline to submit a Claim Form for approval by the Settlement Administrator as an Approved Claim.  Each Settlement Class Member who submits an Approved Claim will receive a pro rata payment from the Settlement Fund in the form of a check, issued and mailed by the Settlement Administrator within 60 days of the Effective Date.

**(f)**     The Settlement Administrator will be responsible for reviewing all claims to determine their validity.  The Settlement Administrator will reject any claim that does not comply in any material respect with the instructions on the Claim Form or the terms of paragraphs 1.4 and 1.7, above, or is submitted after the Claims Deadline.  Defendant has the

17

right to audit the claims process for evidence of fraud or error; provided, however, that the Settlement Administrator or the Court shall be the final arbiter of a claim's validity.

      **(g)**    Each claimant who submits an invalid Claim Form to the Settlement Administrator must be given a notice of the Claim Form's deficiency and an opportunity to cure the deficiency within 21 days of the date of the notice.

      **(h)**    All cash payments issued to Settlement Class Members via check will state on the face of the check that it will expire and become null and void unless cashed within one hundred and eighty (180) days after the date of issuance.  If a check issued to a Settlement Class Member is not cashed within one hundred and eighty (180) days after the date of issuance, such funds shall revert to the Legal Aid Society, Inc., a non-sectarian, not-for-profit organization that principally operates in New York City, or another non-sectarian, not-for-profit organization(s) recommended by Class Counsel and Defendant, and as approved by the Court.

      **2.3**    **Prospective Relief - Practice Changes.**  Prospectively, Defendant is revising the presentation and wording of the automatic renewal terms on the checkout pages in its mobile and desktop platforms and in its direct mail offers to be consistent with the requirements of Cal. Bus. & Prof. Code § 17602(a)(1)-(2).  Defendant agrees to provide consumers who submit an order for a new automatically renewing subscription with an e-mail or paper acknowledgment (appropriate to the method of subscription) that includes the automatic renewal terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, consistent with Bus. & Prof. Code § 17602(c).

**3.**    **RELEASE.**

      **3.1**    The obligations incurred pursuant to this Settlement Agreement shall be a full and final disposition of the Action and any and all Released Claims, as against all Released Parties.

**3.2**     Upon the Effective Date, the Releasing Parties, and each of them, shall be deemed to have, and by operation of the Final Judgment shall have, fully, finally, and forever released, relinquished, and discharged all Released Claims against the Released Parties, and each of them.

**3.3**     Plaintiff, the Settlement Class and the Releasing Parties each individually covenant not to bring any Released Claim and expressly agree that this Release will be, and may be raised as, a complete defense to and will preclude any action or proceeding encompassed by the release(s) contained herein in respect to any NYT Subscription associated with a Class Member.

## 4.  NOTICE TO THE CLASS.

**4.1**     The Notice Plan shall consist of the following:

**(a)**     *Settlement Class List*.  Defendant shall produce an electronic list from its records that includes the names, and last known e-mail and U.S. Mail addresses that, according to its records, belong to Persons with NYT Subscriptions within the Settlement Class.  The electronic list shall also differentiate between Active Class Members, Inactive Class Members, and Fully Active Class Members, and shall include the Settlement Class Member's NYT Subscriptions.  This electronic document shall be called the "Class List," and shall be provided to the Settlement Administrator with a copy to Class Counsel.  In no event shall the Class List be provided to the Settlement Administrator later than fourteen (14) days prior to the date Notice shall be disseminated.  This Class List is confidential and shall not be used for any other purposes beyond providing notice to the Settlement Class and assisting with the determination of valid claims.  Class Counsel's assent to this Agreement shall constitute consent on behalf of each and every member of the Settlement Class as defined herein to disclose this information as stated in this paragraph.

(b)     *Direct Notice to Settlement Class Members*.  No later than the twenty-eight (28) days from entry of the Preliminary Approval Order, the Settlement Administrator shall send notice to the Class Members via email in the form attached as **Exhibit B**.  If an email notice to an Active Settlement Class Member or Fully Active Settlement Class Member is returned as non-deliverable, the Settlement Administrator shall send the notice in the form attached as **Exhibit C** to the Settlement Class Member's billing or mailing address via First Class U.S. Mail, together with a postcard Claim Form with return postage prepaid.  If an email notice to an Inactive Settlement Class Member is returned as non-deliverable, the Settlement Administrator shall send the notice in the form attached as **Exhibit D** to the Settlement Class Member's billing or mailing address via First Class U.S. Mail, together with a postcard Claim Form with return postage prepaid.

(c)     For Settlement Class Members without an email address, the Settlement Administrator shall send the Notice via First Class U.S. Mail, together with a postcard Claim Form with return postage prepaid.

(d)     If any Notice is returned as non-deliverable, and a forwarding address is provided, the Settlement Administrator shall re-mail the Notice to the forwarding address within five (5) business days.  If any Notice is returned as non-deliverable, and no forwarding address is provided, the Settlement Administrator shall attempt to ascertain a valid address for the affected Settlement Class Member by seeking change of address information through the U.S. Postal Service's National Change of Address Link, and shall re-mail the Notice within five (5) business days to the address(es) that are found.  The Settlement Administrator shall have no obligation to send Notices beyond those obligations specified herein.

(e)     *Settlement Website.*  Within ten (10) days from entry of the Preliminary Approval Order, Notice shall be provided on a website at an available URL (such as, for

20

example, www.CArenewalsettlementNYT.com) which shall be obtained, administered and

maintained by the Settlement Administrator and shall include the ability to file Claim Forms

online, provided that such Claim Forms, if signed electronically, will be binding for purposes of

applicable law and contain a statement to that effect.  The Notice provided on the Settlement

Website shall be substantially in the form of **Exhibit E** hereto.

        **(f)**    *CAFA Notice.*  Pursuant to 28 U.S.C. § 1715, not later than ten (10) days

after the Agreement is filed with the Court, the Settlement Administrator shall cause to be

served upon the Attorney General of the United States, and any other required government

official, notice of the proposed settlement as required by law, subject to paragraph 5.1 below.

        **4.2**    The Notice shall advise the Settlement Class of their rights, including the rights to

be excluded from or object to the Settlement Agreement or any of its terms.  The Notice shall

specify that any objection to the Settlement Agreement, and any papers submitted in support of

said objection, shall be considered by the Court at the Final Approval Hearing only if, on or

before the Objection/Exclusion Deadline approved by the Court and specified in the Notice, the

Person making the objection files notice of an intention to do so and at the same time (a) files

copies of such papers he or she proposes to be submitted at the Final Approval Hearing with the

Clerk of the Court, or alternatively, if the objection is from a Class Member represented by

counsel, files any objection through the Court's CM/ECF system, and (b) sends copies of such

papers by mail, hand, or overnight delivery service to Class Counsel and Defendant's Counsel.

        **4.3**    Any Settlement Class Member who intends to object to this Agreement must

present the objection in writing to the Settlement Administrator, postmarked on or before the

Objection/Exclusion deadline approved by the Court and specified in the Notice, which must be

personally signed by the objector, and must include:  (1) the objector's name and address; (2) an

explanation of the basis upon which the objector claims to be a Settlement Class Member; (3) all

grounds for the objection, including all citations to legal authority and evidence supporting the objection; (4) the name and contact information of any and all attorneys representing, advising, or in any way assisting the objector in connection with the preparation or submission of the objection or who may profit from the pursuit of the objection (the "Objecting Attorneys"); and (5) a statement indicating whether the objector intends to appear at the Final Approval Hearing (either personally or through counsel who files an appearance with the Court in accordance with the Local Rules).

4.4      If a Settlement Class Member or any of the Objecting Attorneys has objected to any class action settlement where the objector or the Objecting Attorneys asked for or received any payment in exchange for dismissal of the objection, or any related appeal, without any modification to the settlement, then the objection must include a statement identifying each such case by full case caption and amount of payment received.

4.5      A Settlement Class Member may request to be excluded from the Settlement Class by sending a written request postmarked on or before the Objection/Exclusion Deadline approved by the Court and specified in the Notice.  To exercise the right to be excluded, a Person in the Settlement Class must timely send a written request for exclusion to the Settlement Administrator providing his/her name and address, a signature, the name and number of the case, and a statement that he or she wishes to be excluded from the Settlement Class for purposes of this Settlement.  A request to be excluded that does not include all of this information, or that is sent to an address other than that designated in the Notice, or that is not postmarked within the time specified, shall be invalid, and the Person(s) serving such a request shall be a member(s) of the Settlement Class and shall be bound as a Settlement Class Member by this Agreement, if approved.  Any member of the Settlement Class who validly elects to be excluded from this Agreement shall not:  (i) be bound by any orders or the Final Judgment; (ii) be entitled to relief

under this Settlement Agreement; (iii) gain any rights by virtue of this Agreement; or (iv) be entitled to object to any aspect of this Agreement.  The request for exclusion must be personally signed by each Person requesting exclusion.  So-called "mass" or "class" opt-outs shall not be allowed.  To be valid, a request for exclusion must be postmarked or received by the date specified in the Notice.  Upon receiving any request(s) for exclusion, the Settlement Administrator shall stamp on the original the date it was received and shall promptly notify Class Counsel and Defendant's Counsel of such request(s) no later than two (2) calendar days after receiving any request. The Settlement Administrator shall indicate whether such request is timely received, and provide copies of the request(s) for exclusion, the mailing envelope, and any accompanying documentation, by email.

      **4.6**      The Final Approval Hearing shall be no earlier than one hundred and thirty five (135) days after the date Preliminary Approval is granted.

**5.**      **SETTLEMENT ADMINISTRATION.**

      **5.1**      The Settlement Administrator shall, under the supervision of the Court, administer the relief provided by this Settlement Agreement by processing Claim Forms in a rational, responsive, cost effective, and timely manner, consistent with the terms of this Agreement.  The Settlement Administrator shall maintain reasonably detailed records of its activities under this Agreement.  The Settlement Administrator shall maintain all such records as are required by applicable law in accordance with its normal business practices and such records will be made available to Class Counsel and Defendant's Counsel upon request.  The Settlement Administrator shall also provide reports and other information to the Court as the Court may require.  The Settlement Administrator shall provide Class Counsel and Defendant's Counsel with regular reports at weekly intervals containing information concerning Notice, administration, and implementation of the Settlement Agreement.  Should the Court request, the

Parties shall submit a timely report to the Court summarizing the work performed by the Settlement Administrator, including a report of all amounts from the Settlement Fund paid to Settlement Class Members on account of Approved Claims.  Without limiting the foregoing, the Settlement Administrator shall:

      **(a)**    Forward to Defendant's Counsel, with copies to Class Counsel, all original documents and other materials received in connection with the administration of the Settlement, and all copies thereof, within thirty (30) days after the date on which all Claim Forms have been finally approved or disallowed in accordance with the terms of this Agreement;

      **(b)**    Provide Class Counsel and Defendant's Counsel with drafts of all administration related documents, including but not limited to CAFA Notices, follow-up class notices or communications with Settlement Class Members, telephone scripts, website postings or language or other communications with the Settlement Class, at least five (5) days before the Settlement Administrator is required to or intends to publish or use such communications, unless Class Counsel and Defendant's Counsel agree to waive this requirement in writing on a case by case basis;

      **(c)**    Receive requests to be excluded from the Settlement Class and other requests and promptly provide to Class Counsel and Defendant's Counsel copies thereof.  If the Settlement Administrator receives any exclusion forms or other requests after the deadline for the submission of such forms and requests, the Settlement Administrator shall promptly provide copies thereof to Class Counsel and Defendant's Counsel;

      **(d)**    Provide weekly reports to Class Counsel and Defendant's Counsel, including without limitation, reports regarding the number of Claim Forms received, the number approved by the Settlement Administrator, and the categorization and description of Claim Forms rejected, in whole or in part, by the Settlement Administrator; and

(e)      Make available for inspection by Class Counsel or Defendant's Counsel the Claim Forms received by the Settlement Administrator at any time upon reasonable notice.

5.2      The Settlement Administrator shall be obliged to employ reasonable procedures to screen claims for abuse or fraud and deny Claim Forms where there is evidence of abuse or fraud.  The Settlement Administrator shall determine whether a Claim Form submitted by a Settlement Class Member is an Approved Claim by determining if the Person is on the Class List and shall reject Claim Forms that fail to (a) comply with the instructions on the Claim Form or the terms of this Agreement, or (b) provide full and complete information as requested on the Claim Form.  If a Person submits a timely Claim Form by the Claims Deadline where the Person appears on the Class List but the Claim Form is not otherwise complete, then the Settlement Administrator shall give such Person one (1) reasonable opportunity to provide any requested missing information, which information must be received by the Settlement Administrator no later than thirty (30) calendar days after the Claims Deadline.  If the Settlement Administrator receives such information more than thirty (30) days after the Claims Deadline, then any such claim shall be denied.  The Settlement Administrator may contact any Person who has submitted a Claim Form to obtain additional information necessary to verify the Claim Form.

5.3      Defendant's Counsel and Class Counsel shall have the right to challenge the acceptance or rejection of a Claim Form submitted by Settlement Class Members.  The Settlement Administrator shall follow any agreed decisions of Class Counsel and Defendant's Counsel as to the validity of any disputed submitted Claim Form.  To the extent Class Counsel and Defendant's Counsel are not able to agree on the disposition of a challenge, the disputed claim shall be submitted to Jill Sperber, Esq. of Judicate West.  Ms. Sperber will charge the Judicate West hourly rate for providing such services to the Settlement Class, and all expenses related thereto will be paid by the Settlement Administrator from the Settlement Fund.

**5.4**      In the exercise of its duties outlined in this Agreement, the Settlement Administrator shall have the right to reasonably request additional information from the Parties or any Settlement Class Member.

**5.5**.      Defendant, the Released Parties, and Defendant's Counsel shall have no responsibility for, interest in, or liability whatsoever with respect to:  (i) any act, omission, or determination by Class Counsel, or the Claims Administrator, or any of their respective designees or agents, in connection with the administration of the settlement or otherwise; (ii) the management, investment, or distribution of the Settlement Fund; (iii) the allocation of Net Settlement Funds to Settlement Class Members or the implementation, administration, calculation or interpretation thereof; (iv) the determination, administration, calculation, or payment of any claims asserted against the Settlement Fund; (v) any losses suffered by, or fluctuations in value of, the Settlement Fund; or (vi) the payment, reporting, or withholding of any taxes, tax expenses, or costs incurred in connection with the taxation of the Settlement Fund or the filing of any federal, state, or local returns.

**5.7**.      To allow a calculation of the *pro rata* payments to Settlement Class Members, no later than twenty-one (21) days before any distribution of Settlement Funds must occur, the Settlement Administrator shall submit to Class Counsel and Defendant's Counsel a final and total invoice for all of the Settlement Administrator's services.

**5.8**.      All taxes and tax expenses shall be paid out of the Settlement Fund, and shall be timely paid by the Settlement Administrator pursuant to this Agreement and without further order of the Court.  Any tax returns or reporting forms prepared for the Settlement Fund (as well as the election set forth therein) shall be consistent with this Agreement and in all events shall reflect that all taxes on the income earned by the Settlement Fund shall be paid out of the Settlement Fund as provided herein.  The Released Parties shall have no responsibility or

liability for the acts or omissions of the Settlement Administrator or its agents with respect to the reporting or payment of taxes or tax expenses.

## 6.    TERMINATION OF SETTLEMENT.

6.1    Subject to paragraphs 9.1-9.2 below, Defendant or the Class Representative on behalf of the Settlement Class, shall have the right to terminate this Agreement by providing written notice of the election to do so ("Termination Notice") to all other Parties hereto within twenty-one (21) days of any of the following events:  (i) the Court's refusal to grant Preliminary Approval of this Agreement in any material respect; (ii) the Court's refusal to grant Final Approval of this Agreement in any material respect; (iii) the Court's refusal to enter the Final Judgment in this Action in any material respect; (iv) the date upon which the Final Judgment is vacated, modified or reversed in any material respect by the Court, the Court of Appeals or the Supreme Court; or (v) the date upon which an Alternate Judgment, as defined in paragraph 9.1(d) of this Agreement is vacated, modified or reversed in any material respect by the Court, the Court of Appeals or the Supreme Court.

6.2    If, prior to the filing of the Final Approval Motion, Persons who otherwise would be members of the Settlement Class have timely requested exclusion from the Settlement Class in accordance with the provisions of the Notice, and such Persons in the aggregate constitute more than one-half of a percent (.5%) of the Settlement Class, Defendant shall have, in its sole and absolute discretion, the option to terminate this settlement by giving notice as set forth in paragraph 6.1.

## 7.    PRELIMINARY APPROVAL ORDER AND FINAL APPROVAL ORDER.

7.1    Promptly after the execution of this Settlement Agreement, Class Counsel shall submit this Agreement together with its Exhibits to the Court and shall move the Court for Preliminary Approval of the settlement set forth in this Agreement; certification of the

Settlement Class for settlement purposes only; appointment of Class Counsel and the Class

Representative; and entry of a Preliminary Approval Order substantially in the form of **Exhibit F**

hereto, which order shall set a Final Approval Hearing date and approve the Notice and Claim

Form for dissemination substantially in the form of **Exhibits A, B, C**, **D** and **E** hereto.  The

Preliminary Approval Order shall also authorize the Parties, without further approval from the

Court, to agree to and adopt such amendments, modifications and expansions of the Settlement

Agreement and its implementing documents (including all Exhibits to this Agreement) so long as

they are consistent in all material respects with the terms of the Settlement Agreement and do not

limit or impair the rights of the Settlement Class or materially expand the obligations of

Defendant.

   **7.2**  At the time of the submission of this Agreement to the Court as described above,

Class Counsel shall request that, after Notice is given, the Court hold a Final Approval Hearing

and approve the settlement of the Action as set forth herein.

   **7.3**  After Notice is given, the Parties shall request and seek to obtain from the Court a

Final Judgment substantially in the form of **Exhibit H** hereto, which will (among other things):

    **(a)**  find that the Court has personal jurisdiction over all Settlement Class

Members and that the Court has subject matter jurisdiction to approve the Agreement, including

all Exhibits thereto;

    **(b)**  approve the Settlement Agreement and the proposed settlement as fair,

reasonable, and adequate as to, and in the best interests of, the Settlement Class Members; direct

the Parties and their counsel to implement and consummate the Agreement according to its terms

and provisions; and declare the Agreement to be binding on, and have *res judicata* and

preclusive effect in all pending and future lawsuits or other proceedings maintained by or on

behalf of Plaintiffs and Releasing Parties;

**(c)**     find that the Notice implemented pursuant to the Agreement

(1) constitutes the best practicable notice under the circumstances; (2) constitutes notice that is

reasonably calculated, under the circumstances, to apprise the Settlement Class of the pendency

of the Action, their right to object to or exclude themselves from the proposed Agreement, and to

appear at the Final Approval Hearing; (3) is reasonable and constitutes due, adequate, and

sufficient notice to all persons entitled to receive notice; and (4) meets all applicable

requirements of the Federal Rules of Civil Procedure, the Due Process Clause of the United

States Constitution, and the rules of the Court;

**(d)**     find that the prerequisites for a class action under Fed. R. Civ. P. 23(a) and

Fed. R. Civ. P. 23(b) have been satisfied for settlement purposes for the Settlement Class in that:

(1) the number of Settlement Class Members is so numerous that joinder of all members thereof

is impracticable; (2) there are questions of law and fact common to the Settlement Class

Members; (3) the claims of the Class Representative are typical of the claims of the Settlement

Class they seek to represent; (4) the Class Representative has and will continue to fairly and

adequately represent the interests of the Settlement Class for purposes of entering into the

Settlement Agreement; (5) the questions of law and fact common to Settlement Class Members

predominate over any questions affecting any individual Settlement Class Member; (6) the

Settlement Class is ascertainable; and (7) a class action is superior to the other available methods

for the fair and efficient adjudication of the controversy.

**(e)**     dismiss the Action (including all individual claims and Settlement Class

Claims presented thereby) on the merits and with prejudice, without fees or costs to any party

except as provided in the Settlement Agreement;

**(f)**     incorporate the Release set forth above, make the Release effective as of

the date of the Effective Date, and forever discharge the Released Parties as set forth herein;

(g)     permanently bar and enjoin all Settlement Class Members from filing, commencing, prosecuting, intervening in, or participating (as class members or otherwise) in any lawsuit or other action in any jurisdiction based on the Released Claims;

(h)     without affecting the finality of the Final Judgment for purposes of appeal, retain jurisdiction as to all matters relating to administration, consummation, enforcement, and interpretation of the Settlement Agreement and the Final Judgment, and for any other necessary purpose;

(i)     close the case; and

(j)     incorporate any other provisions, as the Court deems necessary and just, provided that such other provisions do not materially abridge, enlarge or modify any rights or responsibilities of the Released Parties or Settlement Class Members under this Agreement.

## 8.     CLASS COUNSEL'S ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES; INCENTIVE AWARD.

8.1     Defendant agrees that Class Counsel may receive from the Settlement Fund, subject to Court approval, attorneys' fees, costs, and expenses not to exceed $1,250,000. Plaintiff will petition the Court for an award of such attorneys' fees, costs, and expenses, and Defendant agrees to not object to or otherwise challenge, directly or indirectly, Class Counsel's petition for attorneys' fees, costs, and expenses if limited to this amount.  Class Counsel, in turn, agrees to seek no more than this amount from the Court in attorneys' fees, costs, and expenses. Payment of the Fee Award shall be made from the Settlement Fund and should the Court award less than the amount sought by Class Counsel, the difference in the amount sought and the amount ultimately awarded pursuant to this paragraph shall remain in the Settlement Fund for *pro rata* distribution to Settlement Class Members in distributions for Approved Claims.

8.2     The Fee Award shall be payable by the Settlement Administrator within ten (10) business days after entry of the Court's Final Judgment, subject to Class Counsel executing the

Undertaking Regarding Attorneys' Fees and Costs (the "Undertaking") attached hereto as **Exhibit F**, and providing all payment routing information and tax I.D. numbers for Class Counsel.  Payment of the Fee Award shall be made from the Settlement Fund by wire transfer to Bursor & Fisher, P.A., in accordance with wire instructions to be provided by Bursor & Fisher, P.A., and completion of necessary forms, including but not limited to W-9 forms. Notwithstanding the foregoing, if for any reason the Final Judgment is reversed or rendered void as a result of an appeal(s) then Class Counsel shall return such funds to the Defendant. Additionally, should any parties to the Undertaking dissolve, merge, declare bankruptcy, become insolvent, or cease to exist prior to the final payment to Class Members, those parties shall execute a new undertaking guaranteeing repayment of funds within 14 days of such an occurrence.

      **8.3**      Defendant agrees that, subject to Court approval, the Settlement Administrator may pay an Incentive Award to the Class Representative from the Settlement Fund, in addition to any settlement payment as a result of a valid claim pursuant to this Agreement, in the amount of up to five thousand dollars ($5,000.00).  Defendant shall not object to or otherwise challenge, directly or indirectly, Class Counsel's application for the Incentive Award to the Class Representative if limited to this amount.  Class Counsel, in turn, agrees to seek no more than this amount from the Court as the Incentive Award for the Class Representative.  Should the Court award less than this amount, the difference in the amount sought and the amount ultimately awarded pursuant to this paragraph shall remain in the Settlement Fund for *pro rata* distribution to Settlement Class Members in Credit Awards or distributions for Approved Claims.  Such Incentive Award shall be paid from the Settlement Fund (in the form of a check to the Class Representative that is sent care of Class Counsel), within five (5) business days after entry of the

Final Judgment if there have been no objections to the Settlement Agreement, and, if there have

been such objections, within five (5) business days after the Effective Date.

## 9.   CONDITIONS OF SETTLEMENT, EFFECT OF DISAPPROVAL, CANCELLATION OR TERMINATION.

**9.1**      The Effective Date of this Settlement Agreement shall not occur unless and until

ten (10) days after each of the following events occurs and shall be the date upon which the last

(in time) of the following events occurs:

      **(a)**      The Parties and their counsel have executed this Agreement;

      **(b)**      The Court has entered the Preliminary Approval Order;

      **(c)**      The Court has entered an order finally approving the Agreement,

following Notice to the Settlement Class and a Final Approval Hearing, as provided in the

Federal Rules of Civil Procedure, and has entered the Final Judgment, or a judgment consistent

with this Agreement in all material respects; and

      **(d)**      The Final Judgment has become Final, as defined above, or, if the Court

enters an Alternate Judgment, such Alternate Judgment becomes Final.

**9.2**      If some or all of the conditions specified in paragraph 9.1 are not met, or if this

Agreement is not approved by the Court, or the settlement set forth in this Agreement is

terminated or fails to become effective in accordance with its terms, then this Settlement

Agreement shall be canceled and terminated subject to paragraph 6.1 unless Class Counsel and

Defendant's Counsel mutually agree in writing to proceed with this Agreement.  If any Party is

in material breach of the terms hereof, any other Party, provided that it is in substantial

compliance with the terms of this Agreement, may terminate this Agreement on notice to all of

the Settling Parties.  Notwithstanding anything herein, the Parties agree that the Court's failure to

approve, in whole or in part, Class Counsel's request for payment of attorneys' fees, costs and/or

expenses and/or the request for Incentive Award payments set forth in paragraph 8.3 above shall not prevent the Agreement from becoming effective, nor shall it be grounds for termination.

**9.3**      If this Agreement is terminated or fails to become effective for the reasons set forth in paragraphs 6.1 or 6.2 and/or 9.1-9.2 above, the Parties shall be restored to their respective positions in the Action as of the moment just prior to the signing of this Agreement. In such event, any Final Judgment or other order entered by the Court in accordance with the terms of this Agreement shall be treated as vacated, *nunc pro tunc*, and the Parties shall be returned to the *status quo ante* with respect to the Action as if this Agreement had never been entered into.  Within five (5) business days after written notification of termination as provided in this Agreement is sent to the other Parties, the Settlement Fund (including accrued interest thereon), less any Settlement Administration costs actually incurred, paid or payable and less any taxes and tax expenses paid, due or owing, shall be refunded by the Settlement Administrator to Defendant, based upon written instructions provided by Defendant's Counsel.  If the Final Settlement Order and Judgment or any part of it is vacated, overturned, reversed, or rendered void as a result of an appeal, or the Settlement Agreement is voided, rescinded, or otherwise terminated for any other reason, Class Counsel shall, within thirty (30) days repay to Defendant, based upon written instructions provided by Defendant's Counsel, the full amount of the attorneys' fees and costs paid to Class Counsel from the Settlement Fund, including any accrued interest.  If the attorney fees and costs awarded by the Court or any part of them are vacated, modified, reversed, or rendered void as a result of an appeal, Class Counsel shall within thirty (30) days repay to Defendant, based upon written instructions provided by Defendant's Counsel, the attorneys' fees and costs paid to Class Counsel and/or Class Representative from the Settlement Fund, in the amount vacated or modified, including any accrued interest.

## 10.    MISCELLANEOUS PROVISIONS.

**10.1**    The Parties (a) acknowledge that it is their intent to consummate this Settlement Agreement; and (b) agree, subject to their fiduciary and other legal obligations, to cooperate to the extent reasonably necessary to effectuate and implement all terms and conditions of this Agreement, to exercise their reasonable best efforts to accomplish the foregoing terms and conditions of this Agreement, to secure final approval, and to defend the Final Judgment through any and all appeals.  Class Counsel and Defendant's Counsel agree to cooperate with one another in seeking Court approval of the Settlement Agreement, entry of the Preliminary Approval Order, and the Final Judgment, and promptly to agree upon and execute all such other documentation as may be reasonably required to obtain final approval of the Agreement.

**10.2**    The Parties intend this Settlement Agreement to be a final and complete resolution of all disputes between them with respect to the Released Claims by Plaintiffs, the Settlement Class and each or any of them, on the one hand, against the Released Parties, and each or any of the Released Parties, on the other hand.

**10.3**    The Parties have relied upon the advice and representation of counsel, selected by them, concerning their respective legal liability for the claims hereby released.  The Parties have read and understand fully the above and foregoing agreement and have been fully advised as to the legal effect thereof by counsel of their own selection and intend to be legally bound by the same.

**10.4**    Whether or not the Effective Date occurs or the Settlement Agreement is terminated, neither this Agreement nor the settlement contained herein or any term, provision or definition therein, nor any act or communication performed or document executed in the course of negotiating, implementing or seeking approval pursuant to or in furtherance of this Agreement or the settlement:

(a)     is, may be deemed, or shall be used, offered or received in any civil, criminal or administrative proceeding in any court, administrative agency, arbitral proceeding or other tribunal against the Released Parties, or each or any of them, as an admission, concession or evidence of, the validity of any Released Claims, the truth of any fact alleged by the Plaintiff, the deficiency of any defense that has been or could have been asserted in the Action, the violation of any law or statute, the definition or scope of any term or provision, the reasonableness of the settlement amount or the Fee Award, or of any alleged wrongdoing, liability, negligence, or fault of the Released Parties, or any of them.  Defendant, while continuing to deny all allegations of wrongdoing and disclaiming all liability with respect to all claims, considers it desirable to resolve the action on the terms stated herein to avoid further expense, inconvenience, and burden, and therefore has determined that this settlement is in Defendant's best interests.  Any public statements made by Plaintiffs or Class Counsel will be consistent with this paragraph and Class Counsel will not issue any press release concerning this Agreement or the settlement contained herein;

(b)     is, may be deemed, or shall be used, offered or received against any Released Party, as an admission, concession or evidence of any fault, misrepresentation or omission with respect to any statement or written document approved or made by the Released Parties, or any of them;

(c)     is, may be deemed, or shall be used, offered or received against the Released Parties, or each or any of them, as an admission or concession with respect to any liability, negligence, fault or wrongdoing or statutory meaning as against any Released Parties, or supporting the certification of a litigation class, in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal.  However, the settlement, this Agreement, and any acts performed and/or documents executed in furtherance of or pursuant to

this Agreement and/or Settlement may be used in any proceedings as may be necessary to effectuate the provisions of this Agreement.  Further, if this Settlement Agreement is approved by the Court, any Party or any of the Released Parties may file this Agreement and/or the Final Judgment in any action that may be brought against such Party or Parties in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim;

(d)     is, may be deemed, or shall be construed against Plaintiffs, the Settlement Class, the Releasing Parties, or each or any of them, or against the Released Parties, or each or any of them, as an admission or concession that the consideration to be given hereunder represents an amount equal to, less than or greater than that amount that could have or would have been recovered after trial; and

(e)     is, may be deemed, or shall be construed as or received in evidence as an admission or concession against Plaintiffs, the Settlement Class, the Releasing Parties, or each and any of them, or against the Released Parties, or each or any of them, that any of Plaintiffs' claims are with or without merit or that damages recoverable in the Action would have exceeded or would have been less than any particular amount.

**10.5**    The Parties acknowledge that (a) any certification of the Settlement Class as set forth in this Agreement, including certification of the Settlement Class for settlement purposes in the context of Preliminary Approval, shall not be deemed a concession that certification of a litigation class is appropriate, or that the Settlement Class definition would be appropriate for a litigation class, nor would Defendant be precluded from challenging class certification in further proceedings in the Action or in any other action if the Settlement Agreement is not finalized or finally approved; (b) if the Settlement Agreement is not finally approved by the Court for any

reason whatsoever, then any certification of the Settlement Class will be void, the Parties and the Action shall be restored to the status quo ante, and no doctrine of waiver, estoppel or preclusion will be asserted in any litigated certification proceedings in the Action or in any other action; and (c) no agreements made by or entered into by Defendant in connection with the Settlement may be used by Plaintiffs, any person in the Settlement Class, or any other person to establish any of the elements of class certification in any litigated certification proceedings, whether in the Action or any other judicial proceeding.

**10.6**.   No person or entity shall have any claim against the Class Representative, Class Counsel, the Settlement Administrator or any other agent designated by Class Counsel, or the Released Parties and/or their counsel, arising from distributions made substantially in accordance with this Agreement.  The Parties and their respective counsel, and all other Released Parties shall have no liability whatsoever for the investment or distribution of the Settlement Fund or the determination, administration, calculation, or payment of any claim or nonperformance of the Settlement Administrator, the payment or withholding of taxes (including interest and penalties) owed by the Settlement Fund, or any losses incurred in connection therewith.

**10.7**.   All proceedings with respect to the administration, processing and determination of Claims and the determination of all controversies relating thereto, including but not limited to disputed questions of law and fact with respect to the validity of Claims, and the enforcement of the Release and Covenant not to Sue set forth herein, shall be subject to the jurisdiction of the Court, which shall have exclusive jurisdiction to protect and effectuate the Final Order and Judgment.

**10.8**   The headings used herein are used for the purpose of convenience only and are not meant to have legal effect.

**10.9**    The waiver by one Party of any breach of this Agreement by any other Party shall not be deemed as a waiver of any other prior or subsequent breaches of this Agreement.

**10.10**    All of the Exhibits to this Agreement are material and integral parts thereof and are fully incorporated herein by this reference.

**10.11**    This Agreement and its Exhibits set forth the entire agreement and understanding of the Parties with respect to the matters set forth herein, and supersede all prior negotiations, agreements, arrangements and undertakings with respect to the matters set forth herein.  No representations, warranties or inducements have been made to any Party concerning this Settlement Agreement or its Exhibits other than the representations, warranties and covenants contained and memorialized in such documents.  This Agreement may be amended or modified only by a written instrument signed by or on behalf of all Parties or their respective successors-in-interest.

**10.12**    Except as otherwise provided herein, each Party shall bear its own costs.

**10.13**    Plaintiffs represent and warrant that they have not assigned any claim or right or interest therein as against the Released Parties to any other Person or Party and that they are fully entitled to release the same.

**10.14**    Each counsel or other Person executing this Settlement Agreement, any of its Exhibits, or any related settlement documents on behalf of any Party hereto, hereby warrants and represents that such Person has the full authority to do so and has the authority to take appropriate action required or permitted to be taken pursuant to the Agreement to effectuate its terms.

**10.15**    This Agreement may be executed in one or more counterparts.  Signature by digital means, facsimile, or in PDF format will constitute sufficient execution of this Agreement. All executed counterparts and each of them shall be deemed to be one and the same instrument.

A complete set of original executed counterparts shall be filed with the Court if the Court so requests.

**10.16**   This Settlement Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the Parties hereto and the Released Parties.

**10.17**   The Court shall retain jurisdiction with respect to implementation and enforcement of the terms of this Agreement, and all Parties hereto submit to the jurisdiction of the Court for purposes of implementing and enforcing the settlement embodied in this Agreement.

**10.18**   This Settlement Agreement shall be governed by and construed in accordance with the substantive laws of the State of New York without giving effect to its conflict of laws provisions.

**10.19**   This Agreement is deemed to have been prepared by counsel for all Parties, as a result of arm's-length negotiations among the Parties.  Because all Parties have contributed substantially and materially to the preparation of this Agreement, it shall not be construed more strictly against one Party than another.

**10.20**   Where this Agreement requires notice to the Parties, such notice shall be sent to the undersigned counsel:  Frederick J. Klorczyk III, Bursor & Fisher, P.A., 888 Seventh Avenue, New York, NY 10019, fklorczyk@bursor.com; Kristen Rodriguez, Dentons US LLP, 1900 K Street NW, Washington DC 20006, kristen.rodriguez@dentons.com; Dana R. Green, Counsel, The New York Times Company, Legal Department, 620 8th Avenue, New York, NY 10018, dana.green@nytimes.com.

**IT IS SO AGREED TO BY THE PARTIES**:


Dated: March 30, 2021                     **MARIBEL MOSES**

                                          By: *Maribel Moses*
                                          Maribel Moses, individually and as representative
                                          of the Class


Dated: March__, 2021                      **THE NEW YORK TIMES COMPANY**


                                          By:_____


**IT IS SO STIPULATED BY COUNSEL:**


Dated: March __, 2021                     **BURSOR & FISHER, P.A.**


                                          By: _____
                                                 Frederick J. Klorczyk III


Dated: March__, 2021                      **DENTONS US LLP**


                                          By:_____
                                                 Kristen C. Rodriguez

**IT IS SO AGREED TO BY THE PARTIES**:


Dated: March__, 2021                    **MARIBEL MOSES**


                                        By:_____
                                        Maribel Moses, individually and as representative
                                        of the Class


Dated: March 30 2021                    **THE NEW YORK TIMES COMPANY**

                                             *David McCraw*
                                        By:_____

**IT IS SO STIPULATED BY COUNSEL:**


Dated: March __, 2021                   **BURSOR & FISHER, P.A.**


                                        By: _____
                                             Frederick J. Klorczyk III


Dated: March__, 2021                    **DENTONS US LLP**


                                        By:_____
                                             Kristen C. Rodriguez

**IT IS SO AGREED TO BY THE PARTIES**:


Dated: March__, 2021                    **MARIBEL MOSES**


                                        By:_____
                                        Maribel Moses, individually and as representative
                                        of the Class


Dated: March__, 2021                    **THE NEW YORK TIMES COMPANY**


                                        By:_____

**IT IS SO STIPULATED BY COUNSEL:**


Dated: March 30, 2021                   **BURSOR & FISHER, P.A.**


                                        By: _____
                                             Frederick J. Klorczyk III


Dated: March 30, 2021                   **DENTONS US LLP**


                                        By:_____
                                             Kristen C. Rodriguez

**EXHIBIT A**

## <u>NEW YORK TIMES SETTLEMENT CLAIM FORM</u>

**THIS CLAIM FORM MUST BE SUBMITTED ONLINE OR POSTMARKED BY [_____], 2021 AND MUST BE FULLY COMPLETED, BE SIGNED, AND MEET ALL CONDITIONS OF THE SETTLEMENT AGREEMENT.**

## Instructions: Fill out each section of this form and sign where indicated.

First Name:_____ Last Name: _____

Address: _____

City: _____ State: _____ Zip Code: _____

If you received notice of the Settlement by e-mail or mail, please provide the Class Member ID from the notice:

_____ _____ _____ _____ _____ _____ _____

**Address Associated With Your Subscription(s) To NYT (if different than above)**

Street Address: _____

City: _____ State:_____ Zip Code: _____

Email Address (associated with NYT Subscription): _____

Contact Phone #: (_____) _____–_____ (You may be contacted if further information is required.)

<u>Class Member Verification:</u> By submitting this Claim Form and checking the boxes below, I declare that I believe I am a member of the Settlement Class and that the following statements are true (each box must be checked to receive a payment):

☐ I enrolled in an automatically renewing NYT Subscription directly through NYT using a California billing or delivery address on or after June 17, 2016 and was charged and paid a renewal fee(s) in connection with such subscription.

☐ I have not filed or submitted an Opt-Out or requested to be excluded from this Settlement.

☐ I have not submitted any other Claim for the same subscription and have not authorized any other person or entity to do so, and know of no other person or entity having done so on my behalf. If I maintained subscription(s) jointly with any other person or entity, only one Claim has or will be submitted per subscription.

☐ Under penalty of perjury, all information in this Claim Form is true and correct to the best of my knowledge and belief.

Signature: _____ Print Name: _____

Date:_____/_____/ _____

Before you complete and submit this Claim Form by mail or online, you should read and be familiar with the information contained in this notice and available at: www.CArenewalsettlementNYT.com.

The Settlement Administrator will review your Claim Form; you may be required to submit additional documentation to validate your claim. If accepted, you will be mailed a check for a *pro rata* share of the Settlement Fund. This process takes time, please be patient.

**Questions? Visit www.CArenewalsettlementNYT.com or call 1-800-555-5555.**

**EXHIBIT B**

**LEGAL NOTICE**

# If You Were Automatically Billed For A New York Times Subscription After June 17, 2016, You May Benefit From A Proposed Class Action Settlement

*Moses v. The New York Times Company*, Case No. 1:20-cv-04658-RA (S.D.N.Y.)

**WHAT IS THIS NOTICE ABOUT?**

A Proposed Settlement has been reached in a class action lawsuit in the United States District Court, Southern District of New York, (the "Action") against The New York Times Company ("NYT") that may affect your rights. California subscribers to NYT's digital, print, and standalone subscription offerings (the "NYT Subscriptions") allege that NYT automatically renewed their subscriptions and charged their payment methods without first providing certain disclosures and obtaining the requisite authorizations, in violation of California law. NYT denies these claims. The Court has not ruled in favor of Plaintiff or NYT. Instead, the parties agreed to a Proposed Settlement to avoid the expense and risks of continuing the lawsuit.

**AM I A MEMBER OF THE CLASS?**

The class is defined as all persons who, from June 17, 2016, to and through [_____], 2021, enrolled in an automatically renewing NYT Subscription directly through NYT using a California billing and/or delivery address, and who are charged and paid an automatic renewal fee(s) in connection with such subscription.

**WHAT DOES THE SETTLEMENT PROVIDE?**

Subject to Court approval, the parties have agreed to a Settlement under which NYT will provide class members with a total value of $5,563,000 in cash and non-cash benefits. You may either (1) do nothing and receive an Automatic Access Code for one month of free access to certain NYT digital subscriptions that normally require a paid subscription, with no expectation or obligation to continue using the services beyond the free period, or (2) submit a valid claim and obtain a prorated cash payment, which Class Counsel estimates to be $5 based on existing claims rates. The claim amount may be subject to *pro rata* increase or decrease depending on the number of claims submitted.

**WHAT ARE MY RIGHTS?**

You have a choice of whether to stay in the Class or not, and you must decide this now. If you stay in the Class, you will be legally bound by all orders and judgments of the Court, and you won't be able to sue, or continue to sue, NYT as part of any other lawsuit involving the same facts or claims that are in this lawsuit. This is true even if you do nothing by not submitting a claim.

1. File a Claim and Receive Cash. Class Members who wish to receive cash **must** make an election to receive cash by submitting a valid Claim Form to the Settlement Administrator by [_____], 2021. You can get a Claim Form on the Internet at www.CArenewalsettlementNYT.com. Read the instructions carefully, fill out the form, and submit it online on or before [_____], 2021. Alternatively, you may also submit a Claim Form by mailing it to the following address: [_____]. It must be postmarked no later than [_____], 2021.

2. Do Nothing and Receive Automatic Access Codes. Class Members who do nothing will receive an Automatic Access Code for one month of free use of certain NYT subscriptions. If your NYT Subscription was active as of [_____], 2021, you will receive an Automatic Access Code for a free one-month NYT Digital Product Subscription (*e.g.*, Cooking, Crosswords) to which you do not currently subscribe. If you were entitled to receive all of NYT's digital subscription offerings as of [_____], you will receive a free one-month NYT Basic Digital Access Subscription that you can share with friends or family. If your subscription was inactive as of [_____], 2021, you will receive an Automatic Access Code for a free one-month NYT Basic Digital Access Subscription.

3. You Can Object to the Settlement. If you believe the Settlement is unsatisfactory, you may file a written objection with the Clerk of the Court for the Southern District of New York and send copies to the following Counsel representing the Class and NYT:

| Plaintiff's Counsel | NYT's Counsel |
|---|---|
| Frederick J. Klorczyk III | Sandra D. Hauser |
| Neal J. Deckant | Natalie J. Spears |
| Bursor & Fisher, P.A. | Kristen C. Rodriguez |
| 888 Seventh Avenue | Dentons US LLP |
| New York, NY 10019 | 233 S. Wacker Drive |
| | Suite 5900 |
| | Chicago, IL 60606 |

4. You Can "Opt Out" of the Settlement. If you exclude yourself from the Class – which is sometimes called "opting-out" of the Class – you won't get any Settlement Benefits from the Proposed Settlement. You will also be responsible for any attorney's fees and costs you incur if you choose to pursue your own lawsuit. Such notice shall include your name, current address, signature, and a statement that you want to be excluded from *Moses v. The New York Times Company*, Case No. 1:20-cv-04658-RA (S.D.N.Y.), no later than [_____], 2021. Send the written notice to [_____].

THE FAIRNESS HEARING

On [_____], 2021, at [_____], the Court will hold a hearing in the United States District Court for the Southern District of New York to determine: (1) whether the Proposed Settlement is fair, reasonable, and adequate and should receive final approval; and (2) whether the application for Plaintiff's attorneys' fees of up to $1,250.000.00, inclusive of reimbursement of out-of-pocket expenses, should be granted. Objections to the Proposed Settlement by Class Members will be considered by the Court, but only if such objections are filed in writing with the Court and sent to Plaintiff's and NYT's counsel by [_____], 2021, as explained above. Class Members who support the Proposed Settlement do not need to appear at the hearing or take any other action to

indicate their approval.  You may hire your own lawyer to appear in Court for you if you wish; however, if you do, you will be responsible for paying that lawyer on your behalf.

**HOW CAN I GET MORE INFORMATION?**

If you have questions or want a detailed notice or other documents about this lawsuit and your rights, visit the website at www.CArenewalsettlementNYT.com.  You may also contact the Settlement Administrator by email at [            ], or by writing to: [            ].

By order of the United States District Court for the Southern District of New York.

**EXHIBIT C**

**COURT AUTHORIZED NOTICE OF CLASS ACTION AND PROPOSED SETTLEMENT**

Moses v. The New York Times Company

P.O. Box ####

City, State ZIP CODE

FIRST CLASS MAIL
U.S. POSTAGE PAID
CITY, ST
PERMIT NO. XXXX

OUR RECORDS INDICATE YOU WERE CHARGED AND PAID AN AUTOMATIC RENEWAL FEE BY THE NEW YORK TIMES. YOU MAY BENEFIT FROM A CLASS ACTION SETTLEMENT.

By Order of the Court
Dated: [＿＿＿], 2021

Postal Service: Please do not mark barcode
<<Barcode>>

Active Class Member ID: <<Refnum>>

<<FirstName>> <<LastName>>
<<BusinessName>>
<<Address>>
<<Address2>>
<<City>>, <<ST>> <<Zip>>-<<zip4>>

[[POSTAL CODE AREA]]

A proposed settlement has been reached in a class action lawsuit alleging that Defendant The New York Times Company ("NYT") unlawfully charged its customers automatic renewal fees in violation of a California subscription automatic renewal law. NYT denies the terms of the lawsuit and contends that it did not do anything wrong. The Court did not resolve the claims and defenses raised in this action. Nor has the Court determined that NYT did anything wrong. The parties have agreed to settle the dispute to avoid the cost and risk of a trial.

**Am I a Class Member?** Our records indicate that you have an **active** automatic renewal subscription with NYT and may be a Class Member. Class Members are all persons who, from June 17, 2016, to and through [_____], 2021, enrolled in an NYT Subscription directly through NYT using a California billing and/or delivery address, and who were charged and paid an automatic renewal fee(s) in connection with such subscription.

**What Can I Get?** If approved by the Court, the Settlement will provide $5,563,000 in cash and non-cash benefits to the Settlement Class, including payment of all claims, all notice and administration expenses, approved attorneys' fees and costs, and an incentive award to the named plaintiff. Once the Settlement becomes Final, you may submit a valid claim and receive a *pro rata* cash payment from the Settlement Fund, which Class Counsel estimates to be $5 based on expected claims rates. Alternatively, if you do nothing, and as long as you don't exclude yourself from the Settlement Class, you will receive an Automatic Access Code for a free one-month NYT Digital Product Subscription (*e.g.*, NYT Cooking, NYT Crosswords) to which you do not currently subscribe, with no expectation or obligation to continue using or paying for the services beyond the free period. For those Class Members who are entitled to receive all of NYT's digital subscription offerings, you will receive an Automatic Access Code for a free one-month NYT Basic Digital Access Subscription that you can share with friends or family, with no expectation or obligation to continue using or paying for the services beyond the free period.

**How Do I Get My Payment?** Class Members who wish to receive cash **must** make an election to receive cash by submitting a valid Claim Form to the Settlement Administrator by [_____], 2021. If you fail to submit a timely Claim Form electing to receive cash and do not exclude yourself from the Settlement, then you will be provided with an Automatic Access Code for a free one-month NYT Digital Product Subscription to which you do not currently subscribe. You do not need to do anything to receive an Automatic Access Code.

**What are My Other Options?** You may exclude yourself from the Settlement Class by sending a letter to the Settlement Administrator, **postmarked no later than [_____], 2021**. If you exclude yourself, you cannot get a settlement cash payment or an Automatic Access Code, but you keep any rights you may have to sue NYT over the legal issues in the lawsuit. If you don't exclude yourself from the Settlement Class, then you and/or your lawyer also have the right to appear before the Court, at your own cost, to object to the proposed settlement, if you wish to do so, but you don't have to. **Your written objection must be filed and postmarked no later than [_____], 2021**. Specific instructions about how to object to, or exclude yourself from, the Settlement are available at **www.CArenewalsettlementNYT.com.** If you do nothing, and the Court approves the Settlement, you will be bound by all of the Court's orders and judgments, and your claims relating to the fees charged by NYT will be released.

**Who Represents Me?** The Court has appointed Bursor & Fisher, P.A. to represent the class. These attorneys are called Class Counsel. You will not be charged for these lawyers. If you want to be represented by your own lawyer in this case, you may hire one at your own expense.

**When Will the Court Consider the Proposed Settlement?** The Court will hold the Final Approval Hearing at **[____] p.m. on [_____], 2021** at the Thurgood Marshall United States Courthouse, Courtroom 1506, 40 Foley Square, New York, NY 10007. At that hearing, the Court will: hear any objections concerning the fairness of the Settlement; determine the fairness of the Settlement; decide whether to approve Class Counsel's request for attorneys' fees and costs; and decide whether to award the Class Representative up to $5,000 from the Settlement Fund for her services in helping to bring and settle this case. NYT has agreed that Class Counsel may be paid attorneys' fees out of the Settlement Fund in an amount to be determined by the Court. Class Counsel is entitled to seek no more than $1,250,000.00 but the Court may award less than this amount.

**How Do I Get More Information?** This is only a summary. For more information, including the full Notice, Claim Form and Settlement Agreement go to: www.CAReadsSettlement.com, contact the Settlement Administrator at 1-[TOLL-FREE-NUMBER], or call or write to Casey v. The New York Times Company, c/o Settlement Administrator, PO Box ####, [City, State ZIP].

**EXHIBIT D**

**COURT AUTHORIZED NOTICE OF CLASS ACTION AND PROPOSED SETTLEMENT**

Moses v. The New York Times Company
P.O Box ####
City, State ZIP CODE

FIRST-CLASS MAIL
U.S. POSTAGE PAID
CITY, ST
PERMIT NO. XXXX

OUR RECORDS INDICATE YOU WERE CHARGED AND PAID AN AUTOMATIC RENEWAL FEE BY THE NEW YORK TIMES. YOU MAY BENEFIT FROM A CLASS ACTION SETTLEMENT.

By Order of the Court
Dated: [＿＿＿], 2021

Postal Service: Please do not mark barcode
<<Barcode>>

Inactive Class Member ID: <<Refnum>>

<<FirstName>> <<LastName>>
<<BusinessName>>
<<Address>>
<<Address2>>
<<City>>, <<ST>> <<Zip>>-<<zip4>>

[[POSTAL CODE AREA]]

A proposed settlement has been reached in a class action lawsuit alleging that Defendant The New York Times Company ("NYT") unlawfully charged its California customers for automatic renewal fees in connection with their NYT subscriptions without providing the disclosures required by California law. NYT denies the claims in the lawsuit and contends that it did not do anything wrong. The Court did not resolve the claims and defenses raised in this action. Nor has the Court determined that NYT did anything wrong. The parties have agreed to settle the dispute to avoid the cost and risk of a trial.

**Am I a Class Member?** Our records indicate that as of [_____] you *formerly* had an automatic renewal subscription with NYT and may be a Class Member. Class Members are persons who from June 17, 2016, to and through [_____] enrolled in an NYT Subscription directly through NYT using a California billing and/or delivery address, and who were charged and paid an automatic renewal fee(s) in connection with such subscription.

**What Can I Get?** If approved by the Court, the Settlement will provide $5,563,000 in cash and non-cash benefits to the Settlement Class, including payment of all claims, all notice and administration expenses, approved attorneys' fees and costs, and an incentive award to the named plaintiff. Once the Settlement becomes Final, you may submit a valid claim and receive a *pro rata* cash payment from the Settlement Fund, which Class Counsel estimates to be $5 based on expected claims rates. Alternatively, if you do nothing, and as long as you don't exclude yourself from the Settlement Class, you will receive an Automatic Access Code for a free one-month NYT Basic Digital Access Subscription, with no expectation or obligation to continue using or paying for the services beyond the free period.

**How Do I Get My Payment?** Class Members who wish to receive cash **must** make an election to receive cash by submitting a valid Claim Form to the Settlement Administrator by [_____], 2021. If you fail to submit a timely Claim Form electing to receive cash and do not exclude yourself from the Settlement, then you will be provided an Automatic Access Code for a free one-month Basic Digital Access Subscription to *The New York Times*. You do not need to do anything to receive an Automatic Access Code.

**What are My Other Options?** You may exclude yourself from the Settlement Class by sending a letter to the Settlement Administrator, **postmarked no later than [_____], 2021**. If you exclude yourself, you cannot get a settlement cash payment or an Automatic Access Code, but you keep any rights you may have to sue NYT over the legal issues in the lawsuit. If you don't exclude yourself from the Settlement Class, then you and/or your lawyer also have the right to appear before the Court, at your own cost, to object to the proposed settlement, if you wish to do so, but you don't have to. **Your written objection must be filed and postmarked no later than [_____], 2021**. Specific instructions about how to object to, or exclude yourself from, the Settlement are available at **www.CArenewalsettlementNYT.com.** If you do nothing, and the Court approves the Settlement, you will be bound by all of the Court's orders and judgments, and your claims relating to the fees charged by NYT will be released.

**Who Represents Me?** The Court has appointed Bursor & Fisher, P.A. to represent the class. These attorneys are called Class Counsel. You will not be charged for these lawyers. If you want to be represented by your own lawyer in this case, you may hire one at your expense.

**When Will the Court Consider the Proposed Settlement?** The Court will hold the Final Approval Hearing at **[____] p.m. on [_____], 2021** at the Thurgood Marshall United States Courthouse, Courtroom 1506, 40 Foley Square, New York, NY 10007. At that hearing, the Court will: hear any objections concerning the fairness of the Settlement; determine the fairness of the Settlement; decide whether to approve Class Counsel's request for attorneys' fees and costs; and decide whether to award the Class Representative up to $5,000 from the Settlement Fund for her services in helping to bring and settle this case. NYT has agreed that Class Counsel may be paid attorneys' fees out of the Settlement Fund in an amount to be determined by the Court. Class Counsel is entitled to seek no more than $1,250,000.00 but the Court may award less than this amount.

**How Do I Get More Information?** This is only a summary. For more information, including the full Notice, Claim Form and Settlement Agreement go to: **www.CArenewalsettlementNYT.com**, contact the Settlement Administrator at **1-[TOLL-FREE-NUMBER]** or Moses v. The New York Times Company, c/o Settlement

Administrator, PO Box ####, [City, State ZIP].

**EXHIBIT E**

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK
*Moses v. The New York Times Company*, Case No. 1:20-cv-04658-RA

**IF YOU WERE AUTOMATICALLY BILLED FOR A NEW YORK TIMES SUBSCRIPTION AFTER JUNE 17, 2016, YOU MAY BENEFIT FROM A PROPOSED CLASS ACTION SETTLEMENT**

*A federal court authorized this notice. This is not a solicitation from a lawyer.*

- A Proposed Settlement has been reached in a class action lawsuit against The New York Times Company ("Defendant" or "NYT"). The class action lawsuit alleges that NYT automatically renewed its customers' digital, print, and standalone subscription offerings (the "NYT Subscriptions") and charged customers' payment methods without providing the disclosures and authorizations required by California law. NYT denies these claims. The Court has not ruled in favor of Plaintiff or NYT. Instead, the parties agreed to a Proposed Settlement to avoid the expense and risks of continuing the lawsuit.

- The class is defined as all persons who, from June 17, 2016, to and through [_____], enrolled in an automatically renewing NYT Subscription directly through NYT using a California billing and/or delivery address, and who were charged and paid an automatic renewal fee(s) in connection with such subscription.

- Those included in the Settlement will be entitled to receive Automatic Access Code(s) for a free one-month digital NYT Subscription or, at their election, a *pro rata* (meaning proportional) cash payment from the Settlement Fund, which Class Counsel estimates to be $5 based on expected claims rates.

- Class members wishing to receive cash must make an election to receive cash by submitting a valid Claim Form to the Settlement Administrator. Class members who neither submit a valid Claim Form nor exclude themselves from the Settlement will receive Automatic Access Codes for one month of free access to select NYT digital products and services that normally require a paid subscription, with no expectation or obligation to continue using the services beyond the free period. The type of NYT Subscription a particular class member is eligible to receive depends on whether his or her NYT Subscription was active or inactive as of [_____], 2021.

- Read this Notice carefully. Your legal rights are affected whether you act or don't act.

QUESTIONS? CALL 1-XXX-XXX-XXXX TOLL FREE, OR VISIT
WWW.CArenewalsettlementNYT.COM

**YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT**

| DO NOTHING | If you have an **<u>active</u>** NYT Subscription and do not submit a timely Claim Form electing to receive cash or exclude yourself from the Settlement, once the Settlement becomes Final, you will receive an Automatic Access Code for a free one-month NYT Digital Product Subscription (*e.g.*, Cooking, Crosswords) to which you do not currently subscribe, with no expectation or obligation to continue using or paying the services beyond the free period. If you are entitled to receive **<u>all</u>** of NYT's digital subscription offerings and do not submit a timely Claim Form electing to receive cash or exclude yourself from the Settlement, once the Settlement becomes Final, you will receive an Automatic Access Code for a free one-month NYT Basic Digital Access Subscription to be shared with friends or family, with no expectation or obligation to continue using or paying the services beyond the free period. |
|---|---|
| | If you have an **<u>inactive</u>** NYT Subscription and do nothing, you will automatically receive an Automatic Access Code for a free one-month NYT Basic Digital Access Subscription, with no expectation or obligation to continue using or paying the services beyond the free period. |
| | Alternatively, regardless of whether your NYT Subscription was active or inactive as of [_____], 2021, you may file a claim that will, if valid, entitle you to receive prorated cash payment(s) from the Settlement Fund in the form of a check, issued and mailed by the Settlement Administrator. |

| **SUBMIT A CLAIM FORM BY [_____], 2021** | To receive cash, you **must** make an election to receive cash by submitting a valid Claim Form to the Settlement Administrator by [_____], 2021. |
|---|---|
| **EXCLUDE YOURSELF FROM THE CLASS BY [_____], 2021** | You will receive no benefits, but you will retain any rights you currently have to sue NYT about the alleged claims in this case. Excluding yourself is the only option that allows you to ever bring or maintain your own lawsuit against NYT regarding the allegations in this case ever again. |
| **OBJECT BY [_____], 2021** | Write to the Court explaining why you don't like the Settlement and think it shouldn't be approved. Filing an objection does not exclude you from the Settlement. |

These rights and options—**and the deadlines to exercise them**—are explained in this Notice.

The Court in charge of this action has preliminarily approved the Settlement as fair, reasonable, and adequate, and must decide whether to give final approval to the Settlement. The relief provided to Class Members will be provided only if the Court gives final approval to the Settlement and, if there are any appeals, after the appeals are resolved in favor of the Settlement. ***Please be patient***.

BASIC INFORMATION

**1. Why was this Notice issued?**

The Court authorized this Notice because you have a right to know about a proposed Settlement of this class action lawsuit and about all of your options, before the Court decides whether to give final approval to the Settlement. This Notice explains the lawsuit, the Settlement, and your legal rights.

The Honorable Ronnie Abrams, of the U.S. District Court for the Southern District of New York, is overseeing this case. The case is called *Moses v. The New York Times Company*, Case No. 1:20-cv-04658-RA. The person who sued is called the Plaintiff. The Defendant is The New York Times Company.

**2. What is a class action?**

In a class action, one or more people called class representatives (in this case, Maribel Moses) sue on behalf of a group or a "class" of people who have similar claims. In a class action, the court resolves the issues for all class members, except for those who exclude themselves from the Class.

### 3. What is this lawsuit about?

This lawsuit claims that NYT violated California law by automatically renewing its customers' subscriptions and charging customers' payment methods without first providing certain disclosures and obtaining the requisite authorizations. NYT denies the claims in the lawsuit and contends that it did not do anything wrong and denies that class certification is warranted or appropriate. The Court did not resolve the claims and defenses raised in this action. Nor has the Court determined that NYT did anything wrong or that this matter should be certified as a class action except if the Settlement is fully approved by the Court. Rather, the Parties have, without admitting liability, agreed to settle the lawsuit to avoid the uncertainties and expenses associated with ongoing litigation.

### 4. Why is there a Settlement?

The Court has not decided whether the Plaintiff or NYT should win this case. Instead, both sides agreed to a Settlement. That way, they avoid the uncertainties and expenses associated with ongoing litigation, and Class Members will get compensation sooner rather than, if at all, after the completion of a trial.

**The issuance of this Notice is not an expression of the Court's opinion on the merit or the lack of merit of the Representative Plaintiff's claims or the defenses in the lawsuit. Both parties recognize that to resolve the issues raised in the lawsuit would be time-consuming, uncertain, and expensive.**

### WHO'S INCLUDED IN THE SETTLEMENT?

### 5. How do I know if I am in the Settlement Class?

The Court decided that everyone who fits the following description is a member of the **Settlement Class**:

All persons who from June 17, 2016, to and through [⬛⬛⬛⬛⬛⬛] enrolled in a NYT Subscription using a California billing address and/or delivery zip code with Defendant and who's payment methods were directly billed by NYT in connection with such subscription

### THE SETTLEMENT BENEFITS

### 6. What does the Settlement provide?

*Monetary Relief*: A Settlement Fund has been created with a value of approximately $5,563,000, consisting of $1,650,000 in cash benefits and approximately $3,913,000 in Automatic Access Codes. The Settlement Fund Class Member payments, as well as the cost to administer the Settlement, the cost to inform people about the Settlement, attorneys' fees, and an award to the Class Representative, will come out of this fund (*see* Question 12).

*Prospective Relief*: NYT has agreed to revise the presentation and wording of the automatic renewal terms on its checkout pages in its mobile and desktop platforms and in its direct mail offers to be consistent with the requirements of Cal. Bus. & Prof. Code § 17602(a)(1)-(2). NYT has further agreed to provide consumers who submit a new order for an automatically renewing subscription with an acknowledgment that includes the automatic renewal terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, consistent with Bus. & Prof. Code § 17602(c).

A detailed description of the Settlement benefits can be found in the Settlement Agreement which can be found in the 'Documents' section of the website.

## 7. How can I get a payment from the Settlement?

Once the Settlement becomes Final, each class member is eligible to receive an access code for free use of certain digital NYT subscriptions, or submit a valid claim and receive a *pro rata* cash payment from the Settlement Fund, which Class Counsel estimates to be $5 based on expected claims rates.

If you do not submit a valid Claim Form by the claims deadline, and as long as you don't exclude yourself from the Settlement Class, you will receive an Automatic Access Code for free use of certain digital NYT subscriptions that normally require a paid subscription, with no expectation or obligation to continue using the services beyond the free period.  If you have an **active** NYT Subscription and do nothing, you will receive an Automatic Access Code for a free one-month NYT Digital Product Subscription (*e.g.*, Cooking, Crosswords) to which you do not currently subscribe. If you are entitled to receive **all** of NYT's digital subscription offerings and do nothing, you will receive an Automatic Access Code for a free one-month NYT Basic Digital Access Subscription to be shared with friends or family. If you have an **inactive** NYT Subscription and do nothing, you will receive Automatic Access Code for a free one-month NYT Basic Digital Access Subscription.

If you wish to receive cash, you **must** make an election to receive cash by submitting a valid Claim Form to the Settlement Administrator by [_____], 2021.  Claim Forms can be found and submitted on-line or you may have received a Claim Form in the mail as a postcard attached to a summary of this Notice.

To submit a Claim Form on-line or to request a paper copy, go to www.CArenewalsettlementNYT.com.

## 8. When will I get my payment?

The hearing to consider the fairness of the settlement is scheduled for [_____], **2021**. If the Court approves the Settlement, eligible Class Members whose claims were approved by the Settlement Administrator will receive their payment after the Settlement has been finally approved and/or after any appeals process is complete. Class Members who do nothing will automatically receive their settlement benefits in the form of the free Automatic Access Code. Class members who submit valid Claims Forms by the by the claims deadline will receive their payment in the form of a check, and all checks will expire and become void 180 days after they are issued.

REMAINING IN THE SETTLEMENT

### 9. What am I giving up if I stay in the Class?

If the Settlement becomes final, you will give up your right to sue NYT and other Released Parties for the claims being resolved by this Settlement. The specific claims you are giving up against NYT are described in the Settlement Agreement. You will be "releasing" NYT and certain of its affiliates, employees and representatives as described in Section 3.2 of the Settlement Agreement. Unless you exclude yourself (*see* Question 13), you are "releasing" the claims, regardless of whether you submit a claim or not. The Settlement Agreement is available through the "Documents" section of the website.

The Settlement Agreement describes the released claims with specific descriptions, so read it carefully. If you have any questions you can talk to the lawyers listed in Question 11 for free, or you can talk to your own lawyer if you have questions about what this means.

### 10. What happens if I do nothing at all?

If you have an **active** NYT Subscription and do nothing, you will receive an Automatic Access Code for a free one-month NYT Digital Product Subscription (e.g., Cooking, Crosswords) to which you do not currently subscribe. If you are entitled to receive **all** of NYT's digital subscription offerings, you will receive an Automatic Access Code for a free one-month NYT Basic Digital Access Subscription to be shared with friends or family. If you have an **inactive** NYT Subscription and do nothing, you will receive an Automatic Access Code for a free one-month NYT Basic Digital Access Subscription.

Automatic Access Codes will be issued in such a manner that they: (i) will not expire for at least 50 years ; (ii) will be freely transferrable, subject to reasonable measures to prevent fraud, duplicating, or counterfeiting of vouchers (including but not limited to requirements concerning printing and authentication, and use of serial numbers, UPC coding, specialized ink and/or paper, watermarks, and/or holograms, and/or physical delivery-all subject to specification by Defendant); (iii) will be redeemable exclusively online, for exclusively digital subscriptions; and (iv) will be redeemable in exchange for certain NYT subscriptions, including a free one-month NYT Digital Product Subscription (for class members with active NYT Subscriptions) and a free one-month NYT Basic Digital Access Subscription (for class members with inactive NYT Subscriptions). Automatic Access Codes may not be used to pay for an existing NYT Subscription.

Automatic Access Codes will be distributed to you after the deadline to appeal the Settlement Approval Order and Final Judgment has passed, assuming no appeal is filed.

THE LAWYERS REPRESENTING YOU

### 11. Do I have a lawyer in the case?

The Court has appointed Bursor & Fisher, P.A to be the attorneys representing the Settlement Class. They are called "Class Counsel." They believe, after conducting an extensive investigation, that the Settlement Agreement is fair, reasonable, and in the best

interests of the Settlement Class. You will not be charged for these lawyers. If you want to be represented by your own lawyer in this case, you may hire one at your expense.

## 12. How will the lawyers be paid?

Any Class Counsel attorneys' fees and costs awarded by the Court will be paid out of the Settlement Fund in an amount to be determined by the Court. The fee petition will seek no more than $1,250,000.00; the Court may award less than this amount. Under the Settlement Agreement, any amount awarded to Class Counsel will be paid out of the Settlement Fund.

Subject to approval by the Court, the Class Representative may be paid up to $5,000 from the Settlement Fund.

### EXCLUDING YOURSELF FROM THE SETTLEMENT

## 13. How do I get out of the Settlement?

To exclude yourself from the Settlement, you must mail or otherwise deliver a written request for exclusion stating that <u>you want to be excluded</u> from the *Moses v. The New York Times Company*, Case No. 1:20-cv-04658-RA Settlement. Your letter or request for exclusion must also include your name, your address, your signature, the name and number of this case, and a statement that you wish to be excluded. You must mail or deliver your exclusion request postmarked no later than **[_____], 2021**, to:

Moses v. The New York Times Company
c/o Settlement Administrator
PO Box ####
City, State ZIP CODE

## 14. If I don't exclude myself, can I sue NYT for the same thing later?

No. Unless you exclude yourself, you give up any right to sue NYT for the claims being resolved by this Settlement.

## 15. If I exclude myself, can I get anything from this Settlement?

No. If you exclude yourself, you will not receive any settlement benefits.

### OBJECTING TO THE SETTLEMENT

## 16. How do I object to the Settlement?

If you are a Class Member and do not exclude yourself from the Settlement Class, you can object to the Settlement if you don't like any part of it. You can give reasons why you think the Court should not approve it. The Court will consider your views. To object, you must file with the Court a letter or brief stating that you object to the Settlement in *Moses v. The New York Times Company*, Case No. 1:20-cv-04658-RA and identify all your reasons for your objections (including citations and supporting evidence) and attach any materials you

rely on for your objections. Your letter or brief must also include your name, your address, the basis upon which you claim to be a Class Member, the name and contact information of any and all attorneys representing, advising, or in any way assisting you in connection with your objection, and your signature. If you, or an attorney assisting you with your objection, have ever objected to any class action settlement where you or the objecting attorney has asked for or received payment in exchange for dismissal of the objection (or any related appeal) without modification to the settlement, you must include a statement in your objection identifying each such case by full case caption. You must also mail or deliver a copy of your letter or brief to Class Counsel and NYT's Counsel listed below.

Class Counsel will file with the Court and post on the website its request for attorneys' fees on or about [**_____**], **2021**.

If you want to appear and speak at the Final Approval Hearing to object to the Settlement, with or without a lawyer (explained below in answer to Question Number 20), you must say so in your letter or brief and file the objection with the Court and mail a copy to these two different places postmarked no later than [**_____**], **2021**. **IF YOU DO NOT TIMELY MAKE YOUR OBJECTION, YOU WILL BE DEEMED TO HAVE WAIVED ALL OBJECTIONS AND WILL NOT BE ENTITLED TO SPEAK AT THE FAIRNESS HEARING.**

| Court | Plaintiff's Counsel | NYT's Counsel |
|---|---|---|
| The Honorable Ronnie Abrams United States District Court for the Southern District of New York 40 Foley Square, Room 1506 New York, NY 10007 | Frederick J. Klorczyk III Neal J. Deckant Bursor & Fisher, P.A. 888 Seventh Avenue New York, NY 10019 | Sandra D. Hauser Natalie J. Spears Kristen C. Rodriguez Dentons US LLP 233 S. Wacker Drive, Suite 5900 Chicago, IL 60606 |

**17. What's the difference between objecting and excluding myself from the Settlement?**

Objecting simply means telling the Court that you don't like something about the Settlement. You can object only if you stay in the Class. Excluding yourself from the Class is telling the Court that you don't want to be part of the Class. If you exclude yourself, you have no basis to object because the Settlement no longer affects you.

THE COURT'S FINAL APPROVAL HEARING

**18. When and where will the Court decide whether to approve the Settlement?**

The Court will hold the Final Approval Hearing **at X:00 p.m.** on [**_____**], **2021**, in Courtroom 1506 at the Thurgood Marshall Federal Courthouse, 40 Foley Square, New York, NY 10007. The purpose of the hearing will be for the Court to determine whether to approve the Settlement as fair, reasonable, adequate, and in the best interests of the Class; to consider the Class Counsel's request for attorneys' fees and expenses; and to consider the request for

QUESTIONS? CALL 1-XXX-XXX-XXXX TOLL FREE, OR VISIT
WWW.CArenewalsettlementNYT.COM
8

an incentive award to the Class Representative. At that hearing, the Court will be available to hear any timely filed objections and arguments concerning the fairness of the Settlement.

The hearing may be postponed to a different date or time without notice, so it is a good idea to check www.CArenewalsettlementNYT.com or call toll free 1-XXX-XXX-XXXX. If, however, you timely objected to the Settlement and advised the Court that you intend to appear and speak at the Final Approval Hearing, you will receive notice of any change in the date of such Final Approval Hearing.

### 19. Do I have to come to the hearing?

No. Class Counsel will answer any questions the Court may have. But you are welcome to come at your own expense. If you send an objection or comment, you don't have to come to Court to talk about it. As long as you filed and mailed your written objection on time, the Court will consider it. You may also pay another lawyer to attend, but it's not required.

### 20. May I speak at the hearing?

Yes. So long as you timely filed an objection to the settlement, you may ask the Court for permission to speak at the Fairness Hearing, but do not have to. To do so, you must include in your letter or brief objecting to the settlement a statement saying that it is your "Notice of Intent to Appear in *Moses v. The New York Times Company*, Case No. 1:20-cv-04658-RA." It must include your name, address, telephone number and signature as well as the name and address of your lawyer, if one is appearing for you. Your objection and notice of intent to appear must be filed with the Court and postmarked no later than **[_____], 2021**, and be sent to the addresses listed in Question 16.

### GETTING MORE INFORMATION

### 21. Where do I get more information?

This Notice summarizes the Settlement. More details are in the Settlement Agreement. You can get a copy of the Settlement Agreement at www.CArenewalsettlementNYT.com. You may also write with questions to Moses v. The New York Times Company c/o Settlement Administrator, PO Box ####, City, XX ZIP CODE. You can call the Settlement Administrator at 1-XXX-XXX- if you have any questions. Before doing so, however, please read this full Notice carefully. You may also find additional information elsewhere on the case website. Please do not telephone the Court to inquire about the Settlement or the claims process.

**EXHIBIT F**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARIBEL MOSES, on behalf of herself and all others similarly situated,<br><br>          Plaintiff,<br><br>  v.<br><br>THE NEW YORK TIMES COMPANY, d/b/a The New York Times.<br><br>          Defendant. | Civil Action No.: 1:20-cv-04658-RA<br><br>Hon. Judge Ronnie Abrams |

## STIPULATION REGARDING UNDERTAKING RE: ATTORNEYS' FEES AND COSTS

Plaintiff Maribel Moses ("Plaintiff"), on behalf of the putative class, and Defendant The New York Times Company ("Defendant" or "NYT") (together the "Parties"), by and through and including their undersigned counsel, stipulate and agree as follows:

WHEREAS, Scott A. Bursor ("Class Counsel"), individually and as principal of his law firm, Bursor & Fisher P.A. ("the Firm"), desire to give an undertaking (the "Undertaking") for repayment of their award of attorney fees and costs, approved by the Court, and

WHEREAS, the Parties agree that this Undertaking is in the interests of all Parties and in service of judicial economy and efficiency.

NOW, THEREFORE, the undersigned Class Counsel, on behalf of himself as an individual and as principal of the Firm, hereby submits himself and the Firm to the jurisdiction of the Court for the purpose of enforcing the provisions of this Undertaking.

Capitalized terms used herein without definition have the meanings given to them in the Class Action Settlement Agreement.

1

By receiving any payments pursuant to the Settlement Agreement, the Firm and its shareholders, members, and/or partners submit to the jurisdiction of the United States District Court for the Southern District of New York for the enforcement of and any and all disputes relating to or arising out of the reimbursement obligation set forth herein and the Settlement Agreement.

In the event that the settlement, Settlement Agreement, Judgment, or any part of it is vacated, overturned, reversed, or rendered void as a result of an appeal, or the settlement or Settlement Agreement is voided, rescinded, or otherwise terminated for any other reason, Class Counsel and the Firm shall, within ten (10) days repay to NYT, based upon written instructions provided by NYT's Counsel, the full amount of the attorneys' fees and costs paid to Class Counsel in this matter, including any accrued interest.

In the event the attorneys' fees and costs awarded by the Court or any part of them are vacated, modified, reversed, or rendered void as a result of an appeal or otherwise, Class Counsel and the Firm shall, within ten (10) days repay to NYT, based upon written instructions provided by NYT's Counsel, the attorneys' fees and costs paid to Class Counsel and/or the Class Representatives in this matter in the amount vacated or modified, including any accrued interest.

This Undertaking and all obligations set forth herein shall terminate upon the Effective Date of the Settlement, defined as the latest of the following dates: (1) five business days after the time for appeal from the Final Order and Judgment approving the Settlement, or award of attorneys' fees, costs/expenses or service awards/payments, has elapsed without any such appeals being filed; or (2) the first business day after the date on which all appeals from the Final Order and Judgment approving the Settlement or award of attorneys' fees, costs/expenses or service awards/payments (including appeals from any appellate court decisions affirming said Final Order

and Judgment, or award of attorneys' fees, costs/expenses or service awards/payments) have been fully exhausted, and no further appeal may be taken.  If any appeal of the Final Order and Judgment, or any order awarding attorneys' fees, costs/expenses or service awards/payments is filed, the Undertaking shall not terminate unless and until a final, non-appealable order affirming the Final Order and Judgment or any order awarding attorneys' fees, costs/expenses and service awards/payments is entered.

In the event Class Counsel and the Firm fail to repay to NYT any attorneys' fees and costs that are owed to it pursuant to this Undertaking, the Court may, upon application of NYT, and notice to Class Counsel and the Firm, summarily issue orders, including but not limited to judgments, attachment orders against Class Counsel and the Firm, and findings for sanctions and/or contempt of court.

The undersigned attorney stipulates, warrants, and represents that he has both actual and apparent authority to enter into this Stipulation, agreement, and Undertaking, individually and on behalf of the Firm.

This Undertaking may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Signatures by facsimile shall be as effective as original signatures.

The undersigned declare under penalty of perjury that they have read and understand the foregoing and that it is true and correct.

IT IS SO STIPULATED:

DATED: March 29, 2021                    BURSOR & FISHER, P.A.

By: Scott A. Bursor, individually and
on behalf of Bursor & Fisher, P.A.

Attorneys for Plaintiff

DATED: March **29**, 2021          DENTONS US LLP

By: Kristen C. Rodriguez
Attorneys for Defendants

4

**EXHIBIT G**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

MARIBEL MOSES, on behalf of herself and
all others similarly situated,

               Plaintiff,

     v.

THE NEW YORK TIMES COMPANY, d/b/a
*The New York Times*,

               Defendant.

---

Civil Action No.: 1:20-cv-04658-RA

Hon. Judge Ronnie Abrams

---

**[PROPOSED] ORDER GRANTING PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT AGREEMENT, CONDITIONALLY CERTIFYING
SETTLEMENT CLASS, APPOINTING CLASS REPRESENTATIVE,
<u>APPOINTING CLASS COUNSEL, AND APPROVING NOTICE PLAN</u>**

WHEREAS, a proposed class action is pending before the Court entitled *Moses v. The New York Times Company*, No. 1:20-cv-04658-RA; and

WHEREAS, Plaintiff Maribel Moses, and The New York Times Company ("Defendant" or "NYT") (collectively, the "Parties"), have entered into a Settlement Agreement, which, together with the exhibits attached thereto, sets forth the terms and conditions for a proposed class action settlement which would dispose of the Action with prejudice as to NYT and bind plaintiff and all class members to a full release of their claims, upon the terms and conditions set forth therein (the "Settlement Agreement"); and

WHEREAS, and the Court having considered all papers submitted on Plaintiff's Motion for Preliminary Approval and Certification of a Settlement Class, including the Settlement Agreement and exhibits attached thereto including the proposed Notices to the Settlement Class;

Case 1:20-cv-04658-RA   Document 51   Filed 08/27/21   Page 82 of 224

IT IS HEREBY ORDERED, DECREED, AND ADJUDGED AS FOLLOWS:

1.      The Parties have agreed to settle and dismiss with prejudice this Action in accordance with the terms and conditions of the Settlement Agreement, inclusive of its exhibits. The definitions in the Settlement Agreement are hereby incorporated herein as though fully set forth in this Order, and all other terms and phrases in this Order shall have the same meaning as ascribed to them in the Settlement Agreement.

2.      This Court finds that it has jurisdiction over the subject matter and all Parties to the Action, including the proposed Settlement Class, pursuant to 28 U.S.C. 1332(d)(2).

3.      The Court finds that, subject to the Final Approval Hearing, the Settlement Agreement, including all exhibits thereto, is preliminarily approved as fair, reasonable, and adequate, and in the best interests of the Settlement Class set forth below.  The Court further finds that the Settlement Agreement substantially fulfills the purposes and objectives of the class action, and provides substantial relief to the Settlement Class without the risks, burdens, costs, or delay associated with continued litigation, trial, and/or appeal.  The Settlement is not a finding or admission of liability by the Defendant or any other person, nor a finding of the validity of any claims asserted in the Action or of any wrongdoing or any violation of law.

4.      The Plaintiff, by and through her counsel, has investigated the pertinent facts and has evaluated the risks associated with continued litigation, trial and/or appeal.  The Court finds that the Settlement Agreement: (a) is the result of arm's-length negotiations between the parties and experienced counsel; (b) is sufficient to warrant notice of the settlement and the Final Approval Hearing to be disseminated to the Settlement Class; (c) meets all applicable requirements of law, including Federal Rule of Civil Procedure 23 and the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715.

2

**Conditional Certification of the Settlement Class**

5.      For purposes of settlement only: (a) Bursor & Fisher, P.A. is appointed Class Counsel for the Settlement Class; and (b) Maribel Moses is appointed Class Representative.  The Court finds that these attorneys are competent and capable of exercising the responsibilities of Class Counsel and that Plaintiff will adequately protect the interests of the Settlement Class defined below.

6.      For purposes of settlement only and for purposes of disseminating Class Notice, and without prejudice to Defendant's right to contest class certification if the Settlement Agreement is not finally approved, the Court conditionally certifies the following Settlement Class as defined in the Settlement Agreement, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(3) and 23(e):

> [A]ll Person who, between June 17, 2016, to and through [*DATE OF THIS ORDER*] enrolled in any of Defendant's digital, print, and/or standalone subscription offerings directly through NYT using a California billing  and/or delivery address, and who were charged and paid an automatic renewal fee(s) in connection with such subscription.[1]

7.      The Court finds, subject to the Final Approval Hearing referred to in paragraph 23 below, that the Settlement Agreement is fundamentally fair, adequate, and reasonable, and, solely within the context of and for the purposes of settlement only, that the Settlement Class satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure, specifically, that: the Settlement Class is so numerous that joinder of all members is impracticable; there are

---

[1] Excluded from the Settlement Class are: (1) any Judge or Magistrate presiding over this Action and members of their families; (2) Defendant, Defendant's subsidiaries, parent companies, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and their current or former officers, directors, agents, attorneys, and employees; (3) Persons who properly execute and file a timely request for exclusion from the class; and (4) the legal representatives, successors or assigns of any excluded Persons.

questions of fact and law common to the Settlement Class; the claims of the Class Representative are typical of the claims of the members of the Settlement Class; the Class Representative and Class Counsel will fairly and adequately protect the interests of the members of the Settlement Class; common questions of law or fact predominate over questions affecting individual members; and a class action is a superior method for fairly and efficiently adjudicating the Action.

8.      If the Settlement Agreement does not receive the Court's final approval, or if final approval is reversed on appeal, or if the Settlement Agreement is terminated or otherwise fails to become effective, the Court's conditional grant of class certification shall be vacated, null, and void in all respects, and the Class Representative and the Settlement Class will once again bear the burden of establishing the propriety of class certification for purposes of litigation.  In such case, neither the conditional certification of the Settlement Class for settlement purposes, nor any other act relating to the negotiation or execution of the Settlement Agreement shall be considered as a factor in connection with any class certification issue(s).

**Notice and Administration**

9.      The Court approves, as to form, content, and distribution, the Notice Plan set forth in the Settlement Agreement, including Claim Form attached to the Settlement Agreement as Exhibit A, the Notice Plan and all forms of Notice to the Settlement Class as set forth in the Settlement Agreement and Exhibits B, C, D and E, thereto, and finds that such Notice is reasonable and the best notice practicable under the circumstances, and that the Notice complies fully with the requirements of the Federal Rules of Civil Procedure.  The Court also finds that the Notice constitutes valid, due and sufficient notice to all persons entitled thereto, and meets the requirements of Due Process.  The Court further finds that the Notice is reasonably calculated to,

under all circumstances, reasonably apprise members of the Settlement Class of the pendency of this action, the terms of the Settlement Agreement, and the right to object to the settlement and to exclude themselves from the Settlement Class.  In addition, the Court finds that no notice other than that specifically identified in the Settlement Agreement is necessary in this Action.  The Parties, by agreement, may revise the Notice and Claim Form in ways that are not material, or in ways that are appropriate to update those documents for purposes of accuracy or formatting.

10.     The Court approves the request for the appointment of _____ as Settlement Administrator of the Settlement Agreement.

11.     Pursuant to paragraph 4.1 of the Settlement Agreement, the Settlement Administrator is directed to publish the Notice and Claim Form on the Settlement Website and to send direct notice via U.S. Mail in accordance with the Notice Plan called for by the Settlement Agreement.  The Settlement Administrator shall also maintain the Settlement Website to provide full information about the Settlement and allow for the filing of claims online.  The Settlement Website shall prominently display all Settlement deadlines for Settlement Class Members as well as notify the Settlement Class to object to the Settlement Agreement, request exclusion from the Class and appear at the Settlement Hearing.

**Submission of Claims and Requests for Exclusion from Settlement Class**

12.     Members of the Settlement Class with NYT Subscriptions who wish to receive benefits in the form of *pro rata* cash payments under the Settlement Agreement must complete and submit a timely and valid Claim Form(s) in accordance with the instructions contained therein.  All Claim Forms must be postmarked or received by the Settlement Administrator by _____ *[suggested date of 73 days after entry of this Order]*.

13.     Members of the Settlement Class who do not submit a valid Claim Form by the

Claims Deadline will receive an Automatic Access Code based on whether their NYT

Subscription was active or inactive as of the Notice Date, issued via email by the Settlement

Administrator, unless they exclude themselves from the Settlement.

14.     Any person falling within the definition of the Settlement Class may, upon valid

and timely request, exclude themselves or "opt out" from the Settlement Class.  Any such person

may do so if, on or before the Objection/Exclusion Deadline of _____ *[suggested*

*date of 73 days after entry of this Order]* they comply with the exclusion procedures set forth in

the Settlement Agreement and Notice.  Any members of the Settlement Class so excluded shall

neither be bound by the terms of the Settlement Agreement nor entitled to any of its benefits.

15.     Any members of the Settlement Class who elect to exclude themselves or "opt

out" of the Settlement Agreement must file a written request with the Settlement Administrator,

received or postmarked no later than the Objection/Exclusion Deadline.  The request for

exclusion must comply with the exclusion procedures set forth in the Settlement Agreement and

Notice and include the Settlement Class member's name and address, a signature, the name and

number of the case, and a statement that he or she wishes to be excluded from the Settlement

Class for the purposes of this Settlement.  Each request for exclusion must be submitted

individually.  So called "mass" or "class" opt-outs shall not be allowed.

16.     Individuals who opt out of the Settlement Class relinquish all rights to benefits

under the Settlement Agreement and will not release their claims.  However, members of the

Settlement Class who fail to submit a valid and timely request for exclusion shall be bound by all

terms of the Settlement Agreement and the Final Judgment, regardless of whether they have

requested exclusion from the Settlement Agreement or received any benefit or award from the

settlement.

17.     No request for exclusion may be made on behalf of a group of Settlement Class Members who do not share a single NYT subscription.  "Mass" opt outs and/or attempts to opt out a "class" shall not be allowed.

**Appearances and Objections**

18.     At least twenty-one (21) calendar days before the Final Approval Hearing, any person who falls within the definition of the Settlement Class and who does not request exclusion from the Settlement Class may enter an appearance in the Action, at their own expense, individually or through counsel of their own choice.  Any Settlement Class Member who does not enter an appearance will be represented by Class Counsel.

19.     Any members of the Settlement Class who have not timely filed a request for exclusion may object to the fairness, reasonableness, or adequacy of the Settlement Agreement or to a Final Judgment being entered dismissing the Action with prejudice in accordance with the terms of the Settlement Agreement, or to the attorneys' fees and expense reimbursement sought by Class Counsel in the amounts specified in the Notice, or to the award to the Class Representative as set forth in the Notice and Settlement Agreement.  At least fourteen (14) days prior to the Objection/Exclusion Deadline, papers supporting the Fee Award shall be filed with the court and posted to the settlement website.  Members of the Settlement Class may object on their own, or may do so through separate counsel at their own expense.

20.     To object, members of the Settlement Class must sign and file a written objection no later than on or before the Objection/Exclusion Deadline of _____ *[suggested date of 73 days after entry of this Order]*.  To be valid, the objection must comply with the objection procedures set forth in the Settlement Agreement and Notice, and include his or her name and address; an explanation of the basis upon which he or she claims to be a Settlement

Class Member; a signature; all grounds for the objection, including all citations to legal authority and evidence supporting the objection; the name and contact information of any and all attorneys representing, advising, or in any way assisting him or her in connection with the preparation or submission of the objection or who may profit from the pursuit of the objection (the "Objecting Attorneys"); and a statement indicating whether he or she intends to appear at the Final Approval Hearing (either personally or through counsel who files an appearance with the Court in accordance with Southern District of New York Local Rules.  If a Settlement Class Member or any of the Objecting Attorneys has objected to any class action settlement where the objector or the Objecting Attorneys asked for or received any payment in exchange for dismissal of the objection, or any related appeal, without any modification to the settlement, then the objection must include a statement identifying each such case by full case caption.

21.     Members of the Settlement Class who fail to file and serve timely written objections in compliance with the requirements of this paragraph and the Settlement Agreement shall be deemed to have waived any objections and shall be foreclosed from making any objections (whether by appeal or otherwise) to the Settlement Agreement or to any of the subjects listed in paragraph 3, above, *i.e.* (a) whether the proposed settlement of the Action on the terms and conditions provided for in the Settlement Agreement is fair, reasonable, and adequate and should be given final approval by the Court; (b) whether a judgment and order of dismissal with prejudice should be entered; (c) whether to approve the Fee Award to Class Counsel; and (d) whether to approve the payment of an incentive award to the Class Representative.

22.     To be valid, objections must be filed with the Court and sent to the following: Class Counsel Frederick J. Klorczyk III of Bursor & Fisher, P.A., 888 Seventh Avenue, New

York, NY 10019; and Defendant The New York Times Company's Counsel Kristen Rodriguez,

Dentons US LLP, 1900 K Street NW, Washington DC 20006.  In addition, any objections made

by a Class member represented by counsel must be filed through the Court's CM/ECF system.

**Final Approval Hearing**

23.     The Final Approval Hearing shall be held before this Court on _____,

at _____ [*at least  120 days after entry of this order*] in Courtroom ___ at the Thurgood

Marshall United States Courthouse, Courtroom 1506, 40 Foley Square, New York, New

York to determine (a) whether the proposed settlement of the Action on the terms and

conditions provided for in the Settlement Agreement (including as it may be modified prior

to the Final Hearing date) is fair, reasonable, and adequate and should be given final

approval by the Court; (b) whether a judgment and order of dismissal with prejudice should

be entered; (c) whether to approve the Fee Award to Class Counsel; and (d) whether to

approve the payment of an incentive award to the Class Representative.  The Court may

adjourn the Final Approval Hearing without further notice to members of the Settlement

Class.  The new date of Hearing, if any, shall be published on the Court's docket and on the

Settlement Website.

24.     Class Counsel shall file papers in support of their Fee Award and Class

Representative's incentive award (collectively, the "Fee Petition") with the Court on or before

_____ [*suggested date of 52 days after entry of this Order, (i.e., 14 days before the*

*Objection/Exclusion Deadline)*.] Defendant may, but is not required to, file a response to Class

Counsel's Fee Petition with the Court on or before _____ [*suggested date of 21 days*

*before Final Approval hearing.*]  Class Counsel may file a reply in support of their Fee Petition

with the Court on or before _____ [*suggested date of 14 days before Final*

*Approval hearing.*]

25.     Papers in support of final approval of the Settlement Agreement and any supplementation to the Fee Petition shall be filed with the Court on or before _____ [*suggested date of 14 days before Final Approval hearing.*]

**Further Matters**

26.     All further proceedings in the Action are ordered stayed until Final Judgment or termination of the Settlement Agreement, whichever occurs earlier, except for those matters necessary to obtain and/or effectuate final approval of the Settlement Agreement.  Additionally, pending this Court's determination as to whether to finally approve the Settlement, the Court hereby prohibits and/or enjoins any other person, entity or counsel (other than successful opt-outs to this Settlement) from representing or from commencing, prosecuting, participating in or assisting in any lawsuit or proceeding against the Released Parties on any matters within the scope of the Released Claims).

27.     Absent prior approval from this Court, Plaintiff and Class Counsel, shall not issue any press release, advertisement, internet posting, or any other public statement (to the media or otherwise), or make any other extrajudicial statements concerning the facts and circumstances of this action or the disclosures exchanged between the parties, with the exception of the notices to be distributed to the Settlement Class Members in accordance with this Settlement.  Any communications between Class Counsel and any individual Settlement Class Members seeking inquiries shall be limited to providing publicly available information contained in the notices provided to the Settlement Class Members, and Class Counsel shall in no way make any disparaging statements about NYT or the Released Parties in responding to any such inquiries.

28.     Members of the Settlement Class shall be bound by all determinations and judgments in the Action, whether favorable or unfavorable.

29.     The Court retains jurisdiction to consider all further applications arising out of or connected with the proposed Settlement Agreement.  The Court may approve the Settlement, with such modifications as may be agreed to by the Parties, if appropriate, without further notice to the Class.

30.     All Settlement Class Members who do not timely exclude themselves from the Settlement:  (a) shall be bound by the provisions of the Settlement Agreement and all proceedings, determinations, orders and judgments in the Action relating thereto, including, without limitation, the Judgment or Alternate Judgment, if applicable, and the Releases provided for therein, whether favorable or unfavorable to the Settlement Class or Settlement Class Member; and (b) shall forever be barred and enjoined from directly or indirectly filing, commencing, instituting, prosecuting, maintaining, participating in, or intervening (as class members or otherwise) in any action, suit, cause of action, arbitration, claim, demand, or other proceeding in any jurisdiction, whether in the United States or elsewhere, on their own behalf or in a representative capacity, that is based upon or arises out of any or all of the Released Claims against NYT and the other Released Parties, as more fully described in the Settlement Agreement, whether or not a Claim Form is required or submitted.

31.     Neither this Order, the Settlement Agreement including the exhibits thereto, the negotiations leading to the execution of the Settlement Agreement, nor any proceedings taken pursuant to or in connection with the Settlement Agreement and/or approval of the Settlement (a) shall be referred to or offered against any of the Releasees as evidence of, or constructed as, or deemed to be evidence of any presumption, concession or admission by any of the Releasees with respect to the truth of any allegation, the validity of any claim or the deficiency of any defense that has been or could have been asserted in the Action or in any other litigation,

including the appropriateness of a litigation class, or of any liability, negligence, fault, or other wrongdoing of any kind of any of the Releasees, in any civil, criminal or administrative action or proceeding, or (b) shall be construed against any of the Releasees or Releasing Parties as an admission, concession or presumption that the consideration to be given represents the amount which could be or would have been recovered after trial; provided, however, that notwithstanding the foregoing, if the Settlement Agreement is approved by the Court, the Parties and Releasees and their respective counsel may file or refer to the Settlement Agreement or the Judgment in any action that may be brought to enforce its terms.

32.     In accordance with the Settlement Agreement, if the Settlement Agreement is not approved by the Court, each party will have the option of having the Action revert to its status as if the Settlement Agreement had not been negotiated, made, or filed with the Court.  In such event, the parties will retain all rights as if the Settlement Agreement was never agreed upon.

33.     If the Settlement Agreement is terminated pursuant to the provisions of the Settlement Agreement or for any reason whatsoever the approval of it does not become Final then (i) the Settlement Agreement shall be null and void, including any provision related to the award of attorneys' fees, and shall have no further force and effect with respect to any party in this Action, and shall not be used in this Action or in any other proceeding for any purpose; (ii) all negotiations, proceedings, documents prepared, and statements made in connection therewith shall be without prejudice to any person or party hereto, shall not be deemed or construed to be an admission by any party of any act, matter, or proposition, and shall not be used in any manner or for any purpose in any subsequent proceeding in this Action or in any other action in any court or other proceeding, provided, however, that the termination of the Settlement Agreement shall not shield from subsequent discovery any factual information provided in connection with the

negotiation of this Settlement Agreement that would otherwise be discoverable; (iii) other than as expressly preserved by the Settlement Agreement in the event of its termination, the Settlement Agreement shall have no further force and effect with respect to any party and shall not be used in the Action or any other proceeding for any purpose; and (iv) any party may elect to move the Court pursuant to the provisions of this paragraph, and none of the non-moving parties (or their counsel) shall oppose any such motion.

34.     Pending final determination of whether the proposed Settlement Agreement should be approved, neither Plaintiff nor any Settlement Class Member, directly or indirectly, in a representative or any other capacity, shall commence or prosecute against Defendant and the other Released Parties any action or proceeding in any court or tribunal asserting any of the Released Claims.

35.     The Parties and their counsel shall meet and confer and work together in good faith to effectuate the terms of the Settlement Agreement and this Order.  The Court may, upon proper notice and motion, resolve any disputes between the parties concerning the Settlement Agreement and this Order.


IT IS SO ORDERED, this _____ day of _____, 2021.


_____
The Honorable Ronnie Abrams, United States
District Judge

13

**EXHIBIT H**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

MARIBEL MOSES, on behalf of herself and all others similarly situated,

                     Plaintiff,

   v.

THE NEW YORK TIMES COMPANY, d/b/a The New York Times.

                     Defendant.

---

Civil Action No.: 1:20-cv-04658-RA

Hon. Judge Ronnie Abrams

---

**[PROPOSED] FINAL APPROVAL ORDER AND JUDGMENT**

On [DATE], this Court granted preliminary approval of the proposed class action settlement agreement between the parties (the "Settlement Agreement" or "Settlement").

The Court also provisionally certified a Settlement Class for settlement purposes, approved the procedure for giving notice and forms of Notice, and set a final approval hearing to take place on [DATE].  The Settlement Class is defined as: all Persons who, from June 17, 2016, to and through the Preliminary Approval Date, enrolled in an automatically renewing NYT Subscription directly through NYT using a California billing and/or delivery address, and who were charged and paid an automatic renewal fee(s) in connection with such subscription. Excluded from this definition are the Released Parties.  Settlement Class Members who exclude themselves from the Settlement, pursuant to the procedures set forth in Paragraph 4.5 of the Settlement, shall no longer thereafter be Settlement Class Members and shall not be bound by the Settlement and shall not be eligible to make a claim for any benefit under the terms of the Settlement.

On [DATE], the Court held a duly noticed final approval hearing to consider: (1) whether the terms and conditions of the Settlement are fair, reasonable and adequate; (2) whether a judgment should be entered dismissing the complaint on the merits and with prejudice in favor of Defendant and against all persons or entities who are Settlement Class members herein who have not requested exclusion from the Settlement Class; and (3) whether and in what amount to award attorneys' fees, costs and expenses to Class Counsel and whether and in what amount to make an incentive award to Plaintiff Maribel Moses.

The Court, having considered all matters submitted to it at the hearing and otherwise, and it appearing that the Class Notice substantially in the form approved by the Court was given in the manner that the Court ordered to persons who purchased the NYT Subscriptions at issue, as ordered by the Court, and having considered and determined that the proposed settlement of the claims of the Settlement Class Members against Defendant, as well as the release of Defendant and the Released Parties, and the awards of attorneys' fees, costs, and expenses and incentive award requested, are fair, reasonable and adequate, hereby ORDERS THAT:

1.      The definitions in the Settlement Agreement and the Court's Preliminary Approval Order are hereby incorporated herein as though fully set forth in this Order, and all other terms and phrases in this Order shall have the same meaning as ascribed to them in the Settlement Agreement and in the Court's Preliminary Approval Order, and/or in any Order of this Court prior to the entry of final Judgment.

2.      The Court finds that the prerequisites for a settlement class under Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 23(a) and (b)(3) have been satisfied, for purposes of settlement only, in that: (a) the number of Settlement Class Members is so numerous that joinder of all members thereof is impracticable; (b) there are questions of law and fact common to the Settlement Class; (c) the claims of the Class Representative are typical of the claims of the

Settlement Class she seeks to represent; (d) the Class Representative has and will fairly and adequately represent the interests of the Settlement Class; (e) the questions of law and fact common to the Settlement Class Members predominate over any questions affecting any individual Settlement Class Member; and (f) a class action is superior to the other available methods for the fair and efficient adjudication of the controversy.

3.      The Court finds that the requirements of Rule 23(e) of the Federal Rule of Civil Procedure and other laws and rules applicable to final settlement approval of class actions have been satisfied, and the Court approves the settlement of this Action as memorialized in the Settlement Agreement as being fair, just reasonable and adequate to the Settlement Class and its members.  The Court further finds that the Settlement Agreement substantially fulfills the purposes and objectives of the class action, and provides substantial relief to the Settlement Class without the risks, burdens, costs or delays associated with continued litigation, trial and/or appeal.  The Settlement is not a finding or admission of liability by the Defendant or any other person, nor a finding of the validity of any claims asserted in the Action or of any wrongdoing or any violation of law.

4.      Pursuant to Fed. R. Civ. P. 23, this Court hereby finally certifies this action, for purposes of settlement, a class action on behalf of all Persons who, from June 17, 2016, to and through the Preliminary Approval Date, enrolled in an automatically renewing NYT Subscription directly through NYT using a California billing and/or delivery address, and who were charged and paid an automatic renewal fee(s) in connection with such subscription.  Excluded from this definition are the Released Parties.  Settlement Class Members who exclude themselves from the Settlement, pursuant to the procedures set forth in Paragraph 4.5 of the Settlement Agreement, shall no longer thereafter be Settlement Class Members and shall not be bound by the Settlement

Agreement and shall not be eligible to make a claim for any benefit under the terms of this Settlement Agreement.

5.     The Court appoints Frederick J. Klorczyk III of Bursor & Fisher, P.A. as Class Counsel for the Settlement Class.  The Court designates Plaintiff Maribel Moses as the Class Representative.

6.     Notice of the pendency of this action as a class action and of the proposed settlement was given to Settlement Class Members in a manner reasonably calculated to provide the best notice practicable under the circumstances.  The form and method of notifying the Settlement Class of the pendency of the Action as a class action and of the terms and conditions of the proposed Settlement met the requirements of Fed. R. Civ. P. 23, due process, and any other applicable law, and constituted due and sufficient notice to all persons and entities entitled thereto.  In addition, the Court finds that Defendant fully satisfied any obligation to provide Notice of the proposed Settlement Agreement to the public officials designated under the Class Action Fairness Act, 28 U.S.C. § 1715, to receive such notice, as set forth in the Defendant's Notice of Compliance with 28 U.S.C. § 1715.

7.     The Court has considered and finds Class Counsel and the Class Representative have adequately represented the Class.  Plaintiff, by and through her counsel, has investigated the pertinent facts and law, and has evaluated the risks associated with continued litigation, class certification, trial, and/or appeal.  The Court finds that the Settlement Agreement was reached in the absence of collusion, is the product of informed, good-faith, arms-length negotiations between the parties and their capable and experienced counsel.

8.     The Court finds that the Settlement is effective in appropriately distributing relief to the Settlement Class in light of the claims and defenses asserted, that the method of processing

Settlement Class Member claims is reasonable and appropriate, and that the Settlement Agreement treats all Settlement Class Members equitably relative to each other.

9.      The Court has evaluated this overall reaction of the Class to the Settlement, and finds that the overall acceptance of the Settlement Agreement by Settlement Class Members supports the Court's conclusion that the Settlement Agreement is in all respects fair, reasonable, adequate, and in the best interests of the Class.

10.     The Parties are directed to consummate the Settlement Agreement in accordance with its terms and conditions.

11.     Defendant shall implement the Prospective Relief - Practice Changes described in Paragraph 2.3 of the Settlement Agreement within a reasonably practicable time from the date of this order.

12.     JND is finally appointed to continue to serve as the Claims Administrator as provided in the Settlement Agreement.  The Claims Administrator is directed to process all Authorized Claims in accordance with the Settlement Agreement.  Class Counsel and Counsel for Defendant are hereby authorized to employ all reasonable procedures in connection with administration of the Settlement Agreement that are not materially inconsistent with this Order or the Settlement Agreement.

13.     The Claims Administrator shall administer the Escrow Account, which is a Qualified Settlement Fund within the meaning of Treasury Regulation § 1.468B-1.  The Claims Administrator, as administrator of the fund within the meaning of Treasury Regulation § 1.468B-2(k)(3), shall be solely responsible for filing or causing to be filed all informational and other tax returns as may be necessary or appropriate (including, without limitation, the returns described in Treasury Regulation § 1.468B-2(k)) for the Escrow Account.  The Claims Administrator shall also be responsible for causing payment to be made from the Escrow Account of any Taxes and

Tax Expenses owed.  None of the Releasees, Plaintiff, Class Counsel or Counsel for Defendant shall have any liability or responsibility for any such Taxes or Tax Expenses, or any required filings regarding same.

14.     There shall be no recourse to any Defendant, Releasee, Released Party or their counsel, or to the Class Representative or Class Counsel, or to the Claims Administrator or to this Court, for any determination made by the Claims Administrator pursuant to its responsibilities under the Settlement Agreement.  In addition, notwithstanding anything else in this Order, if the Claims Administrator or any Party has reason to believe that a false or fraudulent Claim has been submitted in this Settlement, or that any Claim has been submitted under false pretenses, the Claims Administrator may reject the Claim.

15.     The allowance or disallowance by the Court of, any Fee Award or Incentive Award have been considered by the Court separately from the Court's consideration of the fairness, reasonableness and adequacy of the Settlement.  Any Order or proceeding related to the application for an award of fees, costs and expenses, or any appeal from any Fee Award or Incentive Award or other order relating thereto, shall not operate to terminate or cancel the Settlement Agreement, nor affect or delay the finality of this Final Order and Judgment.

16.     Pursuant to Fed. R. Civ. P. 23(h), the Court hereby awards Class Counsel attorneys' fees, costs, and expenses in the amount of $_____.  The Court also orders payment of an incentive award(s) in the amount(s) of $_____ to Plaintiff Maribel Moses.  These amounts are to be paid in the time and manner described in the Settlement Agreement.

17.     The Action is hereby dismissed with prejudice and without costs as against Defendant and the Released Parties.

18.     Class Representative and all Settlement Class Members (except any such person who has filed a proper and timely request for exclusion) and all persons acting on behalf of or in concert with any of the above, are hereby permanently barred and enjoined from instituting, commencing or prosecuting, either directly or in any other capacity, any and all of the Released Claims against any of the Released Parties.  The Court finds that issuance of the permanent injunction described in this paragraph is necessary and appropriate in aid of the Court's jurisdiction over this Action and to protect and effectuate this Order.

19.     Effective as of the Final Settlement Approval Date, each and all of the Settlement Class Members (except any such person who has filed a proper and timely request for exclusion) shall be deemed to have, and by operation of the Final Judgment shall have, fully, finally, and forever released, relinquished, and discharged, and shall be forever barred from asserting, instituting, or maintaining against any or all of the Released Parties, any and all causes of action or claims for relief, whether in law or equity, including but not limited to injunctive relief, actual damages, nominal damages, statutory damages, punitive damages, exemplary or multiplied damages, restitution, disgorgement, expenses, attorneys' fees and costs, and/or any other form of consideration whatsoever (including Unknown Claims), whether in law or in equity, accrued or un-accrued, direct, individual or representative, of every nature and description whatsoever, that were brought or could have been brought in the Action relating to any and all Releasing Parties, any NYT Subscription associated with any of them, or that in any way relate to or arise out of Defendant's automatic renewal and/or continuous service programs in California from June 17, 2016 to date of judgment in this action, including but not limited to any of the facts, transactions, events, matters, occurrences, acts, disclosures, statements, representations, omissions or failures to act related thereto.  Plaintiff, the Settlement Class and the Releasing Parties each individually covenant not to bring any Released Claim and expressly agree that this Release will be, and may

be raised as, a complete defense to and will preclude any action or proceeding encompassed by the release(s) contained herein in respect to any NYT Subscription associated with a Class Member.

20.     Neither the Settlement Agreement, nor any of its terms and provisions, nor any of the negotiations or proceedings connected with it, nor any of the documents or statements referred to therein shall be:

(a)     offered by any person or received against Defendant as evidence or construed as or deemed to be evidence of any presumption, concession, or admission by Defendant of the truth of the facts alleged by the Class Representative or any Settlement Class Member or the validity of any claim that has been or could have been asserted in the Action or in any litigation, or other judicial or administrative proceeding, or the deficiency of any defense that has been or could have been asserted in the Action or in any litigation, or of any liability, negligence, fault or wrongdoing of Defendant;

(b)     offered by any person or received against Defendant as evidence of a presumption, concession or admission of any fault, misrepresentation or omission with respect to any statement or written document approved or made by Defendant or any other wrongdoing by Defendant;

(c)     offered by any person or received against Defendant as evidence of a presumption, concession, or admission with respect to any liability, negligence, fault, or wrongdoing, or in any way referred to for any other reason against any of the settling parties, in any civil, criminal, or administrative action or proceeding; provided, however, that nothing contained in this paragraph shall prevent the Settlement Agreement from being used, offered, or received in evidence in any proceeding to approve, enforce, or otherwise effectuate the Settlement or the Settlement Approval Order and Final Judgment, or in which the

8

reasonableness, fairness, or good faith of the parties in participating in the Settlement (or any agreement or order relating thereto) is an issue, or to enforce or effectuate provisions of the Settlement, the Settlement Approval Order and Final Judgment, the releases as to the Released Parties.

21.     Claims documents in this case, and all materials and data held by the Claims Administrator regarding the Settlement Class, including the Class List, shall be strictly confidential and not subject to publication or disclosure, and shall not be used for any other purposes beyond providing notice to the Settlement Class and assisting with the determination of valid claims.  No person other than the Parties and their counsel, the Claims Administrator, and the Court shall be permitted to obtain or review any Claim Form, or any decision of the Claims Administrator with respect to accepting or rejecting any Claim, except as provided for herein or upon Court Order for good cause shown.

22.     This Settlement Approval Order and Final Judgment constitutes a judgment within the meaning and for purposes of Rule 54 of the Federal Rules of Civil Procedure. Without affecting the finality of the Settlement Approval Order and Final Judgment in any way, this Court hereby retains continuing jurisdiction over: (a) the disposition of the settlement benefits; (b) the settling parties for purposes of construing, enforcing and administering the Settlement Agreement; and (c) enforcement of the Stipulation and Order Regarding Undertaking Re: Attorneys' Fees and Costs.

23.     Without further order of the Court, the settling parties may agree to reasonably necessary extensions of time to carry out any of the provisions of the Settlement Agreement.

24.     In the event that the Final Settlement Approval Date does not occur, this Settlement Approval Order and Final Judgment shall automatically be rendered null and void and shall be vacated and, in such event, all orders entered in connection herewith, except the

Stipulation and Order Regarding Undertaking Re: Attorneys' Fees and Costs, shall be null and

void.

      DONE this ____ day of _____, 2021.

                           _____

                           Hon. Judge Ronnie Abrams
                           United States District Court Judge,
                           Southern District of New York

**EXHIBIT 2**



**BURSOR & FISHER**

P.A.

www.bursor.com

701 BRICKELL AVENUE        888 SEVENTH AVENUE        1990 NORTH CALIFORNIA BLVD.
MIAMI, FL 33131            NEW YORK, NY 10019         WALNUT CREEK, CA 94596

## FIRM RESUME

With offices in Florida, New York, and California, BURSOR & FISHER lawyers have represented both plaintiffs and defendants in state and federal courts throughout the country.

The lawyers at our firm have an active civil trial practice, having won multi-million dollar verdicts or recoveries in six of six class action jury trials since 2008. Our most recent class action trial victory came in May 2019 in *Perez v. Rash Curtis & Associates*, in which Mr. Bursor served as lead trial counsel and won a $267 million jury verdict against a debt collector found to have violated the Telephone Consumer Protection Act.

In August 2013 in *Ayyad v. Sprint Spectrum L.P.*, in which Mr. Bursor served as lead trial counsel, we won a jury verdict defeating Sprint's $1.06 billion counterclaim and securing the class's recovery of more than $275 million in cash and debt relief.

In *Thomas v. Global Vision Products, Inc. (II)*, we obtained a $50 million jury verdict in favor of a certified class of 150,000 purchasers of the Avacor Hair Regrowth System. The legal trade publication VerdictSearch reported that this was the second largest jury verdict in California in 2009, and the largest in any class action.

The lawyers at our firm have an active class action practice and have won numerous appointments as class counsel to represent millions of class members, including customers of Honda, Verizon Wireless, AT&T Wireless, Sprint, Haier America, and Michaels Stores as well as purchasers of Avacor™, Hydroxycut, and Sensa™ products. Since 2014, our lawyers have certified eleven consumer classes pursuant to contested class certification motions (*see Ebin, Forcellati, In re EZ Seed Litig., Dei Rossi, Melgar, Hart, Dzielak, Martinelli, West, McMillion, Kaupelis*, *infra*). Since December 2010, Bursor & Fisher lawyers have been court-appointed Class Counsel or Interim Class Counsel in:

  i.   *O'Brien v. LG Electronics USA, Inc.* (D.N.J. Dec. 16, 2010) to represent a certified nationwide class of purchasers of LG French-door refrigerators,

 ii.   *Ramundo v. Michaels Stores, Inc.* (N.D. Ill. June 8, 2011) to represent a certified nationwide class of consumers who made in-store purchases at Michaels Stores using a debit or credit card and had their private financial information stolen as a result,

iii.   *In re Haier Freezer Consumer Litig.* (N.D. Cal. Aug. 17, 2011) to represent a certified class of purchasers of mislabeled freezers from Haier America Trading, LLC,

 iv.   *Rodriguez v. CitiMortgage, Inc.* (S.D.N.Y. Nov. 14, 2011) to represent a certified nationwide class of military personnel against CitiMortgage for illegal foreclosures,

 v. *Rossi v. The Procter & Gamble Co.* (D.N.J. Jan. 31, 2012) to represent a certified nationwide class of purchasers of Crest Sensitivity Treatment & Protection toothpaste,

 vi. *Dzielak v. Whirlpool Corp. et al.* (D.N.J. Feb. 21, 2012) to represent a proposed nationwide class of purchasers of mislabeled Maytag Centennial washing machines from Whirlpool Corp., Sears, and other retailers,

 vii. *In re Sensa Weight Loss Litig.* (N.D. Cal. Mar. 2, 2012) to represent a certified nationwide class of purchasers of Sensa weight loss products,

 viii. *In re Sinus Buster Products Consumer Litig.* (E.D.N.Y. Dec. 17, 2012) to represent a certified nationwide class of purchasers,

 ix. *Ebin v. Kangadis Food Inc.* (S.D.N.Y. Feb. 25, 2014) to represent a certified nationwide class of purchasers of Capatriti 100% Pure Olive Oil,

 x. *Forcellati v. Hyland's, Inc.* (C.D. Cal. Apr. 9, 2014) to represent a certified nationwide class of purchasers of children's homeopathic cold and flu remedies,

 xi. *Ebin v. Kangadis Family Management LLC, et al.* (S.D.N.Y. Sept. 18, 2014) to represent a certified nationwide class of purchasers of Capatriti 100% Pure Olive Oil,

 xii. *In re Scotts EZ Seed Litig.* (S.D.N.Y. Jan. 26, 2015) to represent a certified class of purchasers of Scotts Turf Builder EZ Seed,

 xiii. *Dei Rossi v. Whirlpool Corp., et al.* (E.D. Cal. Apr. 28, 2015) to represent a certified class of purchasers of mislabeled KitchenAid refrigerators from Whirlpool Corp., Best Buy, and other retailers,

 xiv. *Hendricks v. StarKist Co.* (N.D. Cal. July 23, 2015) to represent a certified nationwide class of purchasers of StarKist tuna products,

 xv. *In re NVIDIA GTX 970 Graphics Card Litig.* (N.D. Cal. May 8, 2015) to represent a proposed nationwide class of purchasers of NVIDIA GTX 970 graphics cards,

 xvi. *Melgar v. Zicam LLC, et al.* (E.D. Cal. March 30, 2016) to represent a certified ten-jurisdiction class of purchasers of Zicam Pre-Cold products,

 xvii. *In re Trader Joe's Tuna Litigation* (C.D. Cal. December 21, 2016) to represent purchaser of allegedly underfilled Trader Joe's canned tuna.

 xviii. *In re Welspun Litigation* (S.D.N.Y. January 26, 2017) to represent a proposed nationwide class of purchasers of Welspun Egyptian cotton bedding products,

 xix. *Retta v. Millennium Products, Inc.* (C.D. Cal. January 31, 2017) to represent a certified nationwide class of Millennium kombucha beverages,

 xx. *Moeller v. American Media, Inc.*, (E.D. Mich. June 8, 2017) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

 xxi. *Hart v. BHH, LLC* (S.D.N.Y. July 7, 2017) to represent a nationwide class of purchasers of Bell & Howell ultrasonic pest repellers,

 xxii. *McMillion v. Rash Curtis & Associates* (N.D. Cal. September 6, 2017) to represent a certified nationwide class of individuals who received calls from Rash Curtis & Associates,

xxiii.   *Lucero v. Solarcity Corp.* (N.D. Cal. September 15, 2017) to represent a certified nationwide class of individuals who received telemarketing calls from Solarcity Corp.,

xxiv.   *Taylor v. Trusted Media Brands, Inc.* (S.D.N.Y. Oct. 17, 2017) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

xxv.   *Gasser v. Kiss My Face, LLC* (N.D. Cal. Oct. 23, 2017) to represent a proposed nationwide class of purchasers of cosmetic products,

xxvi.   *Gastelum v. Frontier California Inc.* (S.F. Superior Court February 21, 2018) to represent a certified California class of Frontier landline telephone customers who were charged late fees,

xxvii.   *Williams v. Facebook, Inc.* (N.D. Cal. June 26, 2018) to represent a proposed nationwide class of Facebook users for alleged privacy violations,

xxviii.   *Ruppel v. Consumers Union of United States, Inc.* (S.D.N.Y. July 27, 2018) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

xxix.   *Bayol v. Health-Ade* (N.D. Cal. August 23, 2018) to represent a proposed nationwide class of Health-Ade kombucha beverage purchasers,

xxx.   *West v. California Service Bureau* (N.D. Cal. September 12, 2018) to represent a certified nationwide class of individuals who received calls from California Service Bureau,

xxxi.   *Gregorio v. Premier Nutrition Corporation* (S.D.N.Y. Sept. 14, 2018) to represent a nationwide class of purchasers of protein shake products,

xxxii.   *Moeller v. Advance Magazine Publishers, Inc. d/b/a Condé Nast* (S.D.N.Y. Oct. 24, 2018) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

xxxiii.   *Bakov v. Consolidated World Travel Inc. d/b/a Holiday Cruise Line* (N.D. Ill. Mar. 21, 2019) to represent a certified class of individuals who received calls from Holiday Cruise Line,

xxxiv.   *Martinelli v. Johnson & Johnson* (E.D. Cal. March 29, 2019) to represent a certified class of purchasers of Benecol spreads labeled with the representation "No Trans Fat,"

xxxv.   *Edwards v. Hearst Communications, Inc.* (S.D.N.Y. April 24, 2019) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

xxxvi.   *Galvan v. Smashburger* (C.D. Cal. June 25, 2019) to represent a proposed class of purchasers of Smashburger's "Triple Double" burger,

xxxvii.   *Kokoszki v. Playboy Enterprises, Inc.* (E.D. Mich. Feb. 7, 2020) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

xxxviii.   *Russett v. The Northwestern Mutual Life Insurance Co.* (S.D.N.Y. May 28, 2020) to represent a class of insurance policyholders that were allegedly charged unlawful paper billing fees,

xxxix.   *In re:  Metformin Marketing and Sales Practices Litigation* (D.N.J. June 3, 2020) to represent a proposed nationwide class of purchasers of generic diabetes medications that were contaminated with a cancer-causing carcinogen,

xl.   *Hill v. Spirit Airlines, Inc.* (S.D. Fla. July 21, 2020) to represent a proposed nationwide class of passengers whose flights were cancelled by Spirit Airlines due to the novel coronavirus, COVID-19, and whose tickets were not refunded,

xli.   *Kramer v. Alterra Mountain Co.* (D. Colo. July 31, 2020) to represent a proposed nationwide class of purchasers to recoup the unused value of their Ikon ski passes after Alterra suspended operations at its ski resorts due to the novel coronavirus, COVID-19,

xlii.   *Qureshi v. American University* (D.D.C. July 31, 2020) to represent a proposed nationwide class of students for tuition refunds after their classes were moved online by American University due to the novel coronavirus, COVID-19,

xliii.   *Hufford v. Maxim Inc.* (S.D.N.Y. Aug. 13, 2020) to represent a class of magazine subscribers under the Michigan Preservation of Personal Privacy Act,

xliv.   *Desai v. Carnegie Mellon University* (W.D. Pa. Aug. 26, 2020) to represent a proposed nationwide class of students for tuition refunds after their classes were moved online by Carnegie Mellon University due to the novel coronavirus, COVID-19,

xlv.   *Heigl v. Waste Management of New York, LLC* (E.D.N.Y. Aug. 27, 2020) to represent a class of insurance policyholders that were allegedly charged unlawful paper billing fees,

xlvi.   *Stellato v. Hofstra University* (E.D.N.Y. Sept. 18, 2020) to represent a proposed nationwide class of students for tuition refunds after their classes were moved online by Hofstra University due to the novel coronavirus, COVID-19.

xlvii.   *Kaupelis v. Harbor Freight Tools USA, Inc.* (C.D. Cal. Sept. 23, 2020), to represent consumers who purchased defective chainsaws.

## SCOTT A. BURSOR

Mr. Bursor has an active civil trial practice, having won multi-million verdicts or recoveries in six of six civil jury trials since 2008. Mr. Bursor's most recent victory came in May 2019 in *Perez v. Rash Curtis & Associates*, in which Mr. Bursor served as lead trial counsel and won a jury verdict finding that the Defendant violated the Telephone Consumer Protection Act 534,712 times, entitling class members to a minimum of $267 million in statutory damages.

In *Ayyad v. Sprint Spectrum L.P.* (2013), where Mr. Bursor served as lead trial counsel, the jury returned a verdict defeating Sprint's $1.06 billion counterclaim and securing the class's recovery of more than $275 million in cash and debt relief.

In *Thomas v. Global Vision Products, Inc.* (2009), the jury returned a $50 million verdict in favor of the plaintiff and class represented by Mr. Bursor. The legal trade publication VerdictSearch reported that this was the second largest jury verdict in California in 2009.

Class actions are rarely tried to verdict. Other than Mr. Bursor and his partner Mr. Fisher, we know of no lawyer that has tried more than one class action to a jury. Mr. Bursor's

BURSOR&FISHER
P.A.

perfect record of six wins in six class action jury trials, with recoveries ranging from $21 million to $299 million, is unmatched by any other lawyer.  Each of these victories was hard-fought against top trial lawyers from the biggest law firms in the United States.

Mr. Bursor graduated from the University of Texas Law School in 1996.  He served as Articles Editor of the Texas Law Review, and was a member of the Board of Advocates and Order of the Coif.  Prior to starting his own practice, Mr. Bursor was a litigation associate with Cravath, Swaine & Moore (1996-2000) and Chadbourne & Parke LLP (2001), where he represented large telecommunications, pharmaceutical, and technology companies in commercial litigation.

Mr. Bursor is a member of the state bars of New York, Florida, and California, as well as the bars of the United States Court of Appeals for the Second, Third, Fourth, Sixth, Ninth and Eleventh Circuits,  and the bars of the United States District Courts for the Southern and Eastern Districts of New York, the Northern, Central, Southern and Eastern Districts of California, the Southern and Middle Districts of Florida, and the  Eastern District of Michigan.

### *Representative Cases*

Mr. Bursor was appointed lead or co-lead class counsel to the largest, 2nd largest, and 3rd largest classes ever certified.  Mr. Bursor has represented classes including more than 160 million class members, roughly 1 of every 2 Americans.  Listed below are recent cases that are representative of Mr. Bursor's practice:

Mr. Bursor negotiated and obtained court-approval for two landmark settlements in *Nguyen v. Verizon Wireless* and *Zill v. Sprint Spectrum* (the largest and 2nd largest classes ever certified).  These settlements required Verizon and Sprint to open their wireless networks to third-party devices and applications.  These settlements are believed to be the most significant legal development affecting the telecommunications industry since 1968, when the FCC's Carterfone decision similarly opened up AT&T's wireline telephone network.

Mr. Bursor was the lead trial lawyer in *Ayyad v. Sprint Spectrum, L.P.* representing a class of approximately 2 million California consumers who were charged an early termination fee under a Sprint cellphone contract, asserting claims that such fees were unlawful liquidated damages under the California Civil Code, as well as other statutory and common law claims.  After a five-week combined bench-and-jury trial, the jury returned a verdict in June 2008 and the Court issued a Statement of Decision in December 2008 awarding the plaintiffs $299 million in cash and debt cancellation.  Mr. Bursor served as lead trial counsel for this class again in 2013 during a month-long jury trial in which Sprint asserted a $1.06 billion counterclaim against the class.  Mr. Bursor secured a verdict awarding Sprint only $18.4 million, the exact amount calculated by the class's damages expert.  This award was less than 2% of the damages Sprint sought, less than 6% of the amount of the illegal termination fees Sprint charged to class members.  In December 2016, after more than 13 years of litigation, the case was settled for $304 million, including $79 million in cash payments plus $225 million in debt cancellation.

Mr. Bursor was the lead trial lawyer in *White v. Cellco Partnership d/b/a Verizon Wireless* representing a class of approximately 1.4 million California consumers who were

charged an early termination fee under a Verizon cellphone contract, asserting claims that such fees were unlawful liquidated damages under the California Civil Code, as well as other statutory and common law claims.  In July 2008, after Mr. Bursor presented plaintiffs' case-in-chief, rested, then cross-examined Verizon's principal trial witness, Verizon agreed to settle the case for a $21 million cash payment and an injunction restricting Verizon's ability to impose early termination fees in future subscriber agreements.

Mr. Bursor was the lead trial lawyer in *Thomas v. Global Visions Products Inc.*  Mr. Bursor represented a class of approximately 150,000 California consumers who had purchased the Avacor® hair regrowth system.  In January 2008, after a four-week combined bench-and-jury trial. Mr. Bursor obtained a $37 million verdict for the class, which the Court later increased to $40 million.

Mr. Bursor was appointed class counsel and was elected chair of the Official Creditors' Committee in *In re Nutraquest Inc.*, a Chapter 11 bankruptcy case before Chief Judge Garrett E. Brown, Jr. (D.N.J.) involving 390 ephedra-related personal injury and/or wrongful death claims, two consumer class actions, four enforcement actions by governmental agencies, and multiple adversary proceedings related to the Chapter 11 case.  Working closely with counsel for all parties and with two mediators, Judge Nicholas Politan (Ret.) and Judge Marina Corodemus (Ret.), the committee chaired by Mr. Bursor was able to settle or otherwise resolve every claim and reach a fully consensual Chapter 11 plan of reorganization, which Chief Judge Brown approved in late 2006.  This settlement included a $12.8 million recovery to a nationwide class of consumers who alleged they were defrauded in connection with the purchase of Xenadrine® dietary supplement products.

Mr. Bursor was the lead trial lawyer in *In re: Pacific Bell Late Fee Litigation*.  After filing the first class action challenging Pac Bell's late fees in April 2010, winning a contested motion to certify a statewide California class in January 2012, and defeating Pac Bell's motion for summary judgment in February 2013, Mr. Bursor obtained final approval of the $38 million class settlement.  The settlement, which Mr. Bursor negotiated the night before opening statements were scheduled to commence, included a $20 million cash payment to provide refunds to California customers who paid late fees on their Pac Bell wireline telephone accounts, and an injunction that reduced other late fee charges by $18.6 million.

## L. TIMOTHY FISHER

L. Timothy Fisher has an active practice in consumer class actions and complex business litigation and has also successfully handled a large number of civil appeals.

Mr. Fisher has been actively involved in numerous cases that resulted in multi-million dollar recoveries for consumers and investors. Mr. Fisher has handled cases involving a wide range of issues including nutritional labeling, health care, telecommunications, corporate governance, unfair business practices and consumer fraud. With his partner Scott A. Bursor, Mr. Fisher has tried five class action jury trials, all of which produced successful results. In *Thomas v. Global Vision Products*, Mr. Fisher obtained a jury award of $50,024,611 — the largest class action award in California in 2009 and the second-largest jury award of any kind.

Mr. Fisher was admitted to the State Bar of California in 1997. He is also a member of the bars of the United States Court of Appeals for the Ninth Circuit and the United States District Courts for the Northern, Central, Southern and Eastern Districts of California. Mr. Fisher taught appellate advocacy at John F. Kennedy University School of Law in 2003 and 2004. In 2010, he contributed jury instructions, a verdict form and comments to the consumer protection chapter of Justice Elizabeth A. Baron's California Civil Jury Instruction Companion Handbook (West 2010). In January 2014, Chief Judge Claudia Wilken of the United States District Court for the Northern District of California appointed Mr. Fisher to a four-year term as a member of the Court's Standing Committee on Professional Conduct.

Mr. Fisher received his Juris Doctor from Boalt Hall at the University of California at Berkeley in 1997. While in law school, he was an active member of the Moot Court Board and participated in moot court competitions throughout the United States. In 1994, Mr. Fisher received an award for Best Oral Argument in the first-year moot court competition.

In 1992, Mr. Fisher graduated with highest honors from the University of California at Berkeley and received a degree in political science.  Prior to graduation, he authored an honors thesis for Professor Bruce Cain entitled "The Role of Minorities on the Los Angeles City Council."  He is also a member of Phi Beta Kappa.

### *Representative Cases*

*Thomas v. Global Vision Products, Inc.* (Alameda County Superior Court).  Mr. Fisher litigated claims against Global Vision Products, Inc. and other individuals in connection with the sale and marketing of a purported hair loss remedy known as Avacor.  The case lasted more than seven years and involved two trials.  The first trial resulted in a verdict for plaintiff and the class in the amount of $40,000,000.  The second trial resulted in a jury verdict of $50,024,611, which led to a $30 million settlement for the class.

*In re Cellphone Termination Fee Cases* - Handset Locking Actions (Alameda County Superior Court).  Mr. Fisher actively worked on five coordinated cases challenging the secret locking of cell phone handsets by major wireless carriers to prevent consumers from activating them on competitive carriers' systems.  Settlements have been approved in all five cases on terms that require the cell phone carriers to disclose their handset locks to consumers and to provide unlocking codes nationwide on reasonable terms and conditions.  The settlements fundamentally changed the landscape for cell phone consumers regarding the locking and unlocking of cell phone handsets.

*In re Cellphone Termination Fee Cases* - Early Termination Fee Cases (Alameda County Superior Court and Federal Communications Commission).  In separate cases that are a part of the same coordinated litigation as the Handset Locking Actions, Mr. Fisher actively worked on claims challenging the validity under California law of early termination fees imposed by national cell phone carriers. In one of those cases, against Verizon Wireless, a nationwide settlement was reached after three weeks of trial in the amount of $21 million.  In a second case, which was tried to verdict, the Court held after trial that the $73 million of flat early termination fees that Sprint had collected from California consumers over an eight-year period were void and unenforceable.

### *Selected Published Decisions*

*Melgar v. Zicam LLC*, 2016 WL 1267870 (E.D. Cal. Mar. 30, 2016) (certifying 10-jurisdiction class of purchasers of cold remedies, denying motion for summary judgment, and denying motions to exclude plaintiff's expert witnesses).

*Salazar v. Honest Tea, Inc*., 2015 WL 7017050 (E.D. Cal. Nov. 12. 2015) (denying motion for summary judgment).

*Dei Rossi v. Whirlpool Corp.*, 2015 WL 1932484 (E.D. Cal. Apr. 27, 2015) (certifying California class of purchasers of refrigerators that were mislabeled as Energy Star qualified).

*Bayol v. Zipcar, Inc.*, 78 F.Supp.3d 1252 (N.D. Cal. 2015) (denying motion to dismiss claims alleging unlawful late fees under California Civil Code § 1671).

*Forcellati v. Hyland's, Inc.*, 2015 WL 9685557 (C.D. Cal. Jan. 12, 2015) (denying motion for summary judgment in case alleging false advertising of homeopathic cold and flu remedies for children).

*Bayol v. Zipcar, Inc.*, 2014 WL 4793935 (N.D. Cal. Sept. 25, 2014) (denying motion to transfer venue pursuant to a forum selection clause).

*Forcellati v. Hyland's Inc.*, 2014 WL 1410264 (C.D. Cal. Apr. 9, 2014) (certifying nationwide class of purchasers of homeopathic cold and flu remedies for children).

*Hendricks v. StarKist Co.*, 30 F.Supp.3d 917 (N.D. Cal. 2014) (denying motion to dismiss in case alleging underfilling of 5-ounce cans of tuna).

*Dei Rossi v. Whirlpool Corp.*, 2013 WL 5781673 (E.D. Cal. October 25, 2013) (denying motion to dismiss in case alleging that certain KitchenAid refrigerators were misrepresented as Energy Star qualified).

*Forcellati v. Hyland's Inc.*, 876 F.Supp.2d 1155 (C.D. Cal. 2012) (denying motion to dismiss complaint alleging false advertising regarding homeopathic cold and flu remedies for children).

*Clerkin v. MyLife.com*, 2011 WL 3809912 (N.D. Cal. August 29, 2011) (denying defendants' motion to dismiss in case alleging false and misleading advertising by a social networking company).

*In re Cellphone Termination Fee Cases*, 186 Cal.App.4th 1380 (2010) (affirming order approving $21 million class action settlement).

*Gatton v. T-Mobile USA, Inc.*, 152 Cal.App.4th 571 (2007) (affirming order denying motion to compel arbitration).

### *Selected Class Settlements*

*Melgar v. Zicam* (Eastern District of California) - $16 million class settlement of claims alleging cold medicine was ineffective.

*Gastelum v. Frontier California Inc.* (San Francisco Superior Court) - $10.9 million class action settlement of claims alleging that a residential landline service provider charged unlawful late fees.

*West v. California Service Bureau, Inc.* (Northern District of California) - $4.1 million class settlement of claims under the Telephone Consumer Protection Act.

*Gregorio v. Premier Nutrition Corp.* (Southern District of New York) - $9 million class settlement of false advertising claims against protein shake manufacturer.

*Morris v. SolarCity Corp.* (Northern District of California) - $15 million class settlement of claims under the Telephone Consumer Protection Act.

*Retta v. Millennium Products, Inc.* (Central District of California) - $8.25 million settlement to resolve claims of bottled tea purchasers for alleged false advertising.

*Forcellati v. Hyland's* (Central District of California) – nationwide class action settlement providing full refunds to purchasers of homeopathic cold and flu remedies for children.

*Dei Rossi v. Whirlpool* (Eastern District of California) – class action settlement providing $55 cash payments to purchasers of certain KitchenAid refrigerators that allegedly mislabeled as Energy Star qualified.

*In Re NVIDIA GTX 970 Graphics Chip Litigation* (Northern District of California) - $4.5 million class action settlement of claims alleging that a computer graphics card was sold with false and misleading representations concerning its specifications and performance.

*Hendricks v. StarKist Co.* (Northern District of California) – $12 million class action settlement of claims alleging that 5-ounce cans of tuna were underfilled.

*In re Zakskorn v. American Honda Motor Co.* Honda (Eastern District of California) – nationwide settlement providing for brake pad replacement and reimbursement of out-of-pocket expenses in case alleging defective brake pads on Honda Civic vehicles manufactured between 2006 and 2011.

*Correa v. Sensa Products, LLC* (Los Angeles Superior Court) - $9 million settlement on behalf of purchasers of the Sensa weight loss product.

*In re Pacific Bell Late Fee Litigation* (Contra Costa County Superior Court) - $38.6 million settlement on behalf of Pac Bell customers who paid an allegedly unlawful late payment charge.

*In re Haier Freezer Consumer Litigation* (Northern District of California) - $4 million settlement, which provided for cash payments of between $50 and $325.80 to class members who purchased the Haier HNCM070E chest freezer.

*Thomas v. Global Vision Products, Inc.* (Alameda County Superior Court) - $30 million settlement on behalf of a class of purchasers of a hair loss remedy.

*Guyette v. Viacom, Inc.* (Alameda County Superior Court) - $13 million settlement for a class of cable television subscribers who alleged that the defendant had improperly failed to share certain tax refunds with its subscribers.

## JOSEPH I. MARCHESE

Joseph I. Marchese is a Partner with Bursor & Fisher, P.A.  Joe focuses his practice on consumer class actions, employment law disputes, and commercial litigation.  He has

represented corporate and individual clients in a wide array of civil litigation, and has substantial trial and appellate experience.

Joe has diverse experience in litigating and resolving consumer class actions involving claims of mislabeling, false or misleading advertising, privacy violations, data breach claims, and violations of the Servicemembers Civil Relief Act.

Joe also has significant experience in multidistrict litigation proceedings. Recently, he served on the Plaintiffs' Executive Committee in *In Re: Blue Buffalo Company, Ltd. Marketing And Sales Practices Litigation*, MDL No. 2562, which resulted in a $32 million consumer class settlement. Currently, he serves on the Plaintiffs' Steering Committee for Economic Reimbursement in *In Re: Valsartan Products Liability Litigation*, MDL. No. 2875.

Joe is admitted to the State Bar of New York and is a member of the bars of the United States District Courts for the Southern District of New York, the Eastern District of New York, and the Eastern District of Michigan, as well as the United States Court of Appeals for the Second Circuit.

Joe graduated from Boston University School of Law in 2002 where he was a member of The Public Interest Law Journal. In 1998, Joe graduated with honors from Bucknell University.

### *Selected Published Decisions:*

*Boelter v. Hearst Communications, Inc.*, 269 F. Supp. 3d 172 (S.D.N.Y. Sept. 7, 2017), granting plaintiff's motion for partial summary judgment on state privacy law violations in putative class action.

*Boelter v. Hearst Communications, Inc.*, 192 F. Supp. 3d 427 (S.D.N.Y. June 17, 2016), denying publisher's motion to dismiss its subscriber's allegations of state privacy law violations in putative class action.

*In re Scotts EZ Seed Litigation*, 304 F.R.D. 397 (S.D.N.Y. 2015), granting class certification of false advertising and other claims brought by New York and California purchasers of grass seed product.

*Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014), granting nationwide class certification of false advertising and other claims brought by purchasers of purported "100% Pure Olive Oil" product.

*In re Michaels Stores Pin Pad Litigation*, 830 F. Supp. 2d 518 (N.D. Ill. 2011), denying retailer's motion to dismiss its customers' state law consumer protection and privacy claims in data breach putative class action.

## *Selected Class Settlements:*

*Edwards v. Hearst Communications, Inc.*, Case No. 15-cv-09279-AT (S.D.N.Y. 2019) – final approval granted for $50 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*Moeller v. Advance Magazine Publishers, Inc. d/b/a Condé Nast*, Case No. 15-cv-05671-NRB (S.D.N.Y. 2019) – final approval granted for $13.75 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

In *re Scotts EZ Seed Litigation*, Case No. 12-cv-4727-VB (S.D.N.Y. 2018) – final approval granted for $47 million class settlement to resolve false advertising claims of purchasers of combination grass seed product.

*In Re:  Blue Buffalo Marketing And Sales Practices Litigation*, Case No. 14-MD-2562-RWS (E.D. Mo. 2016) – final approval granted for $32 million class settlement to resolve claims of pet owners for alleged false advertising of pet foods.

*Rodriguez v. Citimortgage, Inc.*, Case No. 11-cv-4718-PGG (S.D.N.Y. 2015) – final approval granted for $38 million class settlement to resolve claims of military servicemembers for alleged foreclosure violations of the Servicemembers Civil Relief Act, where each class member was entitled to $116,785 plus lost equity in the foreclosed property and interest thereon.

*O'Brien v. LG Electronics USA, Inc., et al.*, Case No. 10-cv-3733-DMC (D.N.J. 2011) – final approval granted for $23 million class settlement to resolve claims of Energy Star refrigerator purchasers for alleged false advertising of the appliances' Energy Star qualification.

## JOSHUA D. ARISOHN

Joshua D. Arisohn is a Partner with Bursor & Fisher, P.A. Josh has litigated precedent-setting cases in the areas of consumer class actions and terrorism. He participated in the first ever trial to take place under the Anti-Terrorism Act, a statute that affords U.S. citizens the right to assert federal claims for injuries arising out of acts of international terrorism. Josh's practice continues to focus on terrorism-related matters as well as class actions.

Josh is admitted to the State Bar of New York and is a member of the bars of the United States District Courts for the Southern District of New York and the Eastern District of New York.

Josh previously practiced at Dewey & LeBoeuf LLP and DLA Piper LLP. He graduated from Columbia University School of Law in 2006, where he was a Harlan Fiske Stone Scholar, and received his B.A. from Cornell University in 2002. Josh has been honored as a 2015 and 2016 Super Lawyer Rising Star.

### *Selected Published Decisions:*

*Morris v. SolarCity Corp.*, 2016 WL 1359378 (N.D. Cal. Apr. 4, 2016), denying defendant's motion to dismiss claims that solar company illegally called consumers using an artificial or prerecorded voice and an automatic telephone dialing system.

*Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427 (S.D.N.Y. 2016), denying defendant's motion to dismiss and finding that the Michigan Video Rental Privacy Act does not violate the First Amendment.

*Edwards v. Oportun, Inc.*, 193 F. Supp. 3d 1096 (N.D. Cal. 2016), denying defendant's motion dismiss and rejecting its argument that providing a class representative with a cashier's check for his individual damages mooted his individual and class claims.

### *Selected Class Settlements:*

*Morris v. SolarCity Corp.*, Case No. 3:15-cv-05107-RS (N.D. Cal.) - final approval granted for $15 million class settlement to resolve claims under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*

## JOEL D. SMITH

Joel D. Smith is a Partner with Bursor & Fisher, P.A. Joel's practice focuses on consumer class actions and complex litigation. He has substantial experience in trial and appellate courts across the nation.

Prior to joining Bursor & Fisher, Joel was a litigator at Crowell & Moring, where he represented Fortune 500 companies, privately-held businesses, and public entities in commercial litigation and nationwide class actions. While at Crowell & Moring, Joel litigated some of the firm's most high-profile matters, including several class actions alleging deceptive sales practices with respect to Apple iPhones and iPads, and a class action seeking to hold U.S. energy companies accountable for global warming. In California state court, Joel represented four major U.S. retailers in a case arising from a devastating arson fire and ensuing state of emergency in Roseville, California. That case included crossclaims by the defendant alleging a vast cover-up by the City of Roseville's fire and police departments; the involvement of the federal Bureau of Alcohol, Tobacco, Firearms and Explosives; and settlement on the eve of a trial that was expected to last several months and involve numerous witnesses. Joel also was part of the trial team in a widely publicized trial over the death of a contestant who died after participating in a Sacramento radio station's water drinking contest.

More recently, Joel has represented University of California students in a class action seeking the return of late fees unlawfully collected from students. He also served as interim class counsel in *In re Welspun Litigation* (S.D.N.Y. January 26, 2017), a class action against three of the largest retailers in the United States and one of the largest textile manufacturers in the world, arising from events that one reporter described as the "biggest counterfeit story in retail history."

Joel received both his undergraduate and law degrees from the University of California at Berkeley. While at Berkeley School of Law, he was a member of the California Law Review, received several academic honors, externed for the California Attorney General's office and published an article on climate change policy and litigation.

Joel is admitted to the State Bar of California, as well as the United States Courts of Appeals for the Second, Third and Ninth Circuits; the Northern, Central, Southern and Eastern Districts of California; and is a member of the General Bar of the Northern District of Illinois.

### *Selected Published Decisions:*

*Revitch v. DIRECTV, LLC*, --- F.3d --- (9th Cir. 2020), affirming denial of motion to compel arbitration in putative class action alleging unlawful calls under the Telephone Consumer Protection Act.

*Kaupelis v. Harbor Freight Tools USA, Inc.*, 2020 WL 5901116 (C.D. Cal. Sept. 23, 2020), granting class certification of consumer protection claims brought by purchasers of defective chainsaws.

### *Selected Class Settlements:*

*Morris v. SolarCity Corp.*, Case No. 3:15-cv-05107-RS (N.D. Cal.) - final approval granted for $15 million class settlement to resolve claims under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*

## NEAL J. DECKANT

Neal J. Deckant is a Partner with Bursor & Fisher, P.A. Neal focuses his practice on complex business litigation, consumer class actions, and employment law disputes. Prior to joining Bursor & Fisher, Neal counseled low-income homeowners facing foreclosure in East Boston.

In 2015, Neal was defense trial counsel for a law firm and several of its partners in a sexual harassment case brought by a former associate of that firm. The plaintiff's complaint sought $22 million in compensatory and punitive damages. After a 3-week trial in federal court in New York, the jury returned a verdict of not liable for the federal and state law claims. During the trial, the judge also granted defendants' motion for judgment as a matter of law on the plaintiff's claims for retaliation and defamation. The jury found liability solely under New York City's human rights law, awarding only $140,000 in damages.

Neal is admitted to the State Bars of California and New York, and is a member of the bars of the United States District Court for the Northern District of California, the United States District Court for the Eastern District of California, the United States District Court for the Central District of California, the United States District Court for the Southern District of California, the United States District Court for the Southern District of New York, the United States District Court for the Eastern District of New York, and the bars of the United States Courts of Appeals for the Second and Ninth Circuits.

Neal received his Juris Doctor from Boston University School of Law in 2011, graduating cum laude with two Dean's Awards.  During law school, Neal served as a Senior Articles Editor for the Review of Banking and Financial Law, where he authored two published articles about securitization reforms, both of which were cited by the New York Court of Appeals, the highest court in the state.  Neal was also awarded Best Oral Argument in his moot court section, and he served as a Research Assistant for his Securities Regulation professor. Neal has also been honored as a 2014, 2015, 2016, and 2017 Super Lawyers Rising Star.  In 2007, Neal graduated with Honors from Brown University with a dual major in East Asian Studies and Philosophy.

### *Selected Published Decisions:*

*Martinelli v. Johnson & Johnson*, 2019 WL 1429653 (N.D. Cal. Mar. 29, 2019), granting class certification of false advertising and other claims brought by purchasers of Benecol spreads labeled with the representation "No Trans Fats."

*Dzielak v. Whirlpool Corp.*, 2017 WL 6513347 (D.N.J. Dec. 20, 2017), granting class certification of consumer protection claims brought by purchasers of Maytag Centennial washing machines marked with the "Energy Star" logo.

*Duran v. Obesity Research Institute*, LLC, 204 Cal. Rptr. 3d 896 (Cal. Ct. App. 2016), reversing and remanding final approval of a class action settlement on appeal, regarding allegedly mislabeled dietary supplements, in connection with a meritorious objection.

*Marchuk v. Faruqi & Faruqi, LLP*, et al., 100 F. Supp. 3d 302 (S.D.N.Y. 2015), granting individual and law firm defendants' motion for judgment as a matter of law on plaintiff's claims for retaliation and defamation, as well as for all claims against law firm partners, Nadeem and Lubna Faruqi.

*Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014), granting nationwide class certification of false advertising and other claims brought by purchasers of purported "100% Pure Olive Oil" product.

*Ebin v. Kangadis Food Inc.*, 2014 WL 737878 (S.D.N.Y. Feb. 25, 2014), denying distributor's motion for summary judgment against nationwide class of purchasers of purported "100% Pure Olive Oil" product.

### *Selected Class Settlements:*

*In Re NVIDIA GTX 970 Graphics Chip Litigation*, Case No. 15-cv-00760-PJH (N.D. Cal. Dec. 7, 2016) – final approval granted for $4.5 million class action settlement to resolve claims that a computer graphics card was allegedly sold with false and misleading representations concerning its specifications and performance.

*Hendricks v. StarKist Co.*, 2016 WL 5462423 (N.D. Cal. Sept. 29, 2016) – final approval granted for $12 million class action settlement to resolve claims that 5-ounce cans of tuna were allegedly underfilled.

BURSOR&FISHER
P.A.

*In re: Kangadis Food Inc.*, Case No. 8-14-72649 (Bankr. E.D.N.Y. Dec. 17, 2014) – class action claims resolved for $2 million as part of a Chapter 11 plan of reorganization, after a corporate defendant filed for bankruptcy, following claims that its olive oil was allegedly sold with false and misleading representations.

### *Selected Publications:*

Neal Deckant, *X. Reforms of Collateralized Debt Obligations: Enforcement, Accounting and Regulatory Proposals*, 29 Rev. Banking & Fin. L. 79 (2009) (cited in *Quadrant Structured Products Co., Ltd. v. Vertin*, 16 N.E.3d 1165, 1169 n.8 (N.Y. 2014)).

Neal Deckant, *Criticisms of Collateralized Debt Obligations in the Wake of the Goldman Sachs Scandal*, 30 Rev. Banking & Fin. L. 407 (2010) (cited in *Quadrant Structured Products Co., Ltd. v. Vertin*, 16 N.E.3d 1165, 1169 n.8 (N.Y. 2014); *Lyon Village Venetia, LLC v. CSE Mortgage LLC*, 2016 WL 476694, at *1 n.1 (Md. Ct. Spec. App. Feb. 4, 2016); Ivan Ascher, Portfolio Society: On the Capitalist Mode of Prediction, at 141, 153, 175 (Zone Books / The MIT Press 2016); Devon J. Steinmeyer, *Does State National Bank of Big Spring v. Geithner Stand a Fighting Chance?*, 89 Chi.-Kent. L. Rev. 471, 473 n.13 (2014)).

### **YITZCHAK KOPEL**

Yitzchak Kopel is a Partner with Bursor & Fisher, P.A. Yitz focuses his practice on consumer class actions, employment law disputes, and complex business litigation. He has represented corporate and individual clients before federal and state courts, as well as in arbitration proceedings.

Yitz has substantial experience in successfully litigating and resolving consumer class actions involving claims of consumer fraud, data breaches, and violations of the telephone consumer protection act. Since 2014, Yitz has obtained class certification on behalf of his clients five times, three of which were certified as nationwide class actions. Bursor & Fisher was appointed as class counsel to represent the certified classes in each of the cases.

Yitz is admitted to the State Bars of New York and New Jersey, the bar of the United States Court of Appeals for the Eleventh and Ninth Circuits, and the bars of the United States District Courts for the Southern District of New York, Eastern District of New York, Eastern District of Missouri, Eastern District of Wisconsin, and District of New Jersey.

Yitz received his Juris Doctorate from Brooklyn Law School in 2012, graduating *cum laude* with two Dean's Awards. During law school, Yitz served as an Articles Editor for the Brooklyn Law Review and worked as a Law Clerk at Shearman & Sterling. In 2009, Yitz graduated *cum laude* from Queens College with a B.A. in Accounting.

### *Selected Published Decisions:*

*Poppiti v. United Industries Corp.*, 2020 WL 1433642 (E.D. Mo. Mar. 24, 2020), denying motion to dismiss claims in putative class action concerning citronella candles.

BURSOR&FISHER
P.A.

*Bakov v. Consolidated World Travel, Inc.*, 2019 WL 6699188 (N.D. Ill. Dec. 9, 2019), granting summary judgment on behalf of certified class in robocall class action.

*Krumm v. Kittrich Corp.*, 2019 WL 6876059 (E.D. Mo. Dec. 17, 2019), denying motion to dismiss claims in putative class action concerning mosquito repellent.

*Crespo v. S.C. Johnson & Son, Inc.*, 394 F. Supp. 3d 260 (S.D.N.Y. 2019), denying defendant's motion to dismiss fraud and consumer protection claims in putative class action regarding Raid insect fogger.

*Bakov v. Consolidated World Travel, Inc.*, 2019 WL 1294659 (N.D. Ill. Mar. 21, 2019), certifying a class of persons who received robocalls in the state of Illinois.

*Bourbia v. S.C. Johnson & Son, Inc.*, 375 F. Supp. 3d 454 (S.D.N.Y. 2019), denying defendant's motion to dismiss fraud and consumer protection claims in putative class action regarding mosquito repellent.

*Hart v. BHH, LLC*, 323 F. Supp. 3d 560 (S.D.N.Y. 2018), denying defendants' motion for summary judgment in certified class action involving the sale of ultrasonic pest repellers.

*Hart v. BHH, LLC*, 2018 WL 3471813 (S.D.N.Y. July 19, 2018), denying defendants' motion to exclude plaintiffs' expert in certified class action involving the sale of ultrasonic pest repellers.

*Penrose v. Buffalo Trace Distillery, Inc.*, 2018 WL 2334983 (E.D. Mo. Feb. 5, 2018), denying bourbon producers' motion to dismiss fraud and consumer protection claims in putative class action.

*West v. California Service Bureau, Inc.*, 323 F.R.D. 295 (N.D. Cal. 2017), certifying a nationwide class of "wrong-number" robocall recipients.

*Hart v. BHH, LLC*, 2017 WL 2912519 (S.D.N.Y. July 7, 2017), certifying nationwide class of purchasers of ultrasonic pest repellers.

*Browning v. Unilever United States, Inc.*, 2017 WL 7660643 (C.D. Cal. Apr. 26, 2017), denying motion to dismiss fraud and warranty claims in putative class action concerning facial scrub product.

*Brenner v. Procter & Gamble Co.*, 2016 WL 8192946 (C.D. Cal. Oct. 20, 2016), denying motion to dismiss warranty and consumer protection claims in putative class action concerning baby wipes.

*Hewlett v. Consolidated World Travel, Inc.*, 2016 WL 4466536 (E.D. Cal. Aug. 23, 2016), denying telemarketer's motion to dismiss TCPA claims in putative class action.

*Bailey v. KIND, LLC*, 2016 WL 3456981 (C.D. Cal. June 16, 2016), denying motion to dismiss fraud and warranty claims in putative class action concerning snack bars.

*Hart v. BHH, LLC*, 2016 WL 2642228 (S.D.N.Y. May 5, 2016) denying motion to dismiss warranty and consumer protection claims in putative class action concerning ultrasonic pest repellers.

*Marchuk v. Faruqi & Faruqi, LLP, et al.*, 100 F. Supp. 3d 302 (S.D.N.Y. 2015), granting clients' motion for judgment as a matter of law on claims for retaliation and defamation in employment action.

*In re Scotts EZ Seed Litigation*, 304 F.R.D. 397 (S.D.N.Y. 2015), granting class certification of false advertising and other claims brought by New York and California purchasers of grass seed product.

*Brady v. Basic Research, L.L.C.*, 101 F. Supp. 3d 217 (E.D.N.Y. 2015), denying diet pill manufacturers' motion to dismiss its purchasers' allegations for breach of express warranty in putative class action.

*Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151 (S.D.N.Y. 2014), denying online job board's motion to dismiss its subscribers' allegations of consumer protection law violations in putative class action.

*Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014), granting nationwide class certification of false advertising and other claims brought by purchasers of purported "100% Pure Olive Oil" product.

*Ebin v. Kangadis Food Inc.*, 2014 WL 737878 (S.D.N.Y. Feb. 25, 2014), denying distributor's motion for summary judgment against nationwide class of purchasers of purported "100% Pure Olive Oil" product.

### ***Selected Class Settlements:***

*Hart v. BHH, LLC*, Case No. 1:15-cv-04804 (S.D.N.Y. Sept. 22, 2020), resolving class action claims regarding ultrasonic pest repellers.

*In re: Kangadis Food Inc.*, Case No. 8-14-72649 (Bankr. E.D.N.Y. Dec. 17, 2014), resolving class action claims for $2 million as part of a Chapter 11 plan of reorganization, after a corporate defendant filed for bankruptcy following the certification of nationwide claims alleging that its olive oil was sold with false and misleading representations.

*West v. California Service Bureau*, Case No. 4:16-cv-03124-YGR (N.D. Cal. Jan. 23, 2019), resolving class action claims against debt-collector for wrong-number robocalls for $4.1 million.

## **FREDERICK J. KLORCZYK III**

Frederick J. Klorczyk III is a Partner with Bursor & Fisher, P.A.  Fred focuses his practice on complex business litigation and consumer class actions.

Fred has substantial experience in successfully litigating and resolving consumer class actions involving claims of mislabeling, false or misleading advertising, and privacy violations. In 2019, Fred certified both a California and a 10-state express warranty class on behalf of purchasers of a butter substitute.  In 2014, Fred served on the litigation team in *Ebin v. Kangadis Food Inc.*  At class certification, Judge Rakoff adopted Fred's choice of law fraud analysis and research directly into his published decision certifying a nationwide fraud class.

Fred is admitted to the State Bars of California, New York, and New Jersey, and is a member of the bars of the United States District Courts for the Northern, Central, Eastern, and Southern Districts of California, the Southern, Eastern, and Northern Districts of New York, the District of New Jersey, the Northern District of Illinois, the Eastern District of Missouri, the Eastern District of Wisconsin, and the Eastern District of Michigan, as well as the bars of the United States Courts of Appeals for the Second and Ninth Circuits.

Fred received his Juris Doctor from Brooklyn Law School in 2013, graduating m*agna cum laude* with two CALI Awards for the highest grade in his classes on conflict of laws and criminal law.  During law school, Fred served as an Associate Managing Editor for the Brooklyn Journal of Corporate, Financial and Commercial Law and as an intern to the Honorable Alison J. Nathan of the United States District Court for the Southern District of New York and the Honorable Janet Bond Arterton of the United States District Court for the District of Connecticut.  In 2010, Fred graduated from the University of Connecticut with a B.S. in Finance.

### ***Selected Published Decisions:***

*Revitch v. New Moosejaw, LLC*, 2019 WL 5485330 (N.D. Cal. Oct. 23, 2019), denying defendants' motions to dismiss consumer's allegations of state privacy law violations in putative class action.

*In re Welspun Litigation*, 2019 WL 2174089 (S.D.N.Y. May 20, 2019), denying retailers' and textile manufacturer's motion to dismiss consumers' allegations of false advertising relating to purported "100% Egyptian Cotton" linen products.

*Martinelli v. Johnson & Johnson*, 2019 WL 1429653 (E.D. Cal. Mar. 29, 2019), granting class certification of California false advertising claims and multi-state express warranty claims brought by purchasers of a butter substitute.

*Porter v. NBTY, Inc.*, 2016 WL 6948379 (N.D. Ill. Nov. 28, 2016), denying supplement manufacturer's motion to dismiss consumers' allegations of false advertising relating to whey protein content.

*Weisblum v. Prophase Labs, Inc.*, 88 F. Supp. 3d. 282 (S.D.N.Y. 2015), denying supplement manufacturer's motion to dismiss consumers' allegations of false advertising relating to a homeopathic cold product.

*In re Scotts EZ Seed Litigation*, 304 F.R.D. 397 (S.D.N.Y. 2015), granting class certification of false advertising and other claims brought by New York and California purchasers of grass seed product.

BURSOR&FISHER
P.A.

*Marchuk v. Faruqi & Faruqi, LLP, et al.*, 100 F. Supp. 3d 302 (S.D.N.Y. 2015), granting individual and law firm defendants' motion for judgment as a matter of law on plaintiff's claims for retaliation and defamation, as well as for all claims against law firm partners, Nadeem and Lubna Faruqi.

*Ebin v. Kangadis Food Inc.*, Case No. 13-4775 (2d Cir. Apr. 15, 2015), denying olive oil manufacturer's Rule 23(f) appeal following grant of nationwide class certification.

*Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014), granting nationwide class certification of false advertising and other claims brought by purchasers of purported "100% Pure Olive Oil" product.

*Ebin v. Kangadis Food Inc.*, 2014 WL 737878 (S.D.N.Y. Feb. 25, 2014), denying distributor's motion for summary judgment against nationwide class of purchasers of purported "100% Pure Olive Oil" product.

### *Selected Class Settlements:*

*Gregorio v. Premier Nutrition Corp.*, Case No. 17-cv-05987-AT (S.D.N.Y. 2019) – final approval granted for $9 million class settlement to resolve claims of protein shake purchasers for alleged false advertising.

*Ruppel v. Consumers Union of United States, Inc.*, Case No. 16-cv-02444-KMK (S.D.N.Y. 2018) – final approval granted for $16.375 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*In Re: Blue Buffalo Marketing And Sales Practices Litigation*, Case No. 14-MD-2562-RWS (E.D. Mo. 2016) –final approval granted for $32 million class settlement to resolve claims of pet owners for alleged false advertising of pet foods.

*In re: Kangadis Food Inc.*, Case No. 8-14-72649 (Bankr. E.D.N.Y. Dec. 17, 2014) – resolved class action claims for $2 million as part of a Chapter 11 plan of reorganization, after a corporate defendant filed for bankruptcy following the certification of nationwide claims alleging that its olive oil was sold with false and misleading representations.

## YEREMEY O. KRIVOSHEY

Yeremey O. Krivoshey is a Partner with Bursor & Fisher, P.A.  Mr. Krivoshey focuses his practice on class actions involving false advertising, fraud, illegal fees in consumer contracts, invasion of privacy, and unlawful debt collection practices.  He has represented clients in a wide array of civil litigation, including appeals before the Ninth Circuit.

Mr. Krivoshey served as trial counsel with Mr. Bursor in *Perez. v. Rash Curtis & Associates*, where, in May 2019, the jury returned a verdict for a minimum of $267 million in statutory damages under the Telephone Consumer Protection Act.

Mr. Krivoshey is admitted to the State Bar of California.  He is also a member of the bars of the United States Court of Appeals for the Ninth Circuit and the United States District Courts for the Northern, Central, Southern, and Eastern Districts of California, as well as the District of Colorado.

Mr. Krivoshey graduated from New York University School of Law in 2013, where he was a Samuel A. Herzog Scholar.  Prior to Bursor & Fisher, P.A., Mr. Krivoshey worked as a Law Clerk at Vladeck, Waldman, Elias & Engelhard, P.C, focusing on employment discrimination and wage and hour disputes.  In law school, he has also interned at the American Civil Liberties Union and the United States Department of Justice.  In 2010, Mr. Krivoshey graduated *cum laude* from Vanderbilt University.

### *Representative Cases:*

*Perez v. Rash Curtis & Associates*, Case No. 16-cv-03396-YGR (N.D. Cal. May 13, 2019).  Mr. Krivoshey litigated claims against a national health-care debt collection agency on behalf of people that received autodialed calls on their cellular telephones without their prior express consent.  Mr. Krivoshey successfully obtained nationwide class certification, defeated the defendant's motion for summary judgment, won summary judgment as to the issue of prior express consent and the use of automatic telephone dialing systems, and navigated the case towards trial.  With his partner, Scott Bursor, Mr. Krivoshey obtained a jury verdict finding that the defendant violated the Telephone Consumer Protection Act ("TCPA") 534,712 times.  Under the TCPA, class members are entitled to a minimum of $500 per each call made in violation of the TCPA – in this case, a minimum of $267 million for 534,712 unlawful calls.

### *Selected Published Decisions:*

*Bayol v. Zipcar, Inc*., 2014 WL 4793935 (N.D. Cal. Sept. 25, 2014), denying enforcement of forum selection clause based on public policy grounds.

*Bayol v. Zipcar, Inc*., 78 F. Supp. 3d 1252 (N.D. Cal. Jan. 29, 2015), denying car-rental company's motion to dismiss its subscriber's allegations of unlawful late fees.

*Brown v. Comcast Corp*., 2016 WL 9109112 (C.D. Cal. Aug. 12, 2016), denying internet service provider's motion to compel arbitration of claims alleged under the Telephone Consumer Protection Act.

*Choi v. Kimberly-Clark Worldwide, Inc*., 2019 WL 4894120 (C.D. Cal. Aug. 28, 2019), denying tampon manufacturer's motion to dismiss its customer's design defect claims.

*Horanzy v. Vemma Nutrition Co*., Case No. 15-cv-298-PHX-JJT (D. Ariz. Apr. 16, 2016), denying multi-level marketer's and its chief scientific officer's motion to dismiss their customer's fraud claims.

*McMillion, et al. v. Rash Curtis & Associates*, 2017 WL 3895764 (N.D. Cal. Sept. 6, 2017), granting nationwide class certification of Telephone Consumer Protection Act claims by persons receiving autodialed and prerecorded calls without consent.

*McMillion, et al. v. Rash Curtis & Associates*, 2018 WL 692105 (N.D. Cal. Feb. 2, 2018), granting plaintiffs' motion for partial summary judgment on Telephone Consumer Protection Act violations in certified class action.

*Perez v. Indian Harbor Ins. Co.*, 2020 WL 2322996 (N.D. Cal. May 11, 2020), denying insurance company's motion to dismiss or stay assigned claims of bad faith and fair dealing arising out of $267 million trial judgment.

*Perez v. Rash Curtis & Associates*, 2020 WL 1904533 (N.D. Cal. Apr. 17, 2020), upholding constitutionality of $267 million class trial judgment award.

*Salazar v. Honest Tea, Inc.*, 2015 WL 7017050 (E.D. Cal. Nov. 12. 2015), denying manufacturer's motion for summary judgment as to customer's false advertising claims.

### *Selected Class Settlements:*

*Juarez-Segura, et al. v. Western Dental Services, Inc.* (Cal. Sup. Ct.) $35 million settlement to resolve claims of dental customers for alleged unlawful late fees.

*Moore v. Kimberly-Clark Worldwide, Inc.* (Ill. Cir. Ct.) $10.5 million settlement to resolve claims of tampon purchasers for alleged defective products.

*Retta v. Millennium Prods., Inc.*, 2017 WL 5479637 (C.D. Cal. Aug. 22, 2017) granting final approval of $8.25 million settlement to resolve claims of kombucha purchasers for alleged false advertising.

*Cortes v. National Credit Adjusters, L.L.C.* (E.D. Cal.) $6.8 million settlement to resolve claims of persons who received alleged autodialed calls without prior consent in violation of the TCPA.

*Bayol et al. v. Health-Ade LLC, et al.* (N.D. Cal.) – granting final approval of $3,997,500 settlement to resolve claims of kombucha purchasers for alleged false advertising.

### PHILIP L. FRAIETTA

Philip L. Fraietta is a Partner with Bursor & Fisher, P.A. Phil focuses his practice on data privacy, complex business litigation, consumer class actions, and employment law disputes.

Phil has significant experience in litigating consumer class actions, particularly those involving data privacy claims. Since 2016, Phil has settled five state privacy law actions on a class-wide basis for a total of over $95 million in settlement value for class members. In addition to data privacy claims, Phil has significant experience in litigating and settling class action claims involving dietary supplements.

Phil is admitted to the State Bars of New York and New Jersey, the bars of the United States District Courts for the Southern District of New York, the Eastern District of New York, the Western District of New York, the Northern District of New York, the District of New Jersey, the Eastern District of Michigan and the United States Court of Appeals for the Second Circuit. Phil was a Summer Associate with Bursor & Fisher prior to joining the firm.

BURSOR&FISHER
P.A.

Phil received his Juris Doctor from Fordham University School of Law in 2014, graduating cum laude. During law school, Phil served as an Articles & Notes Editor for the Fordham Law Review, and published two articles. In addition, Phil received the Addison M. Metcalf Labor Law Prize for the highest grade in his graduating class in the Labor Law course, and received the highest grade in his Anti-Discrimination Law & Policy course.  In 2011, Phil graduated cum laude from Fordham University with a B.A. in Economics.

### *Selected Published Decisions:*

*Boelter v. Hearst Communications, Inc.*, 269 F. Supp. 3d 172 (S.D.N.Y. 2017), granting plaintiff's motion for partial summary judgment on state privacy law violations in putative class action.

*Boelter v. Hearst Communications, Inc.*, 192 F. Supp. 3d 427 (S.D.N.Y. 2016), denying publisher's motion to dismiss its subscriber's allegations of state privacy law violations in putative class action.

*Boelter v. Advance Magazine Publishers Inc.*, 210 F. Supp. 3d 579 (S.D.N.Y. 2016), denying publisher's motion to dismiss its subscriber's allegations of state privacy law violations in putative class action.

*Porter v. NBTY, Inc.*, 2016 WL 6948379 (N.D. Ill. Nov. 28, 2016), denying supplement manufacturer's motion to dismiss consumers' allegations of false advertising relating to whey protein content.

### *Selected Class Settlements:*

*Edwards v. Hearst Communications, Inc.*, Case No. 15-cv-09279-AT (S.D.N.Y. 2019) – final approval granted for $50 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*Moeller v. Advance Magazine Publishers, Inc. d/b/a Condé Nast*, Case No. 15-cv-05671-NRB (S.D.N.Y. 2019) – final approval granted for $13.75 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*Gregorio v. Premier Nutrition Corp.*, Case No. 17-cv-05987-AT (S.D.N.Y. 2019) – final approval granted for $9 million class settlement to resolve claims of protein shake purchasers for alleged false advertising.

*Ruppel v. Consumers Union of United States, Inc.*, Case No. 16-cv-02444-KMK (S.D.N.Y. 2018) – final approval granted for $16.375 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

*Taylor v. Trusted Media Brands, Inc.*, Case No. 16-cv-01812-KMK (S.D.N.Y. 2018) – final approval granted for $8.225 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

BURSOR&FISHER
P.A.

*Moeller v. American Media, Inc.*, Case No. 16-cv-11367-JEL (E.D. Mich. 2017) – final approval granted for $7.6 million class settlement to resolve claims of magazine subscribers for alleged statutory privacy violations.

## SARAH N. WESTCOT

Sarah N. Westcot is a Partner with Bursor & Fisher, P.A.  Ms. Westcot focuses her practice on complex business litigation, consumer class actions, and employment law disputes. She has represented clients in a wide array of civil litigation, and has substantial trial and appellate experience.

Ms. Westcot served as trial counsel in *Ayyad v. Sprint Spectrum L.P.*, where Bursor & Fisher won a jury verdict defeating Sprint's $1.06 billion counterclaim and securing the class's recovery of more than $275 million in cash and debt relief.

Ms. Westcot also has significant experience in high-profile, multi-district litigations.  She currently serves on the Plaintiffs' Steering Committee in *In re Zantac (Ranitidine) Products Liability Litigation,* MDL No. 2924 (S.D. Florida).

Ms. Westcot is admitted to the State Bars of California and Florida, and is a member of the bars of the United States District Courts for the Northern, Central, Southern, and Eastern Districts of California and the Southern and Middle Districts of Florida.

Ms. Westcot received her Juris Doctor from the University of Notre Dame Law School in 2009.  During law school, Ms. Westcot was a law clerk with the Cook County State's Attorney's Office in Chicago and the Santa Clara County District Attorney's Office in San Jose, CA.  She graduated with honors from the University of Florida in 2005.

## ALEC M. LESLIE

Alec Leslie is an Associate with Bursor & Fisher, P.A.  He focuses his practice on consumer class actions, employment law disputes, and complex business litigation.

Alec is admitted to the State Bar of New York and is a member of the bar of the United States District Courts for the Southern and Eastern Districts of New York.  Alec was a Summer Associate with Bursor & Fisher prior to joining the firm.

Alec received his Juris Doctor from Brooklyn Law School in 2016, graduating *cum laude*.  During law school, Alec served as an Articles Editor for Brooklyn Law Review.  In addition, Alec served as an intern to the Honorable James C. Francis for the Southern District of New York and the Honorable Vincent Del Giudice, Supreme Court, Kings County.  Alec graduated from the University of Colorado with a B.A. in Philosophy in 2012.

## BLAIR E. REED

Blair Reed is an Associate with Bursor & Fisher, P.A. She focuses her practice on complex business litigation and consumer class actions.

Blair served on the trial team for *Perez v. Rash Curtis & Associates*, where Bursor & Fisher won a jury verdict of over $265 million for violations of the Telephone Consumer Protection Act.

Blair is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern, Central, Southern, and Eastern Districts of California.

Blair received her Juris Doctor from the University of San Francisco School of Law in 2017, where she was a Dean's Scholar and served as a staff member for USF Law Review. During law school, Blair worked as a Law Clerk at a Bay Area law firm with a focus on wage and hour class actions. In addition, she worked as a Law Clerk at the Santa Cruz County District Attorney's Office. In 2013, Blair graduated from the University of San Francisco where she played on the Women's Tennis Team and studied Communications.

## ANDREW OBERGFELL

Andrew Obergfell is an Associate with Bursor & Fisher, P.A. Andrew focuses his practice on complex civil litigation and class actions.

Andrew graduated from Drew University with *summa cum laude* distinction. While at Drew University, Andrew was captain of the varsity baseball team. Andrew was inducted into the Phi Beta Kappa honor society and was President of the college's chapter of the Pi Sigma Alpha political science honor society.

Andrew attended Seton Hall University School of Law, where he obtained his law degree with *magna cum laude* distinction, and was inducted into the prestigious Order of the Coif honor society.  While in law school, Andrew was an editor and published author for the Seton Hall Law Review, participated in the Impact Litigation Clinic, and was a member of the Interscholastic Moot Court Board.  As part of the Interscholastic Moot Court Board, Andrew received the national best-brief award in the 2015 ABA National Appellate Advocacy Competition, as well as the 2015 best student-written brief of the year award as recognized by Scribes, the American Society of Legal Writers.

Prior to joining the firm, Andrew practiced at an AmLaw 100 law firm. He also clerked for The Honorable Douglas M. Fasciale in the New Jersey Superior Court, Appellate Division, in Newark, New Jersey.

## STEPHEN BECK

Stephen is an Associate with Bursor & Fisher, P.A. Stephen focuses his practice on complex civil litigation and class actions.

Stephen is admitted to the State Bar of Florida and is a member of the bars of the United States District Courts for the Southern and Middle Districts of Florida.

Stephen received his Juris Doctor from the University of Miami School of Law in 2018. During law school, Stephen received an Honors distinction in the Litigation Skills Program and

was awarded the Honorable Theodore Klein Memorial Scholarship for excellence in written and oral advocacy. Stephen also received the CALI Award in Legislation for earning the highest grade on the final examination. Stephen graduated from the University of North Florida with a B.A. in Philosophy in 2015.

## BRITTANY SCOTT

Brittany Scott is an Associate with Bursor & Fisher, P.A.  She is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern, Central, Southern, and Eastern Districts of California.

Brittany received her Juris Doctor from the University of California, Hastings College of the Law in 2019, graduating *cum laude.* During law school, Brittany was a member of the Constitutional Law Quarterly, for which she was the Executive Notes Editor. Brittany published a note in the Constitutional Law Quarterly entitled "Waiving Goodbye to First Amendment Protections: First Amendment Waiver by Contract." Brittany also served as a judicial extern to the Honorable Andrew Y.S. Cheng for the San Francisco Superior Court. In 2016, Brittany graduated from the University of California Berkeley with a B.A. in Political Science.

## MAX ROBERTS

Max Roberts is an Associate with Bursor & Fisher, P.A.  Max focuses his practice on complex civil litigation and class actions.  Max was a Summer Associate with Bursor & Fisher prior to joining the firm.

Max is admitted to the State Bar of New York and is a member of the bars of the United States District Courts for the Northern, Southern, and Eastern Districts of New York.

Max received his Juris Doctor from Fordham University School of Law in 2019, graduating *cum laude.*  During law school, Max was a member of Fordham's Moot Court Board, the Brennan Moore Trial Advocates, and the Fordham Urban Law Journal, for which he published a note entitled *Weaning Drug Manufacturers Off Their Painkiller: Creating an Exception to the Learned Intermediary Doctrine in Light of the Opioid Crisis*.  In addition, Max served as an intern to the Honorable Vincent L. Briccetti of the Southern District of New York and the Fordham Criminal Defense Clinic.  Max graduated from Johns Hopkins University in 2015 with a B.A. in Political Science.

Outside of the law, Max is an avid triathlete.

## JULIA K. VENDITTI

Julia K. Venditti is an Associate with Bursor & Fisher, P.A.  Julia focuses her practice on complex civil litigation and consumer class actions.  Julia was a Summer Associate with Bursor & Fisher prior to joining the firm.

Julia is admitted to the State Bar of California and is a member of the bars of the United States District Courts for the Northern and Southern Districts of California.

Julia received her Juris Doctor in 2020 from the University of California, Hastings College of the Law, where she graduated *cum laude* with two CALI Awards for the highest grade in her Evidence and California Community Property classes.  During law school, Julia was an active member of the UC Hastings Moot Court team and participated in the Evans Constitutional Law Moot Court competition, where she finished as a national quarterfinalist and received a best brief award.  Julia was also inducted into the UC Hastings Honors Society and was awarded Best Brief and an Honorable Mention for Best Oral Argument in her First-Year Moot Court section.  In addition, Julia served as a Research Assistant for her Constitutional Law professor, as a Teaching Assistant for Legal Writing & Research, and as a Law Clerk at the San Francisco Public Defender's Office.  In 2017, Julia graduated *magna cum laude* from Baruch College/CUNY, Weissman School or Arts and Sciences, with a B.A. in Political Science.

## CHRISTOPHER R. REILLY

Chris Reilly is a Law Clerk with Bursor & Fisher, P.A. Chris focuses his practice on consumer class actions and complex business litigation.

Chris received his Juris Doctor from Georgetown University Law Center in 2020. During law school, Chris clerked for the Senate Judiciary Committee, where he worked on antitrust and food and drug law matters under Senator Richard Blumenthal.  He has also clerked for the Mecklenburg County District Attorney's Office, the ACLU Prison Project, and the Pennsylvania General Counsel's Office.  Chris served as Senior Editor of Georgetown's Journal of Law and Public Policy.  In 2017, Chris graduated from the University of Florida with a B.A. in Political Science.

**EXHIBIT 3**

**FILED**
**CLERK**

6/19/2018 2:14 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
. . . . . . . . . . . . . . . . . . . . . . . . . . . .
                              .
Theodore Pearlman, et at.,    .  Docket #CV-10-4992 (JS) (AKT)
                              .
           Plaintiffs,        .
                              .  United States Courthouse
           V.                 .  Central Islip, New York
                              .  May 17, 2018
Cablevision Systems           .  11:00 a.m.
Corporation,                  .
                              .
           Defendant.         .
. . . . . . . . . . . . . . . . . . . . . . . . . . . .
```

TRANSCRIPT OF FINAL APPROVAL HEARING
BEFORE THE HONORABLE A. KATHLEEN TOMLINSON
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For The Plaintiffs:            Ralph M. Stone, Esq.
                               Stone Bonner & Rocco, LLP
                               145 West 45th St.
                               New York, NY 10036

                               Todd J. Krouner, Esq.
                               Law Offices of
                               Todd J. Krouner, PC
                               93 N. Greeley Ave.
                               Chappaqua, NY 10514

                               Carol S. Shahmoon, Esq.
                               CSS Legal Group, PllC
                               One Great Neck Rd.-Ste. #7
                               Great Neck, NY 11021

For The Defendant:             Andrew M. Genser, Esq.
                               Kirkland & Ellis
                               153 E. 53rd Street
                               New York, NY 10022

2

Dmitriy Tishyevich, Esq.
Kirkland & Ellis, LLP
601 Lexington Ave.
New York, NY 10022

Rebecca Baneman, Esq.
Altice USA, Inc.
1 Court Sq.
Long Island City, NY 11101

Thomas A. Dickerson, Esq.
35 Hampton Ave.
Yonkers, NY 10710

Donovan Bezer, Esq.
Law Office of Donovan Bezer
30 Park Ave.
Lyndhurst, NY 07071

Audio Operator:

Transcribing Firm:         Writer's Cramp, Inc.
63 Dakota Drive
Hamilton, NJ 08619
609-588-8043

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1          THE CLERK:  Calling civil case 10-4992, <u>Pearlman, et</u>

2    <u>al. vs. Cablevision Systems Corporation</u>.  Please state your

3    appearance for the record.

4          MR. STONE: Good morning, Your Honor, Ralph Stone for

5    the plaintiffs.

6          MR. KROUNER:  Todd J. Krouner.

7          MR. SHAHMOON:  Carol Shahmoon for plaintiffs.

8          THE COURT:  Good morning.

9          MR. GENSER:  Good morning, Your Honor, Andrew Genser

10   from Kirkland & Ellis for defendant.  Go ahead.

11         MR. TISHYEVICH:  Your Honor, Dmitriy Tishyevich,

12   Kirkland & Ellis for defendants.

13         MS. BANEMAN:  Rebecca Baneman, in-house counsel with

14   Altice USA for defendants.

15         MR. DICKERSON:  Thomas A. Dickerson representing

16   objectors Foley, Wynne, and Belgraier.

17         MR. BEZER:  Good morning, Your Honor, Donovan Bezer

18   for objectors Simon and Christine Bezer.

19         THE COURT:  All right.  Good morning everyone.  I'm

20   going to ask you when I call upon you if you would come to the

21   podium.  We do not have a court reporter here as you can see,

22   and I want to be sure that we have a very clean record today,

23   which means that the best way to do that is to get everybody

24   on the mic and be sure that you can be heard first of all, and

25   that this will be present some nightmare for the person who's

1   going to be transcribing it after it's over.  So let me first

2   of all welcome everybody here and I appreciate the efforts

3   that have gone into the preparation for this hearing.  You've

4   given us a -- certainly not an insubstantial amount of work

5   and documentation to go through to conduct this hearing today,

6   and we're prepared to engage in that process now.

7       (Pause in proceeding)

8       THE COURT:  By way of a brief background with

9   respect to this case I note the following:  five separate

10  groups of plaintiffs as individuals and representatives of a

11  class commenced distinct actions in 2010 against defendants

12  Cablevision Systems Corporation and CSC Holdings, LLC, for

13  their alleged failure to provide certain television

14  programming to their subscribers for a two week period in

15  October of 2010.  The five actions were consolidated in 2011,

16  and the parties have been litigating the case ever since.

17  After all of plaintiffs' claims were dismissed on motion

18  except for their breach of contract claim, the class was

19  certified by Judge Seybert under Federal Rule of Civil

20  Procedure 23.  The parties subsequently completed expert

21  discovery and briefed their cross motions for summary

22  judgment.  It was at that point that the parties informed the

23  court that they intended to attempt to settle this case.  To

24  that end, they entered into arm's length settlement

25  negotiations and mediated the case before the Honorable

1    Richard Holwell, a Federal District judge who had retired from

2    the bench in the Southern District of New York.  The parties

3    settled the case in March of 2017.  Judge Seybert then

4    referred the matter to me with the consent of the parties to

5    address the settlement.  This court preliminarily approved the

6    approved class action settlement agreement as fair, adequate,

7    and reasonable on January 1st of 2018 and set the final

8    fairness hearing for today, May 17th on the question of

9    whether the proposed settlement should be finally approved as

10   fair, adequate, and reasonable as to to the settlement class

11   members.  In advance of the hearing, the plaintiffs filed a

12   motion for final approval of the class action settlement,

13   including the award of -- service awards for the named

14   plaintiffs, all of whom counsel maintains significantly

15   contributed to the success of this action and attorneys fees

16   and expenses.  The five objectors oppose the proposed class

17   action settlement agreement -- and actually, there are more

18   but we'll talk about that in a moment -- and I'll be

19   addressing those submissions as well.

20       (Pause in proceeding)

21       THE COURT:  Now in the preliminary approval order

22   which I signed on January 8th of 2018, the settlement class

23   was defined -- and I'm just going to read briefly from that.

24   I'm looking at paragraph 2 now on page 2 of that order.

25   {Quote} "The settlement class shall consist" -- excuse me --

1    "The settlement class shall consist of the class which the

2    court has previously certified in its March 31, 2014

3    memorandum and order as set forth below, but shall exclude any

4    class member who has opted out of the class as of March 2nd,

5    2015, or who opts out of the settlement pursuant to paragraph

6    7 below.  All individuals who," -- and this is the definition

7    of the class -- "all individuals who contracted with

8    Cablevision prior to October 16, 2010, to receive Cablevision

9    services on or after October 16, 2010, excluded from the class

10   are Cablevision's officers, directors, legal representatives,

11   heirs, successors, and assigns, and any judicial officer

12   assigned to this case, and his or her immediate family."  In

13   paragraph 3 the order states as follows, "The settlement class

14   shall further be divided -- sub divided in the following three

15   sub classes, which the court for the purposes of settlement

16   preliminarily approves; group A shall consist of settlement

17   class members who as of 30 days after the date of the final

18   approval order are current video subscribers of Cablevision

19   with access to video on demand.  Group B shall consist of

20   settlement class members who as of 30 days after the date of

21   the final approval order are current subscribers of

22   Cablevision who do not subscribe to video services that

23   provide access to video on demand.  And group C shall consist

24   of settlement class members who as of 30 days after the date

25   of the final approval order, are former subscribers of

1    Cablevision."

2        (Pause in proceeding)

3        THE COURT:  The court had previously found that

4    providing class notice to current Cablevision subscribers

5    through inserts to monthly billing statements for those

6    getting paper bills and providing email notices to subscribers

7    who receive electronic bills, as well as publication notice

8    for former Cablevision subscribers was appropriate under Rule

9    23(C)(2), and constituted adequate notice to all persons

10    entitled to receive notice as well as meeting all due process

11    requirements under federal law.

12        (Pause in proceeding)

13        THE COURT:  And I am looking back now, again to the

14    preliminary approval order at paragraphs 10, 11, and 12, which

15    state as follows:  Paragraph 10, "Any member of the settlement

16    class who did not or does not timely request exclusion as set

17    forth in the published notice or the settlement notice as

18    appropriate and who wishes to object to the fairness,

19    reasonableness, or adequacy of the proposed settlement must

20    file with the court and mail a copy to all parties no later

21    than 45 days after the final notice date a statement of the

22    objection as well as the specific reasons, if any, for each

23    objection, including any legal support the members -- the

24    member of the settlement class, which is to bring to the

25    court's attention, and all evidence the member of the

 1    settlement class wishes to introduce in support of her or his

 2    objection or be forever barred from objecting."  Paragraph 11

 3    states that, "Any attorney hired by a member of the settlement

 4    class at the sole expense of the member of the settlement

 5    class for the purpose of objecting to the proposed settlement

 6    shall file with the clerk of the court and mail a copy to both

 7    parties, a notice of appearance no later than 45 days after

 8    the final notice date, or as the court may otherwise direct.

 9    Attorneys who do not adhere to these requirements will not be

10    heard at the final approval hearing."  Paragraph 12 states

11    that, "Any member of the settlement class who files and serves

12    a written objection and who intends to make an appearance at

13    the final approval hearing, either in person or through

14    personal counsel, hired at the sole expense of that member of

15    the settlement class shall file with the court and mail a copy

16    to the parties a notice of intention to appear no later than

17    45 days after the final notice date, or as the court otherwise

18    may direct.  Settlement class members and their attorneys who

19    do not adhere to these requirements will not be heard at the

20    final approval hearing."  On April 4th, 2018, Thomas A.

21    Dickerson, Esq., filed a notice of appearance on behalf of

22    Brian T. Foley, Edward W. Wynne, and Arnold H. Belgraier,

23    class members and objectors to the proposed class settlement

24    in this case.  Attorney Dickerson also filed a notice of

25    intent to appear at the fairness hearing, a memorandum of law

1    setting forth his client's objections to certain aspects of

2    the class action settlement agreement, and a request for the

3    production of documents by the parties.  The parties filed

4    their motions for final approval of class action settlement

5    and motion for attorneys fees and reimbursement of expenses on

6    April 9th, 2018.  The following day, attorney Dickerson filed

7    a second request for discovery by objectors Foley, Wynne, and

8    Belgraier, and on April 13th, 2018, he filed a second

9    memorandum of law in opposition to the parties' motion for

10   final approval.  A subsequent notice of appearance was filed

11   by Donovan Bezer, Esq., of the Law Office of Donovan Bezer.

12   According to the filing, attorney Bezer seeks to appear for

13   the purpose of filing an objection.  Attorney Bezer's clients,

14   Simon Bezer and Christine Bezer, filed correspondence with the

15   court as well.  They urged the court to disapprove the

16   proposed settlement at least postpone final approval until the

17   parties had presented sufficient information to support

18   approval.  The Bezers also request that the court stay this

19   action until their counsel is admitted to this court and has

20   had the opportunity to file a more substantive objection to

21   the agreement.  Class counsel filed a response to the objector

22   submission on May 4th, 2018."  Bear with me here.

23        (Pause in proceeding)

24             THE COURT:  Thank you.  At this time I am going to

25   call upon class counsel to place on the record what occurred

1    once the notices -- notice was disseminated, the responses

2    received, the number of objectors, et cetera, and then I would

3    like counsel to also place the terms of the settlement in the

4    record using the Grinnell criteria as a guidepost.

5            MR. STONE:  Thank you, Your Honor.  I -- if I may

6    have one moment just to get the --

7            THE COURT:  Yes.

8            MR. STONE:  -- data together.

9        (Pause in proceeding)

10           MR. STONE:  Thank you again, Your Honor --

11           THE COURT:  Yes.

12           MR. STONE:  -- and it's Ralph Stone for the

13   plaintiffs.

14           THE COURT:  You may proceed Mr. Stone.

15           MR. STONE:  The notice campaign was carried out in

16   accordance with the preliminary approval order, and following

17   that notice campaign, plaintiff's counsel received in total,

18   including, without regard to timeliness, five objections and

19   23 requests to be excluded from the class.  In addition, we

20   had previously received in response to the class notice given

21   in early 2015, 262 requests to be excluded from the class,

22   giving us a total of 285 members of the class who wish to be

23   excluded.

24           THE COURT:  Let me stop you for one second.

25           MR. STONE:  Yes.

```
 1              THE COURT:  The mic is in front of you.  Pull it up
 2    so you don't -- that's better.  Okay.  That'll pick up your
 3    voice better.  Go ahead.
 4              MR. STONE:  Sorry about that.
 5              THE COURT:  That's all right.
 6              MR. STONE:  Do you -- should I go over it again?
 7              THE COURT:  No, no.  You're fine.
 8              MR. STONE:  Okay.  With respect to the five
 9    objections, would Your Honor like me to address those now or
10    in relation to --
11              THE COURT:  You can.
12              MR. STONE:  -- the Grinnell factors in a general
13    discussion of the case?
14              THE COURT:  However you want to present it.  I will
15    leave it up to you.
16              MR. STONE:  Then I'd like to go back then and just
17    discuss the case briefly because I think they inform how we go
18    through the Grinnell factors, and I'll try not to take too
19    long --
20              THE COURT:  Go ahead.
21              MR. STONE:  -- in doing so.  Just as a refresher and
22    for the record, the case was about what has been called a
23    blackout, or an outage, or an interruption of a group of
24    channels in the period of the last two weeks of October 2010.
25    Among the channels lost were Channel 5, Channel 9, National
```

1  Geographic Wild, and the Fox Business News Network, and Fox
2  Deportes, a Spanish language sports channel.  What made this
3  case of any interest to anybody was the loss of Channel 5.  We
4  probably would not be here if Channel 5 wasn't in that group.
5  Channel 5 was the most important channel in the tri-state area
6  at that time, and may very well still be the most popular
7  channel to this day.  It carried *American Idol* and *Glee*, two
8  of the most popular programs on television at the time.  It
9  carried the Major League Baseball Playoffs, which included the
10  Yankees at that time, and it carried Giants football games
11  back when the Giants were good.  The outage resulted from
12  Cablevision not being permitted to carry these channels
13  because their retransmission agreement with News Corp., who
14  owned the Fox channels had expired and was still being
15  negotiated.  Both sides of that dispute were entrenched for
16  several days, and regulators found themselves without the
17  authority to force a solution so all they could do was
18  encourage Cablevision and News Corp. to settle their issues.
19  Now, there are three things I'd like to focus on out of that
20  fact pattern to to begin with.  First, while Channel 5 was
21  indeed a very popular channel it was an over-the-air channel,
22  meaning that anybody with rabbit ears could get it.  You did
23  not need Cablevision service to get Channel 5.  Second, the
24  outage was the result of a contractual dispute and Cablevision
25  contended that its hands were tied as a matter of law.  While

1    plaintiffs could pooh-pooh that, some defenses potentially

2    stemmed from that fact.  And third, regulators could not do

3    anything about it.  At the bottom -- at bottom, this was a

4    contractual dispute.  The terms of service between Cablevision

5    and its subscribers had two paragraphs in conflict:  paragraph

6    4, which is the paragraph that plaintiffs latched onto

7    provides that in such an -- in case of a programming

8    interruption, Cablevision provides either alternative

9    programming or a pro-rata credit -- not a refund, a pro-rata

10   credit -- at its discretion.  Cablevision, on the other hand,

11   relies on paragraph 17 of its terms of service which provides

12   that Cablevision can basically change programming however and

13   whenever it wants.  As in any case, liability and damages were

14   hotly disputed.  Now, I think the liability case is what has

15   the Dickerson objectors most excited.  This was a contract of

16   adhesion after all, so if we could make the conflict between

17   these two paragraphs, 4 and 17, into an ambiguity, we should

18   win.  Importantly, paragraph 4 had never been interpreted the

19   way plaintiffs had suggested it should be interpreted.  It had

20   been interpreted that way before, and certainly not by

21   Cablevision in the course of its business.  And while both

22   sides lost their industry experts to Daubert motions in this

23   case, this bad fact, the way they interpreted it -- which is a

24   bad fact for the plaintiffs -- would have been presented

25   through Cablevision's witnesses and we would not have had a

```
 1   witness to counter or rebut what those witnesses had to say.
 2   In any event, it was not a foregone conclusion that we were
 3   right about paragraph 4.  Now, the Dickerson objectors would
 4   liked to have seen a trial two years ago, but they forget that
 5   all of this was subject to a set of cross motions for summary
 6   judgment.  Our case could easily have disappeared before any
 7   trial, and we avoid this possible fate through this
 8   settlement.  Even if both motions for summary judgment had
 9   been denied, it's far from clear that we would've had a jury
10   trial.  That's because the facts are not really in dispute.
11   How the terms of service ultimately would be interpreted is
12   more of a legal question for the court than a fact issue.  So
13   as exciting as a jury trial against a cable company may have
14   been to us -- and we can all agree, sadly for Cablevision, as
15   a general rule nobody likes their cable company -- it is not
16   at all clear we would have had one after summary judgment.
17   But let's go one step further and talk about damages, or in
18   this case really, the remedies.  As our mediator Judge Holwell
19   put it in our mediation, "I see what you like about this case
20   but what about damages?"  If we imagine that we're correct
21   about paragraph 4, what can we win?  Both sides hired top
22   economists to pitch our cases.  We essentially said that
23   Cablevision should give back half of each subscriber's monthly
24   bill and came to an estimate of $86 million, which Cablevision
25   says was miscalculated and should have been $83 million, the
```

```
 1    difference having to do with how many days of the month there
 2    were in October.  Their expert put it at no more than $2.7
 3    million, and probably closer to $2.4 million based on a
 4    calculation of the seeming worth of the blacked out channels
 5    in relation to the channels that were provided in the various
 6    tiers of service.  Our biggest problems with our damages were,
 7    one, a mitigation issue because the over-the-air problem, the
 8    fact that anybody could get Channel 5 just putting up a pair
 9    of rabbit ears, was a serious problem that we were likely to
10    hear about again.  Another serious problem we were very
11    concerned about is the fear that our theory would produce an
12    inappropriate windfall that would never survive the Second
13    Circuit.  Thirdly, paragraph 4 gave Cablevision the option,
14    {quote} "in its discretion," {close quote} to provide
15    alternative programming rather than a pro-rata credit.  This
16    is an appropriate point to address the court's next question,
17    which is what does the settlement provide, because in many
18    respects what our settlement provides is alternative
19    programming which may very well have been precisely the remedy
20    that might have been ordered had their been a trial and had we
21    won.  As Your Honor has set out in the record, there are three
22    groups of class members -- three sub classes.  The group A
23    group is current Cablevision subscribers.  The current
24    Cablevision subscribers will receive 60 days after the
25    settlement becomes final -- final after final approval and the
```

```
 1    time for appeals has run or it survives an appeal -- which
 2    we've -- easily think it would -- class members will receive
 3    the right to watch two standard or high definition library
 4    catalog movies for free during a 60 day period, starting 60
 5    days after the court has issued final approval of the
 6    settlement.  And the value of those movies could be either
 7    $2.95 or $3.95, depending on the movie selected by the class
 8    member.  Both prior to settling and much more recently, we
 9    have reconfirmed that the library of movies available at those
10    price points is both -- is large, contains a wide variety of
11    titles, including titles that would be of interest to class
12    counsel and our children.  The second group of class members
13    is group B class members who are Cablevision subscribers who
14    no longer receive video service but just receive internet
15    service.  Those class members will receive the Cablevision
16    service protection plan for free for a month.  It's got a
17    retail value of $6.99 per subscriber, and it provides coverage
18    for subscribers from unexpected service fees such as home
19    visits relating to wiring, jacks, or connectors at no charge,
20    starting on the first day of the month following 60 days after
21    the final approval order becomes effective.  The last group,
22    former subscribers of Cablevision who no longer have any
23    business relationship will receive two WiFi day passes, which
24    sell for $4.99 per pass, which can be used for a period of
25    four months or 120 days, starting 60 days after the final
```

1   approval order becomes effective.  Those WiFi day passes are
2   freely transferrable, so that people who receive them can give
3   them to whomever they want or use them however they see fit.
4   What's interesting and important to note about this settlement
5   is that all of this is just going to happen after the case is
6   approved.  People do not have to file claims.  They will
7   receive notice about the availability of the movies.  They've
8   already received some notice about it.  They will receive a
9   reminder notice, which was one of the points of our March
10  amendment -- March of 2018 amendment to the settlement
11  agreement moving when the actual relief gets rolled out to
12  consumers, moving it from 30 days to 60 days, which
13  Cablevision felt would more effectively give them an
14  opportunity to give notice to class members of this
15  availability.  These things will simply be provided.
16  Secondly, with respect to the service protection, which I
17  think of as basically an insurance policy, that will become
18  effective for a month and then it will expire.  Class members
19  don't have to do anything to renew it or to cancel it.  It
20  just goes away, but they just it.  And likewise with the WiFi
21  day passes, these will simply be sent to former Cablevision
22  subscribers.  It's very automated, people have to do nothing,
23  and what's also very important in looking at this
24  consideration and understanding it is -- and why we say it's
25  not a coupon among other things -- is people do not have to

1    buy anything, they do not need any further relationship with

2    Cablevision for purposes of enjoying this benefit, and they

3    don't have to spend any additional money, they just get these

4    things and it goes away.  And so, in that respect, for

5    instance, in one of the cases cited by Judge Dickerson

6    involved free drinks on Southwest Airlines, which a court

7    found to be a coupon but that's because you have to buy a

8    ticket to fly on Southwest Airlines to enjoy a free drink on a

9    Southwest Airlines flight to begin with.

10        Turning back to the discussion of the case and turning

11   now -- I'd like to turn to the Grinnell factors and I'll just

12   march through them.  I think I've provided a great deal of the

13   background so that we can just march through --

14        THE COURT:  Yes.

15        MR. STONE:  -- the Grinnell factors fairly quickly.

16   The first Grinnell factor is the complexity, expense, and

17   likely duration of the case.  In some ways we have, in fact,

18   characterized the case as fairly simple but let's not fool

19   ourselves.  This was a complex class, a class involving

20   millions of people, thorny and novel issues of contract

21   interpretation.  This is a case that's taken seven years to

22   get to a settlement.  It is a class action, and Kirkland &

23   Ellis, our adversary counsel, knows how to fight and easily

24   could have dragged this case on, particularly if there had

25   been a trial and appeals.  There's a great advantage to

1   avoiding the prolonging of a long case like this.  The second
2   is the reaction of the class to the settlement.  Only 23
3   people opted out in reaction to the settlement notice, and
4   there are a total 285 opt-outs out of a class of more than 3
5   million people.  We have not surveyed to find out why people
6   opted-out.  Some may be Cablevision employees, some may be
7   peoples -- like objector Woods-King (phonetic) who stayed in
8   the case who views consumer class actions with skepticism, but
9   the number is trivial, and insignificant, and does not
10  indicate or suggest that the settlement is unpopular in some
11  way.

12        And then we have the five objections.  We have the
13  Dickerson objection which we can deal with further, and we
14  have the Bezer objection which we still don't really know what
15  he has to say.  The next Grinnell factor is the stage of the
16  proceedings and the amount of discovery completed.  The
17  purpose of examining this factor is so that the court can be
18  satisfied that counsel understood how to value the claim and,
19  in fact, in this case we were basically getting the thing
20  ready for trial.  All of discovery had been completed, all of
21  the expert discovery had been completed, and I think our
22  papers amply demonstrate our familiarity with the issues, and
23  the complexities, and the reasons for settlement.  The stages
24  of proceedings certainly favors approval of the settlement.
25  I've discussed the risks of establishing liability and the

1    risks of establishing damages at length already.  The next

2    factor is the risk of maintaining a class through trial.  We

3    did not perceive this as a major risk, and we think the class

4    is proper, was properly certified, and so we think of that as

5    a non-factor, but it certainly wasn't a risk that drove our

6    desire to settle.  The ability of Cablevision to withstand a

7    greater judgment.  While Altice's stock -- we've been watching

8    -- has been going down, and we -- as of today, we have no

9    reason to believe that Altice and or Cablevision would have

10   been incapable of paying a judgment, we just don't think the

11   judgement was likely to be particularly large.

12        The next factor is the range of the reasonableness of the

13   fund in relation to the best possible outcome and in looking

14   at that, while we argue to the court that the best possible

15   outcome would have been an $86 million refund, the reality is

16   that the contract clause, if we were right about it, provided

17   for a credit -- not a refund -- or alternative programming.

18   And so while we can measure the value of -- or the retail

19   value of the settlement consideration, $28 million against $86

20   million -- that's not too bad.  The reality is that's almost

21   certainly not what the outcome would have been, even if we had

22   been successful at trial but it does represent more than one

23   third of the best -- our recovery, we think, is more than one

24   third of the best possible recovery, and more than 10 times

25   Cablevision's estimate.

1    Then the factor that is next considered is the range of

2    reasonableness in relation to all of the risks attendant to

3    litigation, and that's really all of the other risks we had

4    been talking about, and the risks -- I think the story could

5    change, Altice could have a bankruptcy, the case could have

6    been lost on summary judgment, could have been lost on an

7    appeal, and would have taken many, many more years to

8    complete.  We think that we're providing enormous value to

9    class members and as a result we think is a settlement that's

10   a very good, one that we're very happy to endorse to the

11   court, and that we recommend by approved.  I don't know the

12   extent to which the court wants to hear further discussion

13   with respect to any particular objection the settlement, of if

14   there's any --

15          THE COURT:  I'm going to get to the objections in a

16   moment.  If there's something that you want to address

17   specifically about the objections you certainly have the

18   opportunity to do so now.

19          MR. STONE:  I think -- you know, at this point I

20   have spoken about why we generally reject the concept of this

21   as a coupon settlement, and that we don't think it would be --

22   we think redemption is just not an appropriate word to think

23   of in terms of this case, and before I yield the lectern to an

24   objector, I would just point out that people subscribe to

25   cable TV but often don't watch.  Lots and lots of our class

1    members didn't care that Channel 5 was gone.  Some people did

2    care.  There was a lot of outrage and it was newsworthy, but

3    what people pay for when they subscribe to cable TV, while

4    they're enjoying the programming for the most part -- many

5    don't -- is they're paying for availability of programming,

6    and that's something that this settlement provides.  It's

7    exactly what this settlement provides.  We're providing the

8    availability of programming, and as I mentioned in my

9    discussion, it quite possibly -- could be the exact same

10   relief that might have been ordered at the end of a litigated

11   process rather than one achieved through settlement.  The

12   other thing I would point out is that with respect to former

13   Cablevision subscribers, because -- Cablevision -- if we had

14   won a trial, Cablevision might have very well taken the

15   position, well we can't give them a pro-rata credit, because a

16   credit in the case of a cable bill is a charge against their

17   current or next bill.  It's not cash and it's not a refund,

18   it's a credit.  They can't give them that, and they can't give

19   them alternative programming because they no longer subscribe

20   to it.  So we're providing a benefit to a huge --

21   approximately half the class that may very well have gotten

22   even if we had been successful at trial.

23              THE COURT:  All right.  Thank you.

24              MR. STONE:  Thank you, Your Honor.

25              THE COURT:  Before I turn to the objectors, I

1    certainly want to give the defendants an opportunity to place

2    anything on the record that they might desire to do so with

3    respect to the settlement.

4          MR. GENSER:  Thank you, Your Honor, Andrew Genser

5    for the defendants.  Your Honor, we don't have a lot to add

6    and I think that Mr. Stone covered it quite comprehensively.

7    Obviously, Cablevision in any compromise or settlement in some

8    senses neither party gets everything that it wants, and

9    Cablevision certainly would've been much happier to achieve a

10   settlement that had a lower amount of benefits to the class,

11   and, you know, we certainly believed that we defenses here,

12   that we had -- you know, both on liability and on damages, but

13   it's a compromise.  It was hard fought.  It's a compromise and

14   we do think that it satisfies all of the factors, and we

15   support it because we think that for our client it would bring

16   appropriate closure, even though it's more than we had wanted

17   to pay in a settlement.

18         THE COURT:  All right.  Thank you.

19         MR. GENSER:  Thank, Your Honor.

20         THE COURT:  Thank you.  All right.  I'll note for

21   the record that eight class members have objected to the

22   proposed settlement, and I want to just briefly go over

23   several of them right now.  First of all, Catherine Woods-

24   King, who is not in court today, as a preliminary matter I

25   note that Ms. Woods-Kings objections was not filed directly

1    with the court, but rather was mailed to class counsel who

2    then filed a letter on ECF as an attachment to the plaintiff's

3    response to the objections.  Ms. Woods-King's objection to the

4    proposed settlement agreement as premised primarily on her

5    general disdain for class action settlements, she questions

6    the motives of plaintiff's counsel, arguing that she's,

7    {quote} "suspects this case is just another example of

8    ambulance chasing by law firms looking to cash in on the

9    latest infraction by a large company with deep pockets and

10   heavy regulatory responsibilities."  She questions how

11   diligently plaintiffs' counsel negotiated on her behalf in

12   light of the nature of the benefits available under the

13   agreement to aggrieved subscribers.  It appears that Ms.

14   Woods-King would have preferred to receive a partial refund of

15   her cable fees for the two week period at issue, and she

16   concludes her letter with the following statement:  {quote}

17   "Please send a message that hunting and pecking around for

18   this type of minutiae, which most of the plaintiffs could not

19   care less about, to drum up giant fees is not acceptable for

20   respectable members of the bar, and gives the plaintiffs'

21   lawyers a fraction of what they've requested."  Ms. Woods-King

22   -- that's the end of the quote by the way -- Ms. Woods-King

23   advises she will not be appearing at the fairness hearing but

24   she does hope that the court will consider her comments.  I've

25   done so.  The fact is that she doesn't state any specific

1   objection to any terms of the settlement agreement.  She

2   hasn't appeared today obviously, and in addition there's no

3   indication that she's any idea of the lengthy history of this

4   case, including the depth of discovery motion practice, et

5   cetera, that's been done here, and since she hasn't appeared

6   I'm not required to consider her objections.  However, I have

7   done so and I find them lacking in substance with regard to

8   the terms of the agreement and I'm overruling those

9   objections.

10       We also have a Linda Cerreta, C-E-R-R-E-T-A, who

11   submitted a letter dated April 3rd of 2018, stating she

12   objects to the proposed settlement on the grounds that

13   Cablevision's subscribers should be offered the option of

14   choosing either a cash settlement check or credit toward the

15   subscriber's monthly bill.  More specifically, she explains

16   that the agreement appears to have been "disingenuously

17   crafted," {quote} {unquote} with the perceived expectation

18   that a large percentage of the class members will forget about

19   this action and their award, and consequently not follow

20   through to claim it, which she clearly doesn't understand they

21   don't have to, but in any event she asserts that the defendant

22   would be unjustly enriched here.  She further represents her

23   suggested options would benefit all class members, not just a

24   few.  She stated she doesn't plan to appear and she leaves it

25   to the court to decide a fair and reasonable compensation.  I

1    -- my sense of this from reading the objection is that she has

2    a fundamental -- excuse me -- misunderstanding of what's going

3    on here, but the fact that she has not appeared, although I've

4    considered her objections I am overruling them.

5         We also have Darlene Drummer who plaintiffs' counsel also

6    received a letter from.  She's a Cablevision subscriber and

7    states that, "she's not satisfied with the benefits offered

8    under the agreement."  Her dissatisfaction appears to stem

9    from her general frustration over the quality of Cablevision's

10   programming.  In this regard she explains that, "CT Television

11   is currently a blank screen."  She doesn't believe that the

12   cable service does enough to negotiate fair programming.  She

13   also states that, "Cablevision constantly switches programming

14   yet rates go up," and further argues that her complaints about

15   Cablevision's programming are directed to an automatic non-

16   response, which she says is unacceptable.  These objections

17   all suffer from similar defects that render them without merit

18   for purposes of final approval of this hearing.  At the

19   outset, general grievances regarding Cablevision's programming

20   don't warrant disapproval of the settlement agreement.  Her

21   submission also lacks objection to any specific settlement

22   term, and her skepticism about the class action device as a

23   whole also does not go to any specific term of the settlement

24   agreement.  Her preference for cash and argument that cash

25   benefits would benefit all class members and not just some is

1   certainly conclusory on her part and unsubstantiated by any

2   evidence.  And so as these three in particular I decline to

3   disapprove the settlement based on their objections.

4        That brings me to Christine and Simon Bezer.  On April

5   19th, 2018, the court received a notice of appearance from

6   attorney Donovan Bezer.  He explained that he had applied for

7   admission to this court and wishes to appear for the purpose

8   of filing an objection.  The court also received

9   correspondence from Mr. Bezer's clients, Simon and Christine

10  Bezer, presumably some family members.  The urged the court to

11  disapprove the proposed settlement or at least to postpone the

12  final fairness hearing until the parties had presented

13  sufficient information to support approval, and the Bezers

14  further request that the court stay the action until their

15  counsel has been admitted to this federal district and has had

16  the opportunity to submit a more detailed objection.  Attorney

17  Bezer recently filed on ECF an emergency motion to permit

18  submission of a brief in opposition to the settlement or in

19  the alternative, to permit objectors to read their brief into

20  the record at the final fairness hearing and to stay the

21  proceedings.  In his motion, attorney Bezer argues that the

22  reason why he was unable to file timely -- or timely file

23  objections on behalf of his clients is due to the court's

24  requirement that all papers be filed on ECF, and that he was

25  only provided with such access on May 14th, 2018.  He claims

1    in sum, that his clients have a right to utilize counsel of

2    their choice and precluding that counsel from communicating

3    with the court until their counsel has access to ECF

4    constitutes a prior restraint on speech.  With all due

5    respect, the court finds this response both dubious and

6    somewhat disingenuous given the timing there was nothing

7    preventing attorney Bezer from sending a letter directly to

8    chambers regarding his circumstances, and also his clients

9    have known about the proposed settlement for some time because

10   they were part of the notified class.  So although I'm really

11   not required to at this point, I am going to give Mr. Bezer an

12   opportunity to speak briefly to the objections.  I will point

13   out that I declined to stay the hearing based on the failure

14   of counsel to state anywhere in his untimely submissions the

15   specific objections that his clients have to this settlement.

16   But as I said, I'm going to give Mr. Bezer an opportunity to

17   be heard here briefly as to the objections.  So, Mr. Bezer?

18            MR. BEZER:  Yes, Your Honor, good afternoon.  Again,

19   Donovan Bezer for objectors Simon and Christine Bezer.  Given

20   what Your Honor just ruled from the bench, I'll brief unless

21   permitted to expand my ideas.  Your Honor just indicated that

22   the argument regarding not being able to communicate the

23   objection was dubious and disingenuous number one, because the

24   letter could have been sent directly to chambers and number

25   two, because my clients have known about this settlement for

1    time.  I've asserted that my clients did not know about the

2    settlement until April of 2018, and this is May 17th.  This is

3    a very, very abbreviated time frame to get up to speed and to

4    participate in this hearing, so I would respectfully disagree

5    with Your Honor's characterization of the amount of time that

6    they had --

7              THE COURT:  Well, I -- one thing I --

8              MR. BEZER:  I'm sorry.

9              THE COURT:  -- what also strikes me in the notice

10   that went out said that any of the objections were to be sent

11   to class counsel.  So you had opportunity as well.

12             MR. BEZER:  Yes, and again, I'm going to be very

13   brief but I will address that if Your Honor --

14             THE COURT:  Go ahead.

15             MR. BEZER:  -- will allow.  The first reason you

16   said -- that Your Honor said was dubious and disingenuous was

17   because a letter could have been sent directly to chambers.

18   That's not possible or permissible for several reasons.

19   Number one, my clients are not lawyers so if a letter was

20   going to go to chambers I think everybody in this courtroom

21   knows, it would have been a letter drafted by myself.  I --

22             THE COURT:  I'm not --

23             MR. BEZER:  I'm sorry.

24             THE COURT:  I'm not doubting that or debating that.

25   I would have expected it to come from you.  Go ahead.

1          MR. BEZER:  Yes, Your Honor, and I hasten to add --
2     although I'm sure everybody in the court is aware -- that the
3     unauthorized practice of law is a crime.  So to have sent a
4     letter with detailed objections -- detailed legal arguments to
5     Your Honor, would number one, constitute the unauthorized
6     practice of law before I was officially permitted to practice
7     law in this district.  And number two, it would have ignored
8     the very clear requirement to E-file.  Now, I've stated in the
9     papers that I've filed that the indication that you have to E-
10    file in this case is -- does not appear in just one part.
11    It's -- they're numerous, so I rely on those different
12    authorities for having to E-file.  But secondly, I know Your
13    Honor considers the First Amendment argument dubious.  I get
14    that, but my clients have a First Amendment right to petition
15    this court.  They don't have a First Amendment right to
16    petition Mr. Stone to communicate their message to this court.
17    My clients have a very well settled right to communicate their
18    arguments to this court, and the right to counsel and the
19    right to petition this court has to be understood in the
20    context of the Sixth Amendment.  The Sixth Amendment -- while
21    it is a criminal amendment, it's -- was -- it's been since --
22    it's a bedrock foundation of our jurisprudence.  It does not
23    prevent a criminal defendant the ability to communicate to a
24    police officer to the state of what their defenses are, it
25    fully enables them to communicate their message to a court.

1    They have a right to be heard.  It's in that context that the

2    civil right to counsel is derived in federal law.  Your Honor,

3    again, I'm being very quick and I'm not going to get into the

4    substance of the objection because I don't sense that's what

5    Your Honor --

6                THE COURT:  Well, look, my sense of what you did

7    submit is that you're -- you share similar arguments with Mr.

8    Dickerson's clients that this is somehow a coupon scenario.

9                MR. BEZER:  I honestly have no idea how Your Honor

10   would draw that conclusion because I have not been permitted

11   to present any argument yet, I would respectfully urge this

12   court -- the chance to, first and foremost, to file a brief.

13   There's no prejudice to anyone.  This case has been lasting

14   for eight years.  We're not in danger of the defendant fleeing

15   the country and relocating and incorporating in a different

16   country.  Nobody's going anywhere.  If this -- if the brief

17   were permitted to be filed it would give Mr. Stone, and

18   defendant, and anybody else an opportunity to look over those

19   arguments and respond to them.

20               THE COURT:  Did you have a conversation at some

21   point with class counsel about what the basis of your

22   objections were?

23               MR. BEZER:  Mr. Stone has asserted to this court

24   that he believes he understands what the basis for my

25   objection is, but no, I didn't read the brief to him and I

1    didn't get a chance to explain my legal argument to him.  I

2    know that he has an opinion as to that just as Your Honor

3    does, but I haven't been given a chance yet to state the basis

4    for my objection -- for my clients' objection, rather.

5              THE COURT:  Okay. You understand that you were

6    supposed to do that before this hearing ever took place, under

7    the typical rules in theses proceedings, to give some -- while

8    you were submitting all this information in terms of being

9    admitted, if you're representing somebody who's trying to

10   object here I would have expected that you would have at least

11   stated that -- what the specific basis was for the objection.

12             MR. BEZER:  I understand that's Your Honor's

13   approach to this, but I'm saying equivocally -- unequivocally

14   that I was not permitted to assert the legal basis for the

15   objection --

16             THE COURT:  Okay.

17             MR. BEZER:  -- before I was sworn in last Friday,

18   Your Honor.

19             THE COURT:  Okay.  Did you apply for regular

20   admission or pro hoc vice admission?

21             MR. BEZER:  No, Your Honor, as set forth in my

22   papers, I have the -- a constitutional right myself to be

23   admitted in a plenary fashion in this district.  I've been

24   admitted in New York since 2010, I'm admitted to other

25   district courts.  I -- there's really no basis to force

1    somebody to apply for pro hoc vice admission, and in --

2            THE COURT:  It was just a question.  I'm not

3    saying --

4            MR. BEZER:  Yes, Your Honor.

5            THE COURT:  -- those are requirements.  They're

6    questions, so --

7            MR. BEZER:  Yes, Your Honor, I'm sorry

8            THE COURT:  All right.  Are you prepared to tell me

9    what the basis is for your clients' objections?

10           MR. BEZER:  Yes, I -- and again, I would just ask

11   again first if I could file the brief, because if Your Honor

12   is prepared to allow objectors to present the full force of

13   their argument it would have be read into the record.  That

14   would waste judicial resources, force everybody here to try

15   and take notes of the brief.  E-filing is a more efficient

16   means of communicating argument, and I think that's why the

17   court has --

18           THE COURT:  All right.  Well, I'm not going to

19   permit the filing of any brief subsequent to this proceeding.

20   So if you'd like to tell me the basis for your objections now

21   I'm happy to hear them.

22           MR. BEZER:  Sure, Your Honor.  Now, obviously Your

23   Honor this -- so at this point, I'm going to attempt to read

24   the brief into the record whereas at first I -- Your Honor

25   asked me to be brief --

1        THE COURT:  No, I'm not going to -- I'm allowing you

2    to speak here.  Essentially, you don't have a right to be

3    speaking here but I'm allowing you speak because I would like

4    to get the sense of what your objections are.  I'm not going

5    to stand here -- how long is your brief?

6        MR. BEZER:  Less than the 25 page limit.  I

7    didn't --

8        THE COURT:  Okay.  No, we're not going to read 25

9    pages into the record.  If you want to summarize for me what

10   the basis are for your clients' objections, as I said I'm more

11   than happy to hear them and consider them.

12       MR. BEZER:  Yes, Your Honor.  Well, in very brief

13   summary -- Your Honor did indicate that I should be brief -- I

14   would respectfully suggest that the settlement is not fair and

15   adequate under the Federal Rules of Civil Procedure and under

16   the Class Action Fairness Act.  Referring to what has happened

17   at this hearing, I notice -- I note that Mr. Stone indicated

18   that the mediator stated that, "I see what you like about this

19   case but what about the damages?"  And I think that's the -- a

20   good summary of kind of the thrust of plaintiff's case, and

21   the way plaintiff has gone about this.  Some of the

22   information, obviously, they're willing to present to the

23   court and present to the absent class members, but the

24   information that the absent class members would like to see,

25   the plaintiff will not share.  Judge Dickerson obviously

1    requested discovery.   That hasn't been provided, and I would

2    just note that obviously the -- my clients have a great more

3    to say about this, but I respect that Your Honor requested

4    that I be brief and directed that she will not allow me to

5    read the full thrust of my argument into the record.  So I

6    would accept some guidance from Your Honor as to whether

7    continue or whether to wrap this up --

8            THE COURT:  When you said the settlement, as far as

9    your clients are concerned, is not fair or adequate and that

10   you believe it violates CAFA, I'd like to hear the specifics

11   of that.

12           MR. BEZER:  And the specifics obviously require me

13   getting into a brief that's less than 25 pages but is

14   certainly longer than Your Honor is looking forward to hearing

15   right now, which is precisely why I asked for the -- I asked

16   previously for the opportunity to file the brief so it

17   wouldn't have to be read into the record, too.  Respectfully,

18   Your Honor, I don't think it's fair to my clients or to any

19   absent class members to require that the argument be boiled

20   down from the 25-page maximum that Your Honor has in her

21   individual practice rules to two sentences or whatever Your

22   Honor is envisioning that this --

23           THE COURT:  Well, I'm not going to continue to play

24   this back and forth with you counsel --

25           MR. BEZER:  Yes, Your Honor.

1         THE COURT:  -- I've given you an opportunity.  I'm

2    sitting here trying to listen to the basis for your

3    objections, and I'm -- feel like I'm not getting a straight

4    answer.

5         MR. BEZER:  I'm sorry, my straight answer --

6         THE COURT:  Well, you know, if you're telling me as

7    a practicing attorney you can't boil down your arguments to a

8    few minutes and explain them to me but instead you should be

9    able to read into the record 25 pages, then I say -- how --

10   you know, I question how long you've been practicing in this

11   manner.

12        MR. BEZER:  I'm -- well, I'm very -- understood,

13   Your Honor.  As Mr. Stone just indicated less than an hour

14   ago, he classifies this -- characterizes this as a complex

15   case.  His filings and his colleagues' filings have been a

16   great more than 25 pages.  So I apologize -- it may be an

17   indication of the length of time that I've been practicing,

18   but the best I can summarize the arguments is, as I said, that

19   the -- they are not -- the settlement is not fair within the

20   guidelines of the Federal Rules of Civil Procedure --

21        THE COURT:  Why and how?

22     (Laughter)

23        MR. BEZER:  Your Honor, I'm --

24        THE COURT:  You wrote a brief.

25        MR. BEZER:  Yes.

1          THE COURT:  You can't tell me what's in the brief

2    without reading your brief to me?  I mean, I'm asking you a

3    straight forward question.  What's the basis for your saying

4    it's not fair or adequate, and why it violates the Class

5    Action Fairness Act?

6          MR. BEZER:  I -- Your Honor, again I apologize that

7    I'm not able to distill the brief into a short enough argument

8    here at the lectern --

9          THE COURT:  I'm not asking -- all I'm asking you for

10   is a straight answer.

11         MR. BEZER:  Yes, Your Honor.  Can I just finish the

12   thought --

13         THE COURT:  Go ahead.

14         MR. BEZER:  -- please?  Thanks.  But I will say that

15   I do believe that Your Honor should inquire as to whether this

16   is a coupon settlement, or as class counsel have argued, not a

17   coupon settlement.  I think that that's fairly straight

18   forward --

19         THE COURT:  Okay.

20         MR. BEZER:  -- and again, I'm trying as hard as I

21   can to distill the arguments, but obviously I spent a great

22   deal of time in trying to prepare the argument.

23         THE COURT:  All right.  So you believe this is a

24   coupon case?

25         MR. BEZER:  Yes.

1          THE COURT:  Okay.  Go ahead.  What else?

2          MR. BEZER:  Your Honor -- I'm sorry.  I'm frustrated

3    but I --

4          THE COURT:  Is that the violation of CAFA that

5    you're --

6          MR. BEZER:  I'm sorry, I couldn't hear you.

7          THE COURT:  Is that the violation of CAFA that

8    you're referring to because you believe this is a coupon case?

9          MR. BEZER:  When you say "the violation," it's not

10   my argument that there's one --

11         THE COURT:  I said, "a violation."

12         MR. BEZER:  Oh, okay.  I -- no, I wouldn't

13   necessarily state that because it is a coupon that it

14   automatically violates CAFA.

15         THE COURT:  Okay.

16         MR. BEZER:  But I would suggest that Your Honor has

17   a duty to inquire as to whether it is, in fact, a coupon

18   settlement.

19         THE COURT:  But we're going to get to that.

20         MR. BEZER:  Yes, Your Honor.

21         THE COURT:  Okay.  I'd like to know why you think

22   it's not fair and adequate.  In what way?

23         MR. BEZER:  I -- Your Honor, and I'm very sorry.  I

24   don't mean any disrespect, but I cannot distill that into the

25   -- in a cogent argument the way Your Honor is requesting.  So

1    I hesitate to drag my presentation out any longer than Your

2    Honor wants, because I'm certain that I'm not going to be able

3    to summarize the argument in a length of time that will be

4    satisfactory to Your Honor, and this is a District Court.  I

5    have great respect for Your Honor and the court in general,

6    and I don't want to run --

7              THE COURT:  But I didn't give you any time limit, I

8    asked you to be brief.  I mean, what would be very helpful to

9    me if you just try focusing and answering my questions --

10             MR. BEZER:  Yes, ma'am.

11             THE COURT:  -- which question was, do you say that

12   the agreement's not fair and is not adequate, and I'm just

13   asking you to give me your support for that statement.

14             MR. BEZER:  My support, it was set forth in a brief

15   that I'm not able to read into the record --

16             THE COURT:  Okay.

17             MR. BEZER:  -- or to file --

18             THE COURT:  All right.

19             MR. BEZER:  -- and I'm telling Your Honor that if I

20   could, you know, stand on the tip of my toes so to speak, I

21   would.  I just don't have the ability to distill the argument

22   down as narrowly as Your Honor would prefer, and I do

23   apologize for that.  I acknowledge that I've been practicing

24   for a fraction of the amount of time Your Honor has and the

25   other learned counsel in this court right now, but I've done

1    the best that I can.  I would answer any more questions that
2    Your Honor had, but I just --
3            THE COURT:  Well, I don't seem to be getting answers
4    to the questions I am asking, and if you're going to keep
5    telling me that you can't answer it because you need to read
6    the brief into the record then I don't think we're going to
7    have a very successful outcome here.
8            MR. BEZER:  I understand, and I do thank Your Honor
9    for allowing me to address the court.
10           THE COURT:  All right.  Anything else you want to
11   say?
12           MR. BEZER:  No, Your Honor, thank you.
13           THE COURT:  All right.
14       (Pause in proceeding)
15           THE COURT:  All right.  Objections here were also
16   filed by attorney Thomas Dickerson, counsel for class members
17   Belgraier, Foley, and Wynne.  As I've previously noted this
18   morning, over the past few weeks attorney Dickerson has made a
19   number of submissions on behalf of these three objectors, and
20   the plaintiffs at one point move to strike a memorandum as
21   improperly filed.  I issued an order on May 11th advising that
22   the third memorandum of law was an improper reply, but -- and
23   essentially not contemplated by the preliminary approval
24   order.  I also noted that there wasn't any legal authority
25   cited that would permit the submission and gave Mr. Dickerson

1    the opportunity to show cause why it should be admitted.  I

2    certainly want to give Mr. Dickerson the opportunity to

3    discuss the objections and make his record as well.  So, Mr.

4    Dickerson?

5         MR. DICKERSON:  Thank you.

6       (Pause in proceeding)

7         MR. DICKERSON:  Good afternoon, Your Honor.

8         THE COURT:  Good afternoon.

9         MR. DICKERSON:  The first thing I want to do is to

10   apologize to the court for filing a third memorandum of law

11   without seeking the court's permission to do so.  I was in

12   such a hurry to respond to class counsel's memorandum of May

13   4th that I failed to take into account your preliminary

14   approval order, which indicated that there were to be no

15   submissions beyond the submission of class counsel.  So I do

16   apologize and -- but nevertheless, our third memorandum of

17   law, in addition to and should be applied in evaluating the

18   proposed coupon-like settlement that before you as well as the

19   cost and fee application.  I respectfully request that the

20   court consider the arguments contained in all three of our

21   memorandum.  Now, I'm going to be brief and I'm going to focus

22   in on two points, both of which are matters of law.  The first

23   point is is that this is a coupon like settlement, and as a

24   consequence 28 U.S.C 1712 applies, particularly Section A,

25   which deals with how the issue of attorneys fees is to be

1   resolved.  Now, this proposed settlement involves access to

2   two library catalog movies for free.  It also involves one

3   free month of Cablevision's service protection, and involves

4   two free WiFi passes.  These are coupon like benefits and I

5   cite the following authority:  number one, In Re HP Inkjet

6   Printer Litigation, 715 F.3d 1173 (9th Cir. 2013) where in a

7   proposed non-cash settlement provided up to $5 million in e-

8   credits redeemable for printers and printer supplies on HP's

9   website.  Millions of class members were offered the e-credits

10  but only 122,000 filed claims.  The trial court applied fees

11  based upon the lodestar method, which is a method used by

12  class counsel here, and a rough estimate of the ultimate value

13  of the settlement.  This was error, as noted by the Ninth

14  Circuit Court of Appeals, which held that e-credits are

15  coupon- like, and that the settlement is subject to 28 U.S.C.

16  1712.  I couldn't help -- quote from that decision,

17  "Objector's contention that the district court erred when it

18  award $1.5 million in attorneys fees using solely the lodestar

19  method without first calculating the redemption re value of

20  the coupon.  Counsel's fees must be based upon the value of

21  relief obtained for the class," which is the redemption rate

22  of the coupons.  Our second case is Wilson against DirectBuy,

23  Inc., 2011 WL 2050 37 at pages 6-7 (D. Conn. 2011).  This case

24  really is on point.  A proposed non-cash settlement provided

25  for class compensation of, {quote} "at minimum, two free

1    months of membership," {end quote} in defendant's members only
2    discount shopping club.  I repeat, two free months of
3    membership.  It's identical at least in theory and concept to
4    the offer made by Cablevision here, two free movies, one month
5    free service, free WiFi cards.  They're the same.  This case
6    is right on point.  I also note that the court said, "The
7    Class Action Fairness Act -- and so call it CAFA -- added a
8    number of different procedural requirements with respect to
9    coupon settlements, placing limitations on fee awards and
10   requiring the court to make a finding of fairness in writing."
11   In addition to those two cases which I believe are right on
12   point, we have other cases.  We have Berkson against GOGO LLC,
13   147 F. Supp. 3d 123 Judge Weinstein, and of course (E.D.N.Y.
14   2015).  Here's another one that's right on point.  A proposed
15   non-cash settlement provided that class compensation, {quote}
16   "allows for limited free use of GOGO's airline WiFi service."
17   Again, free use of a service which is exactly what this case
18   is.  Judge Weinstein also categorized concepts like one day
19   pass, vouchers, and promo cards -- promo codes as governed by
20   28 U.S.C. 1712, also citing Ninth Circuit -- the Inkjet case.
21   Next case is Reed against Continental Guest Services Corp.,
22   2011 WL 1311886 at page 3 (S.D.N.Y 2011), "proposed non-cash
23   settlement provided for a class compensation of a voucher
24   entitling each of them to any and all of the following:  a
25   Lion King poster and various discounts on theater and

1  transportation costs." Term voucher is really synonymous with
2  coupons.

3      Next case, <u>Cannon again Ashburn Corporation</u>, civil action
4  #16-1452 (D.N.J. 2018), a proposed non-cash settlement
5  provided, in part, for a class compensation of credits towards
6  the purchase of wine from $.20 to $2.25 over a redemption
7  period of 18 months -- note the 60 day period here -- and of
8  course, a cash fund of $500,000. Again, 28 U.S.C. 1712
9  applied. And here's some great cases out of the Seventh
10  Circuit. It's a pity that Judge Posner had to retire. What a
11  brilliant mind, and here are some of the cases. <u>In Re</u>
12  <u>Southwest Airlines Voucher Litigation</u> 799 F. 3d 701 (7th cir.
13  2015), a proposed non-cash settlement provided for class
14  compensation of drink vouchers. Again, right on point. The
15  case really involved a decision by Southwest Airlines to stop
16  accepting these vouchers that they gave out routinely to
17  people, vouchers for one free drink. So there was a class
18  action and ultimately the settlement was, okay, you're going
19  to get your free drink. You're going to get a voucher. And
20  of course, the court said that 28 U.S.C. 1712 applies. And
21  again, it's identical to this case, theoretically. It's a
22  free service. In that case, a drink.

23      Next, <u>Redman against Radioshack Corporation</u>, 768 F. 3rd
24  622 (7th Cir. 2014), proposed non-cash settlement provided for
25  cash compensation of a $10 coupon which could be used to buy

1     products at Radioshack.  Again, the court held that 28 U.S.C.

2     1712 applies.

3         Next, Synfuel Technologies Inc., against DHL Express USA

4     Inc., at 463 F. 3rd 646 (7th Cir. 2006), a proposed non-cash

5     settlement provided for class compensation of {quote} "up to

6     four pre-paid airborne shipping envelopes or $30 in cash."

7     Again, identical to this case.  In Synfuel it's four free

8     shipping envelopes, in other words a service.  You're getting

9     an opportunity on four occasions to use our service for free.

10    That's exactly this case.  Two movies you're allowed access to

11    for free; same thing.  Again, 28 U.S.C. 1712 applies on our

12    last case is Brown against 22nd District Agricultural

13    Association, case #15-CV-2578 (S.D. Cal. 2017), a proposed

14    non-cash settlement provided for class compensation of,

15    {quote} "Each admission entrance free for the 2017 San Diego

16    County Fair shall be reduced by $.50."  Again, 28 U.S.C. 1712

17    applies.  Now, that's our legal authority.  We believe it is

18    on point and that this is, in fact, a coupon-like settlement,

19    and to quote Judge Weinstein, "It has the scent and flavor of

20    a coupon," which exactly what it is.  Now, that's our first

21    point, it's a matter of law.  We hope you interpret it our

22    way, but it's on the law.

23         Now, the second issue is equally important, and it deals

24    with the value of what Cablevision is actually giving up.

25    Now, the value of the proposed class benefits should be

```
 1    determined based upon the real actual cost of the benefits to
 2    the defendant.  Now, class counsel has presented to the court
 3    the retail -- average retail price of $8.29 per class member
 4    times the number of class members, which I presume is around
 5    3.1 million.  So class counsel comes up with the figure $28.4
 6    million is the value of the benefits being offered.  Well,
 7    that's a phantom.  That's utter nonsense.  We submitted a
 8    second discovery device and we asked the parties, well, what's
 9    the actual cost and of course they said nothing.  Is it the
10    retail price?  Absolutely not.  Is it the wholesale price?
11    No.  Is it cost of goods sold?  Probably not.  Is it perhaps
12    cost of goods sold minus depreciation?  Frankly, we don't know
13    but the court should take the opportunity to find out.  What
14    is Cablevision really giving up?  Perhaps these movies have
15    been fully depreciated and their value is zero.  So instead of
16    $28.4 million we need a reality check, and as far as
17    Cablevision's concerned, they should be required to tell us.
18    Now, I suggested that the court appoint independent forensics
19    accountants to find out what Cablevision's true cost is.
20    That's an important number because part of the -- your
21    consideration, of course, is the settlement fair and adequate?
22    Well, 28 million -- 28.4 million is a staggering number, and
23    on its face it looks adequate but is it real?  I don't think
24    so.  So that's our second point, what is the value of these
25    services, and that will -- once that information is available,
```

1   it should help the court to evaluate the benefits to the

2   class.

3       Now, as far as counsel's fees, we made that point in

4   point one, the way it should work is that let's say we -- Your

5   Honor was able to determine that the true value of the

6   services is not 28.4 million but a million, a million dollars.

7   Let's say that's what it costs Cablevision.  You put out the

8   settlement, and only 30% of the class members respond to take

9   advantage of any of these benefits.  You need to know that

10  number, particularly when it comes to attorney's fees, and

11  certainly under 17 -- excuse me, 28 U.S.C. 1712 should be

12  considered.  So if 30% respond, that means that $1 million

13  should be reduced to $300,000 as the real value of the

14  settlement, and then attorney's fees should not be based on

15  loadstar, based on percentage of whatever the court determines

16  the true value of the settlement is, figuring in the cost to

17  Cablevision and the redemption rate, which I believe, under 28

18  U.S.C. 1712, needs to be done.

19      Lastly, I just want to say that I've known Mr. Stone, oh,

20  I don't know, at least 30, 35 years because I used to be a

21  class action plaintiff's lawyer, consumer advocate.  I still

22  am a consumer advocate, only I write about it.  So I have the

23  highest regard for Mr. Stone and his team.  They fought a

24  tough battle against, in my view, a recalcitrant defendant who

25  just won't pay up when there's a program problem.  But

 1   nonetheless, that's in the past.  The only thing important now

 2   is is this settlement fair and adequate.  We don't think it is

 3   at the present time, and if Your Honor has any questions, I'll

 4   try to answer them.

 5         THE COURT:  No, I think you've thoroughly covered

 6   the arguments that you presented in your papers, which I've

 7   read carefully, including some of Judge Posner's decisions.

 8   So I don't have any questions at this point, but I thank you

 9   for your presentation.

10         MR. DICKERSON:  Thank you very much, Your Honor.

11         THE COURT:  All right.

12         MR. DICKERSON:  Have a good day.

13         THE COURT:  Do you want to be briefly heard in

14   response to that?

15         MR. STONE:  Yes, Your Honor.  Yes please.  Again,

16   it's Ralph Stone for the record.  Question number one, is it a

17   coupon, a great deal of emphasis is placed by Judge Dickerson

18   on a string site of cases which almost universally, if not

19   universally, can be distinguished as coupon cases.  Because in

20   those cases, whether it's a credit, or a discount, or a three

21   months of being able to go to a cost savings club, other

22   purchases are required.

23      Giving you a drink ticket on Southwest Airlines, the

24   example from my opening discussion, it's a free drink.  One

25   can call it a free drink, but it's not free.  You have to go

1    on Southwest Airlines, you have to buy a flight on Southwest

2    Airlines to take advantage of the free drink, and in that

3    respect, it's very much a coupon.  Similarly, the Gogo free

4    internet on a flight, same concept;  you have to buy something

5    else to take advanatage of the offer.  The free -- the cost

6    savings club, Direct Buys is the case; there, it's a free

7    month or two of membership in their cost saving club, but to

8    take advantage of your free membership, you actually have to

9    spend money.

10        That's not the case here.  These people are already cable

11   subscribers.  They're getting the movies for free.  They buy

12   nothing else.  They come, they have the opportunity to watch

13   movies -- some people may not look at their bills, may not

14   even know that this contract had ever existed, and might flip

15   on a 3.95 movie and the next month they're going to be

16   pleasantly surprised that they didn't have to pay for it.

17   That's all that's going to happen with respect to the movies.

18   With the wi-fi passes, nothing else to buy, you just get it.

19   You want to use one of the 1.5 million hotspots in the tri-

20   state area where you can use the wi-fi, go for it.  These

21   things are being given to these people free, they're not being

22   further solicited, the don't have -- it's not as if something

23   turns on and you have to turn Cablevision to turn it off.  We

24   made it very clear throughout the settlement process this was

25   not going to be a coupon, this was going to be a freebie.  I

1  give you chocolate; you can eat or you can throw it out, but

2  we gave you chocolate and it's not a coupon.

3      With respect to the question of value, there's just a

4  huge gulf that won't be bridged, not in this conversation with

5  Judge Dickerson.  Our view and our damage theory was that the

6  value of the services being provided was at the retail price.

7  That's how we came up with our 86 or $83 million damage

8  figure.  Now Judge Dickerson is buying into their theory that

9  the value should be trivialized, but the value of what these

10  people are getting, the value of the things they are

11  receiving, is the value that they would have paid for these

12  things had they purchased them themselves; that's the retail

13  price.  Now, we're giving these things to these people and we

14  should get credit for giving these things to these people,

15  whether they use them, whether they turn on their TV, whether

16  they turned on their TV back in October 2010, that's their

17  business.  But our settlement got them $28.4 million worth of

18  value.  Hopefully they'll use it.  But they are being given

19  these things, and they don't have to buy anything else.  So in

20  that respect, this is not a coupon settlement.  You can try as

21  hard as you want to make it seem like a coupon settlement, but

22  it's not.  They're getting these things for free.

23      If Your Honor has any questions, I've tried to keep it

24  brief and focused.

25          THE COURT:  That's fine.  No, I'm good, thank you.

1          MR. STONE:   Thank you.

2          THE COURT:   All right.  On this issue of whether

3     this is a coupon settlement, the Dickerson objectors have

4     argued that the proposed agreement is a coupon settlement, or

5     at least has the look and feel of one, and as such is subject

6     to heightened scrutiny.  Such scrutiny, the objectors assert,

7     requires the court to consider redemption rates and to appoint

8     independent experts in assessing the agreement's fairness and

9     reasonableness.

10         The Dickerson objectors urge the court to reject the

11    benefits offered under the agreement since aggrieved

12    subscribers are instead entitled to recover what they sued

13    for, namely a pro rata credit.  The class counsel strongly

14    disagrees with the objector's characterization of the

15    settlement as a coupon settlement on the grounds that it does

16    not require class members to make any additional purchase from

17    Cablevision, and instead, the benefits are automatic.  They do

18    not require redemption in order to be enjoyed.

19          Looking to the relevant case law on this subject, I

20    point out that coupon settlements {quote} "require class

21    members to purchase something from the defendant that they

22    might not otherwise purchase to enjoy its benefits" {close

23    quote}.  That's from Blessing v. Sirius/XM Radio, 2011 Westlaw

24    3739024 at *2, that is a Southern District of New York, August

25    24, 2011 case, affirmed 507 F. App'x 1 (2d Cir. 2012).  I also

1    refer counsel to <u>Berkson v. Gogo, LLC</u>, 147 F. Supp. 3d 123 at

2    131, a 2015 case from the Eastern District of New York,

3    quoting Volume 4 of William Rubenstein, Newberg on Class

4    Actions, section 12, subdivision 11, (5th ed. 2015), which

5    also cites the Southwest Airlines voucher litigation from the

6    Seventh Circuit, as has been referred to today, which says,

7    {quote} "A coupon is a discount on another product or service

8    offered by the defendant in the lawsuit with the critical

9    factor being that the non-pecuniary benefit forces future

10   business with the defendant."

11         There are three primary concerns with regard to coupon

12   settlements that have led courts to disfavor them.  First of

13   all, {quote} "it is doubtful that coupon settlements provide

14   meaningful compensation to most class members" {unquote}.

15   Two, {open quote} "coupon settlements often fail to disgorge

16   ill-gotten gains from the defendant" {close quote}.  And

17   three, {quote} "coupon settlements raise concerns because they

18   may require the class members to do future business with the

19   defendant in order to receive compensation" {close quote}.

20   That's from the <u>Berkson</u> case at 147 F. Supp. 3d at 131.  And I

21   also would refer you to <u>True v. American Honda Motor Company</u>,

22   749 F. Supp. 2d 1052 at 1069, a Central District of California

23   case from 2010.

24         The Class Action Fairness Act includes a provision

25   devoted solely to coupon settlements, see 28 United States

1    Code Section 1712, {quote} "Although the fair, reasonable and
2    adequate language used in Section 1712(e) is identical to the
3    language relating to settlement approval contained in the
4    Federal Rule 23(e)(2), several courts have interpreted Section
5    1712(e) as imposing a heightened level of scrutiny in
6    reviewing such settlements likely as a result of the concerns
7    set forth," as I've just mentioned.  And that -- I refer you
8    back to the <u>True</u> case at page 1069, which collects a number of
9    cases on this issue.  Other courts, however, declined to do
10   so, see <u>Wilson v. Directbuy, Inc.</u>, 2011 Westlaw 2050537 at *4,
11   that's from the District of Connecticut, May 16th of 2011.
12        Moreover, 28 United States Code Section 1712 {open quote}
13   "places restrictions on how attorney's fees are awarded in
14   coupon settlements by, for example, requiring that the award
15   be based on the value to the class of the coupons that are
16   redeemed" {close quote}.  That's from <u>Silberblatt v. Morgan</u>
17   <u>Stanley</u>, 524 F. Supp. 2d 425 at 432 (S.D.N.Y. 2007) citing the
18   statute.  Notwithstanding the foregoing criticism of coupon
19   settlements, {quote} "courts have regularly approved
20   settlements that provide class members with coupons rather
21   than cash" {close quote}.  That's from In Re: <u>Western Union</u>
22   <u>Money Transfer Litigation,</u> 2004 Westlaw 3709932 at *10, an
23   Eastern District of New York case from October 19th of 2004,
24   also collecting other cases.
25        With these principles in mind, the court turns to the

1    terms of the instant settlement agreement.  The proposed

2    settlement agreement as to group A subclass here says that

3    they shall receive the right to watch two standard or high

4    definition library catalog movies for free, a retail value of

5    $2.95 or $3.95 per movie, depending on the class member's

6    movie selection.  This right may be exercised for 60 days with

7    the 60-day period starting 30 days after the court has issued

8    a final approval of the settlement substantially in the form

9    of exhibit D attached to it.  When a group A class member

10   watches a qualifying movie during the 60-day period, the class

11   member's next Cablevision bill will reflect a charge for the

12   movie and an equal and offsetting credit for the movie.

13   Cablevision will notify group A class members of their right

14   to view to two movies through appropriate messaging in the

15   regular bills of such class members beginning one month prior

16   to the beginning of the 60-day period and for each of the two

17   months of the 60-day period.  The messaging will explain that

18   group A class members will receive a charge and offsetting

19   credit on his or her next monthly bill for each of the two

20   eligible movies purchased during the 60-day period.

21        As to the group B class members, the settlement agreement

22   provides that they'll receive one month of Cablevision's

23   service protection, which, as more fully described on the

24   Cablevision Optimum website, covers subscribers from

25   unexpected service fees, such as for a home visit related to

1   wiring, jacks or connectors at no charge, a retail value of

2   $6.99 starting on the first day of the month following 30 days

3   after the final approval order, and then also the same

4   messaging provisions apply.  Service protection shall

5   terminate for all group B class members when the free month of

6   service protection has been provided unless the group B class

7   member was already a subscriber to service protection or the

8   group B class member affirmatively elects to continue

9   receiving service protection, in which case regular charges

10  will apply.

11       Then as to group C, each group C class member shall

12  receive two wi-fi day passes at no charge, a retail value of

13  $4.99 per wi-fi day pass, which may be used within a 120-day

14  period starting 30 says after the final approval order.

15  Cablevision will provide the technical means for accessing the

16  wi-fi day passes through activation codes, web links or

17  similar means directly to group C class members via email to

18  the extent Cablevision has last known email contact

19  information for them.  Cablevision will also provide a single

20  round of publication notice of the wi-fi day pass class

21  benefit in each of the numbered newspapers here and that the

22  wi-fi day pass claim benefit shall be freely transferrable.

23       The proposed settlement offers class members in-kind

24  benefits instead of each or a credit towards their -- excuse

25  me, instead of cash or a credit towards their Cablevision

1  bill.  Since 28 United States Code Section 1712 does not

2  define coupon, the court looks to case law to determine

3  whether the in-kind benefit offered under the agreement here

4  constitutes a coupon.  In Clement v. American Honda Financial

5  Corporation, 176 F.R.D. 15, it's a case from the District of

6  Connecticut from 1997, the plaintiffs brought suit against

7  American Honda Finance Corp. and Trans Oceanic Motors for,

8  among other things, violations of the Federal Consumer Leasing

9  Act.  The proposed settlement agreement called for the

10  following relief to class members, and I'm quoting here, "The

11  proposed settlement provides for two different sub-classes

12  based upon each class member's trade-in status.  Members of

13  the trade-in deficit subclass, which is comprised of all class

14  members who turned or traded in their vehicle prior to the

15  lease termination date, thereby incurring an early termination

16  charge, will receive a $150 coupon payable towards their next

17  lease or purchase on credit of a Honda or Acura through AHFC."

18  And I find even that description of that provision makes that

19  case distinguishable from the circumstances here.  The offer

20  there clearly is a coupon, and I don't think that that's even

21  debatable.

22      Many of the objectors in Clement argued that the coupons

23  provided for in the settlement agreement were worthless since

24  they required class members to lease or purchase another

25  vehicle through the company against which they were bringing

1    suit.  They further asserted that the amount of the coupon, 75

2    or $150, was minuscule compared to the price of purchasing or

3    leasing a car.  The court agreed at that point, and on those

4    grounds, as well as others, declined to approve the

5    settlement.

6         Looking to another case, Reed v. Continental Guest

7    Services Corporation, a Southern District of New York case

8    from April of 2011, the citation is 2011 Westlaw 1311886 at

9    *1, the court similarly found that it was dealing with a

10   coupon settlement because in Reed, the proposed settlement

11   would have provided class members with a voucher that could be

12   redeemed for one of the following, and this case was mentioned

13   by counsel for the three objectors, Attorney Dickerson:  Those

14   options were a Lion King poster, a discount of $10 from any

15   theater ticket purchase for Continental, a $3.25 discount from

16   any sightseeing service offered by Continental, and a discount

17   of $1.25 from any standard transportation service offered by

18   Continental under $40 and a discount of $3 for any standard

19   transportation service offered by Continental over $40.  To

20   obtain these benefits, class members had to fill out a form

21   and mail it to a Pennsylvania address, once again, factors

22   distinguishing the provisions of settlement from the case

23   we're involved in here today.

24        In Reed, the court held that the proposed settlement was

25   essentially a coupon settlement, bringing with it many, if not

1    all, of the well documented problems associated with such

2    settlements.  The vouchers offered under the agreement were

3    virtually worthless since there was a serious question as to

4    whether many of the class members could even take advantage of

5    the benefits, considering the fact that it was unlikely that

6    they'd be visiting New York City.  The court further held that

7    even if the class member could benefit from the voucher and

8    would take the time to fill out the form and apply for the

9    voucher, there was substantial question whether the class

10   members would ever learn about the settlement since there

11   would be no individualized notice, once again distinguishable

12   from the facts here.

13       And there's another example of the coupon issue.  I bring

14   your attention to a case called State of New York v. Dairylea

15   Co-Op.  The citation is 547 F. Supp. 306 at 308, a Southern

16   District case from 1982.  Under the agreement in Dairylea Co-

17   Op, the settlement provided that Dairylea would expend a total

18   of $750,000 in connection with the distribution of {quote}

19   "cents off coupons" {close quote} redeemable for discounts on

20   Dairylea products.  These coupons would be distributed by

21   being printed on the packaging of Dairylea milk and would

22   redeemable for a discount on a subsequent purchase of Dairylea

23   milk or milk products.  In rejecting the proposed relief, the

24   court explained that the plan -- {quote} "The plan which

25   plaintiff and Dairylea propose converts a compensatory legal

1    settlement into a marketing program.  By its terms, the plan
2    would leave Dairylea with broad discretion of when it where it
3    will offer its discount coupons.  It does provide Dairylea
4    with marketing advantages, not only at the time of sale to
5    consumers hereafter of products bearing the coupons, but also
6    at the time of the coupon's subsequent redemption by such
7    consumers.  Moreover, it is natural that a consumer's
8    expectation of receiving such coupons would attract him or her
9    with regularity to the Dairylea display and might thus improve
10   Dairylea's sales, even at a time when no coupons are in fact
11   furnished.  Further, this plan seems unfair to those actually
12   injured for it makes no effort to specifically reimburse those
13   who were allegedly overcharged in the past but in effect is a
14   payout to future milk drinkers in general."  Again, I find
15   that argument and those factors distinguishable.

16        But not all class action settlement agreements providing
17   for in-kind benefits are considered coupon settlements, and I
18   draw counsel's attention to a case called Dupler, D-U-P-L-E-R,
19   v. Costco Wholesale Corporation, 705 F. Supp. 2d 231.  That's
20   an Eastern District case from 2010.  The plaintiffs in Dupler
21   alleged that Costco's renewal policy constituted a violation
22   of New York General Business Law Section 349, that it breached
23   Costco's membership contract and resulted in Costco's unjust
24   enrichment.  Under the proposed settlement agreement, the
25   parties agreed to the following relief, and I'm quoting here,

1    "Class members whose post-expiration renewal date was 22 days

2    or more but less than two months after their immediately

3    preceding membership expiration date will receive one

4    additional month of Costco membership without charge.  Class

5    members whose post-expiration renewal date was two months or

6    more but less than three months after their immediately

7    preceding membership expiration date will receive two

8    additional months of Costco membership without charge.  Class

9    members whose post-expiration renewal date was three months or

10   more after their immediately preceding membership expiration

11   date will receive three additional months of Costco membership

12   without charge.  Class members whose post-expiration renewal

13   date was 21 days or less after their immediately preceding

14   membership expiration date will receive no additional

15   membership term under this settlement.  Each eligible class

16   member will receive only one extension of Costco membership

17   based on the first post-expiration renewal, even if Costco

18   applied its renewal policy to the customer on more than one

19   occasion.  Class members who are currently Costco customers

20   will receive automatic renewals of their membership for the

21   above discussed periods of time.  Class members who are no

22   longer Costco customers will receive temporary membership

23   privileges for the above discussed periods of time."

24        The court in Dupler did not treat the settlement

25   agreement as a coupon settlement and did not consider

1    redemption rates in analyzing the fairness of the agreement.

2    The court ultimately approved the agreement in the face of 127

3    opt-outs and 24 objectors.  Like the <u>Dupler</u> court, the court

4    in <u>Blessing v. Sirius/XM Radio, Inc</u>., 2011 Westlaw 3739024 at

5    *2, that's a Southern District of New York case from August

6    24th of 2011 affirmed 507 F. App'x 1 (2d Cir. 2012), the court

7    also declined to treat the agreement as a coupon settlement.

8    The settlement agreement in <u>Blessing</u> did not award class

9    members a cash remedy.  Instead, the agreement precluded the

10   defendant from raising its subscription prices for five

11   months.  Objectors in <u>Blessing</u> argued that their reward was

12   similar to a coupon settlement.  In rejecting the objector's

13   contention, the court explained that {quote} "unlike coupon

14   settlements, the instant agreement does not require class

15   members to purchase something that they might not otherwise

16   purchase to enjoy its benefits.  Rather, the vast majority of

17   class members will benefit in the course of their normal

18   subscription payments and former subscribers may benefit from

19   a month of free radio or internet service."

20       I would also draw your attention to a case from the Ninth

21   Circuit, which although it's not binding on the court, I do

22   find persuasive.  This case is entitled In Re: <u>Online DVD</u>

23   <u>Rental Antitrust Litigation</u>.  The citation is 779 F.3d 934,

24   and it is a Ninth Circuit case decided on February 27th, 2015.

25   In the -- in that particular litigation, the individuals

1    representing the putative class of subscribers to internet
2    based DVD rental service found an anti-trust action against
3    internet based DVD rental service at a large discount retailer
4    challenging as anti-competitive a promotion agreement that
5    divided up DVD related businesses between two companies.
6    Plaintiffs ruled for certification of the litigation class of
7    subscribers to internet based DVD rental service.  The
8    objectors in the case contended that the Wal-Mart gift cards
9    which were part of the settlement agreement here were coupons
10   and fell under CAFA, and as a result, the District Court erred
11   by calculating the fee award as a percentage of the overall
12   settlement fund, including the total dollar value of the gift
13   cards instead of calculating the portion of the fee award
14   based on the gift cards as a percentage of the gift cards that
15   were actually redeemed.  The Ninth Circuit found that the
16   District Court correctly held that the Wal-Mart gift cards in
17   that settlement did not constitute a coupon settlement that
18   falls under the umbrella of CAFA.
19        There was reference made to the Senate Judiciary
20   Committee's report which offered a detailed statement from
21   Congressional hearings about certain types of class action
22   settlements in which the class members received nothing more
23   than promotional coupons to purchase more products from the
24   defendants.  That report cites and criticizes coupon
25   settlement awards that provide class members with 30 to $40

1    discounts on future cruises, a 5 to $10 voucher good for
2    future purchases of particular computer hardware or software
3    products, a dollar off every subsequent $5 purchase at a chain
4    of restaurants, a 30% discount on selected products during a
5    one-week time period, $55 to use on a purchase of a new crib
6    from a defendant crib producer accused of making defective
7    cribs, and $1.25 off of a $25 video game.  The court found
8    that the Wal-Mart/Netflix settlement different from the
9    settlements that drew the attention of Congress and stated
10   that affording over 1 million class members $12 in cash or $12
11   to spend at a low price retailer does not leave them with
12   little or no value.  The District Court did not err, the Ninth
13   Circuit went on to state, when it stated simply the $12, while
14   not a lot of money these days, even at Wal-Mart, is $12.
15   Morever, the Ninth Circuit found the case distinguishable from
16   every single coupon settlement example in the Senate report,
17   noting that the report focuses on settlements that involve a
18   discount, frequently a small one, on class members' purchases
19   for a settling defendant.
20        These discount require class member to hand over more of
21   their own money before they can take advantage of the coupon,
22   and they often are only valid for select products or services.
23   The gift cards in this case, however, were held to be
24   different.  Instead of merely offering class members the
25   chance to receive a percentage discount on a purchase of a

1  specific item or set of items at Wal-Mart, the settlement gave

2  class members $12 to spend on any item carried on the website

3  of the giant low-cost retailer.  The class member did not have

4  to spend any of his or her own money and could choose from a

5  large number of potential items to purchase.  And the court

6  found that even if the gift card was only worth $12, it gave

7  class members considerably more flexibility than any of the

8  coupon settlements listed in the Senate report.

9       I find that the settlement agreement in this case has

10  more in common with Dupler and Blessing and In Re: Online DVD

11  Rental Antitrust Litigation than it does with the earlier

12  agreements that I discussed.  First, class members need not

13  contribute more of their own money to take advantage of the

14  benefits offered under the agreement.  In other words, they

15  are not provided with a credit that can be applied toward a

16  good whose purchase price exceeds the credit offered.

17  Moreover, it appears a continued membership where there's a

18  category benefit that does not require a current membership

19  does not convert the agreement to a coupon settlement.  Here,

20  in order to take advantage of the benefits offered under the

21  agreement, a class member need not be a current subscriber to

22  Cablevision.  Group C is comprised of those class members who,

23  as of 30 days after the date of the final approval order, are

24  former subscribers of Cablevision.  Instead of two free

25  standard or high definition library catalog movies or one

1    month of Cablevision's service protection free of charge,

2    group C will receive two wi-fi pass -- day passes at no

3    charge.  The wi-fi passes are also freely transferrable,

4    adding to their value.

5        The court further notes that the settlement does not

6    involve vouchers, coupons or any other claiming device.

7    Instead, the benefits will be provided automatically to all

8    class members.  Since the proposed agreement provides for free

9    merchandise or service, a class benefit -- excuse me, since

10   the proposed agreement provides for free merchandise or

11   services, a class member need not engage in any further

12   business with Cablevision to take advantage of the benefits,

13   and the benefits are provided to class member automatically.

14   And on that basis, I find that the agreement is not a coupon

15   settlement.

16       Now, the Dickerson objectors also argued that the

17   proposed benefits should feature a cash alternative at a

18   discount.  In this regard, the objectors state that for a

19   $2.95 retail price movie, the class members should, in the

20   alternative, receive a dollar in cash or in credit against the

21   next bill.  Through this objection, the parties are

22   essentially requesting that the court impose a preferred

23   payment structure on the settling parties, something the court

24   is not authorized to do, and I refer you to the case of Casey

25   v. CitiBank, N.A., 2014 Westlaw 4120599 at *3, that is a

1    Northern District of New York case from August 21st of 2014,

2    in which the court rejected the objector's proposition that

3    the agreement utilized a claims made versus a direct payment

4    settlement structure.  I also refer you to <u>Uhl</u>, U-H-L, <u>v.</u>

5    <u>Thoroughbred Tech and Telecommunications, Inc.,</u> 309 F.3d 978

6    at 987, that's a Seventh Circuit case from 2002, where the

7    court said, {quote} "Perhaps there could have been an even

8    more creative settlement or, alternatively, one that is more

9    traditional, but that is not the question that we must

10   resolve" {close quote}.  I overrule the objection based on

11   this pro rata credit argument.

12        The Dickerson objectors also argued that the redemption

13   rate of 60 days which applies to the benefit offered to group

14   A class members is too short and should instead be at least

15   two or three years.  At the outset, I note, in order to take

16   advantage of the benefits offered under the settlement

17   agreement, class members do not need, as was said earlier, to

18   redeem a coupon or a voucher.  Rather, the benefits are

19   automatic.  Notwithstanding this difference between Attorney

20   Dickerson and the court's understanding of the agreement, the

21   court will address the substance of the objection since I find

22   that there are grounds to reject it on the merits.  {Quote}

23   "Theoretically, the longer the time available for redemption,

24   the higher the redemption rates.  In practice, the acceptable

25   time is dictated by the product's category" {close quote}.

1    That's from In Re: <u>Motor Sports Merchandise Antitrust</u>
2    <u>Litigation</u>, 112 F. Supp. 2d 1329 at 1336 (N.D. Ga. 2000) in
3    which the court stated, {quote} "It may be reasonable for
4    frequently purchased items to have a shorter acceptable
5    redemption time than those high-ticket items, such as
6    refrigerators or automobiles that are bought infrequently"
7    {close quote}.  For example, in In Re: <u>General Motors</u>
8    <u>Corporation Pick-Up Truck Fuel Tank Product Liability</u>
9    <u>Litigation</u>, 55 F.3d 768 at 808 (3d Cir. 1995) the court
10   explained that the {quote} "infrequency of a consumer's
11   purchase of new truck relative to the 15-month redemption
12   period makes using these certificates significantly more
13   difficult than those in other coupon settlements" {close
14   quote}.

15        The cases cited by the Dickerson objectors further
16   demonstrate this point.  The objector cites In Re: <u>Auction</u>
17   <u>Houses Antitrust Litigation</u>, 2001 Westlaw 170792 at *2, a
18   Southern District of New York case from February 22nd of 2001,
19   affirmed 42 F. App'x 511 (2d Cir. 2002), a case in which the
20   settlement agreement had a redemption rate of five years.  The
21   agreement in In Re: <u>Auction Houses</u> provided for the issuance
22   of discount certificates usable to pay charges incurred at
23   Christies or Sothebys.  Unused certificates could be redeemed
24   for cash after four years.  The agreement in <u>Shaw v. Toshiba</u>
25   <u>American Information Systems, Inc.</u>, 91 F. Supp. 2d 942 at 946,

1    (E.D. Tex. 2000), also cited by the objectors, called for

2    {quote} "cash remedies, warranty remedies, hardware

3    replacements, software patches and coupons all designed to

4    address the allegedly defective FDCs in Toshiba's computers

5    and compensate their respective owners" {close quote}.  A 35-

6    month redemption period was approved in In Re: <u>Mexico Money</u>

7    <u>Fund Tranfer</u> -- excuse me -- yes, <u>Transfer Litigation</u>, 267

8    F.3d 743 at 748 (7th Cir. 2001), a case in which class members

9    were provide with discount coupons for the cost of

10   transferring funds to Mexico.  In that case, it was determined

11   that persons who would transfer money to Mexico do so on an

12   average of 14 times annually.  And then the court, in <u>Radosti</u>,

13   R-A-D-O-S-T-I, <u>v. Envision EMI</u>, 717 F. Supp. 2d 37 at 46 from

14   the District of Columbia Court in 2010 approved a settlement

15   agreement with a seven-year redemption period.  The benefits

16   offered to class members in that case consisted of two

17   vouchers worth $625 each that could be used toward tuition for

18   a future conference or program sponsored by Envision, the

19   defendant company that sponsored a series of youth conferences

20   in connection with the inauguration of Barack Obama.

21       I find these cases clearly distinguishable.  The court

22   notes that given the nature of the benefit offered in this

23   specific litigation now before the court, namely two free

24   movies, in that context, the 60-day redemption period is

25   appropriate.  Moreover, only those class members who already

1    subscribe to video programming will receive the two free

2    movies, thereby increasing the likelihood that the class

3    members will watch the videos during the redemption period.

4        In connection with this objection, Attorney Dickerson

5    argues that the defendant should be required to keep open the

6    redemption period and keep issuing and providing benefits

7    until the total value of the redemptions equal the projected

8    benefits value.  I note that counsel has failed to cite to any

9    specific federal case in support of this recommendation.

10   Further, since I have already determined that a redemption

11   period of 60 days is appropriate for the type of relief

12   awarded under subclass A of this agreement, I'm denying

13   counsel's request for an open-ended redemption period.

14       As to the argument that the release language set forth in

15   paragraph 16(b) is too broad, the objectors argue that the

16   release claims should only be those {quote} "based on breach

17   of contract and remedies, including pro rata credits because

18   certain broadcast stations and networks owned by Fox Cable

19   Network Services were not distributed to customers during the

20   period of October 16th , 2010 to October 30th, 2010.  Under

21   Section 16 of this settlement agreement, class members release

22   Cablevision of the following:  Any and all claims, actions,

23   causes of action, rights, demands, suits, debts, et cetera --

24   and there's a long list here, which I'm not going to go into

25   you're all familiar with the release language.  But it is

1    qualified at the end of that provision with the language

2    {quote} "to any conduct, act, representation, omission, fact,

3    matter of transaction or oral or written statement or

4    occurrence prior to the date of the entry of the final

5    approval order involving, based on, relating to, arising out

6    of, or in any way connected with, directly or indirectly, the

7    factual allegations in the consolidated amended class action

8    complaint filed in this action on February 22nd, 2011,

9    including without limitation the non-carriage of the six Fox

10   channels for two weeks in October 2010 at any time from the

11   beginning of such non-carriage in October 2010 through the

12   date of the final approval order."

13       The court finds that the aforementioned release is

14   appropriate:  {Quote} "In order to achieve a comprehensive

15   settlement that would prevent relitigation of several

16   questions at the core of a class action, a court may permit

17   the release of a claim based on the identical factual

18   predicate as that underlying the claims in the settled class

19   action, even though the claim was not presented and might not

20   have been presentable in the class action" {close quote}.

21   That was from In Re: American Express Financial Advisors

22   Securities Litigation, 672 F.3d 113 at 135-136 (2d Cir. 2011).

23   Here the release is limited to claims based on, relating to,

24   arising out of, or in any way connected with, directly or

25   indirectly, the factual allegations in the consolidated

1    amended class action complaint filed in this action on

2    February 22nd, 2011, including without limitation the non-

3    carriage of the six Fox channels for two weeks in October 2010

4    at any time from the beginning of such non-carriage in October

5    2010 through the date of the final approval order.  This

6    language, as far as the court is concerned, avoids overreach.

7    I note that the Dickerson objectors fail to cite any case in

8    support of their position, and based on the analysis I've just

9    provided, I am rejecting that objection.

10        Now, as to the request for discovery, the Dickerson

11   objectors have filed various requests for discovery so that

12   they may further explore their objections.  It's well

13   settled that {quote} "objectors to a settlement have no

14   automatic right to discovery or an evidentiary hearing in

15   order to substantiate their objections" {close quote}.  That

16   is from Charron, C-H-A-R-R-O-N, v. Weiner, 731 F.3d 241-248

17   (2d Cir. 2011).  Instead, the Second Circuit has instructed

18   that where the objectors raise {open quote} "cogent factual

19   objections to the settlement and prior discovery was

20   insufficient or non-adversarial, district courts are

21   instructed to exercise particular care to see to it that the

22   non-assenting plaintiff, or by logical extension objecting

23   class member, has had a full opportunity to develop the basis

24   for his objection."  We've already had a significant

25   discussion about the primary basis for the objection was that

1    this is a coupon settlement, and I have reached the
2    determination that that's not the case.  Here, prior discovery
3    was more than sufficient, it went on for years.  Motions had
4    been posted and were available in the public domain, they've
5    been on the court docket for years now.  And to some extent, I
6    know this first-hand because I supervised much of the
7    discovery process.
8        The Dickerson objectors seek production of the deposition
9    transcripts and marked exhibits of the three experts
10   identified in the Stone declaration.  Although the objectors
11   do not identify the declaration to which they refer, the
12   court's identified it as the declaration class counsel
13   submitted to support its motion for preliminary approval of
14   the settlement agreement.  In that declaration, Attorney Stone
15   states that the parties engaged several experts in this
16   action, and plaintiffs and Cablevision deposed each other's
17   experts for a total of three expert depositions.  Class
18   counsel represents in their response to the objectors that
19   they directed Attorney Dickerson to the public docket, namely
20   DE 183 and the corresponding Daubert motions.  The court
21   points out that -- {coughs} excuse me -- Judge Seybert issued
22   an order back on December 28th of 2015, which is found at DE-
23   179, directing the parties to refile documents that had been
24   previously filed under seal and in support of their respective
25   motions to exclude expert opinions.  According to the order,

1    the parties were to refile the documents with only

2    confidential information redacted.  Among those refiled

3    documents was the deposition transcript of expert Todd

4    Buchholz -- actually, there were two transcripts, Todd

5    Buchholz and Jonathan Orszag, as well as Larry Gerbrandt.  In

6    addition to the transcripts themselves, many of the marked

7    exhibits are found on the public docket.  They were refiled on

8    January 27th, 2016 and have remained in the public record for

9    more than two years now, readily accessible to anyone looking

10   at this case, including the objectors and not just the

11   parties.

12        Class counsel states that, being given access to the

13   lightly redacted expert depositions, expert reports,

14   corresponding Daubert motions and motions for summary

15   judgment, that Attorney Dickerson has insisted on being

16   granted access to unredacted versions of the experts'

17   transcripts.  It's worth noting that the expert report of Todd

18   Buchholz was refiled without any redactions as DE-81 -- excuse

19   me, 183-1 regarding the plaintiff's January 27th, 2016 filing.

20   As far as the court is concerned, the Dickerson objectors have

21   had sufficient access to the materials sought and have had the

22   ability to see this material for two years -- {coughs} excuse

23   me -- or going back two years, in any event, thereby removing

24   that document from any further relationships to this case.

25        It's apparent that the -- as far as the requests to get

1   documents relating to the monetary value of disrupted

2   programming, it's apparent that the objectors are seeking

3   information pertaining to the monetary value of the benefits

4   for the purpose of calculating a pro rata credit.  The court,

5   however, has already determined that it does not have the

6   authority to impose a preferred settlement structure, even if,

7   for purposes of this argument only, that alternative structure

8   might be more creative or perhaps more traditional, and I'll

9   refer you to the <u>Uhl</u> case, U-H-L, which I previously cited,

10  and here specifically to page 987.  I'll also refer you to

11  <u>Casey v. CitiBank North America</u>, 2014 Westlaw 4120599 at *3,

12  that's an August 21st, 2014 Northern District of New York case

13  which rejected the objector's proposition that the agreement

14  utilized a claims made versus a direct payment settlement

15  structure.  And on these grounds, then, I am denying the

16  request.

17       As to the request for documents relating to monetary

18  costs to Cablevision of the benefits, the Dickerson objectors

19  have also requested all documents which refer or relate to

20  determining the actual monetary cost to Cablevision of the

21  benefits offered to class members under the agreement.  In

22  response, class counsel explains essentially that this request

23  is not applicable because the parties did not go down the path

24  of determining the cost to Cablevision of such benefits.

25  While the parties determined the monetary cost to Cablevision

1    of providing the interrupted programming based on

2    Cablevision's position that its costs for providing such

3    programming should be a proxy for the value to consumers of

4    its interruption, the parties ultimately did not take this

5    approach because it yielded a minimal damages calculation.

6    And I would point out here that under Mr. Orszag's

7    methodology, the total damages were calculated to be

8    approximately 2.4 million, or 78 cents per shareholder.  Class

9    counsel utilized a more accurate measure of value to the

10   subscribers, what the subscribers pay for the particular

11   program or service.  In light of that fact, the request by the

12   objectors for documents relating to the actual monetary cost

13   to Cablevision of the benefits offered under this agreement is

14   denied.

15       Lastly, the Dickerson objectors also seek all documents

16   relating to the fees and costs application of class counsel.

17   The Dickerson objectors have already had access to the

18   plaintiff's fee application, and class counsel has now

19   provided some additional information with respect to the

20   contemporary billing records which I've received, and that

21   information is quite substantial.  I'm not going to require

22   the plaintiffs to provide the objectors with any further

23   documents in this regard.

24       At this point, the court is taking the attorney's fee

25   application and the application for expenses under advisement,

1    and I will render a decision in due course.  However, I am

2    going to give class counsel and the Dickerson objectors an

3    opportunity right now to put anything else on the record

4    regarding the fee application and the expense application,

5    keeping in mind that I have already read the papers that

6    everyone has submitted to date.  So to the extent there's

7    anything else you want to add in this regard, I'm going to

8    give you that opportunity now, and I'll start with class

9    counsel.

10                MR. STONE:  Again, it's Ralph Stone.  And thank you,

11   Your Honor, for the very, very thoughtful analysis of the --

12   all of the issues, but the coupon issue in particular.

13   Turning to the fee question, I think we have adequately

14   briefed it.  There's a lot already there, and of course we're

15   happy to answer whatever questions the court may have.  There

16   are two points that I would want to emphasize now.  One is

17   that the fee is separate and apart from the recovery for the

18   class; so the fee is not coming from the class in any way.

19   That's also something that's in the papers, but it's

20   something, I think, that's important for me to emphasize here.

21        The other thing that I want to emphasize is just the

22   process that led to the fee, the fee itself, and that the

23   process is not controlling on the court, the fee issue is in

24   your discretion of course, Your Honor.  But there is, I think,

25   some persuasive power to the process that led to the proposed

1    fee, and that is that is was a mediated result that was also

2    hard-fought.  We obviously, in discussing -- after the case

3    was settled, the fee issue came up, only then, and that was

4    clear from the outset that that was the way it was going to

5    work.  Then the parties starting talking about fee, and

6    obviously Cablevision wasn't interested in paying them

7    anything.  And you can imagine that, using our evaluation, we

8    were looking at a higher percentage sort of number.  That

9    process took a great deal of time as well and a lot of

10   negotiation, and ultimately resulted in both sides briefing ex

11   parte to Judge Holwell, who then gave us his mediator's

12   recommendation.

13        And I think that -- and I think it's just a guess, I

14   think both sides didn't like it, but that it was a

15   recommendation that, after some consideration, both sides came

16   around to accepting.  And I think that in many ways, that's a

17   testament as well to the fairness of the proposed fee that's

18   out there.  Thank you, Your Honor.

19             THE COURT:  All right.  And how about Cablevision,

20   is there anything you want to -- again, I don't want to fail

21   to give you an opportunity to speak on these issues.

22             MR. GENSER:  No, Your Honor, we have nothing to add.

23             THE COURT:  All right.

24             MR. GENSER:  Thanks, Your Honor.

25             THE COURT:  All right.  Mr. Dickerson, would you

1    like to be heard?

2         MR. DICKERSON:  Yes, thank you.  As I mentioned in

3    the closing, I've known Mr. Stone and other members of his

4    team for many years and have the highest regard for them, so

5    as far as my clients are concerned, we are not objecting to

6    the calculations and all the paperwork that goes along with

7    the fee app.  Our point is simply that if this is a coupon

8    settlement, then 28 U.S.C. 1712 applies regarding how fees are

9    determined.  But Your Honor has ruled that that does not

10   apply, so other than that, we have no objection, and thank

11   you.

12        THE COURT:  Thank you, Mr. Dickerson.  All right --

13        MR. STONE:  Your Honor, may I add one small point.

14        THE COURT:  Yes.

15        MR. STONE:  Returning to the mediation over the

16   attorney's fee thing, I also do want the court to know, I've

17   just been reminded, that in that process we did share our

18   timesheets with both opposing counsel and with Judge Holwell,

19   so that was part of the mix.

20        THE COURT:  All right.

21        MR. STONE:  Thank you, Your Honor.

22        THE COURT:  Thank you.  All right, well, let me

23   bring this to a conclusion.  As we mentioned earlier, a court

24   may approve a class settlement pursuant to the provisions of

25   Rule 23(c) only after holding a hearing and finding that the

1    settlement is fair, reasonable, and adequate.  To determine

2    the fairness of a settlement, a district court must examine

3    the negotiating process leading up to the settlement, as well

4    as the settlement's substantive terms.  That's from D'Amato v.

5    Deutsche Bank, 236 F.3d 78 at 85 (2d Cir. 2011) and also the

6    Dupler case, which I previously mentioned, at page 238.  The

7    court must therefore consider both the procedural fairness of

8    the settlement negotiations, as well as the substantive

9    fairness of the settlement itself.

10        With respect to procedural fairness, we've stated that a

11   district court reviewing a proposed settlement must pay close

12   attention to the negotiating process to ensure that the

13   settlement resulted from arm's length negotiations and that

14   plaintiff's counsel possessed the necessary experience and

15   ability and have engaged in the discovery necessary to

16   effectively represent the class's interests.  Moreover, there

17   is a strong judicial policy in favor of settlements,

18   particularly in the class action context, and that is from In

19   Re: PaineWebber, Limited Partnerships Litigation, 147 F.3d 132

20   at 138 (2d Cir. 1998).

21        In reviewing the substantive fairness of the settlement,

22   the court must consider the criteria set forth in Detroit v.

23   Grinnell Corporation, 495 F.2d 448-463 (2d Cir. 1974), often

24   referred to as the Grinnell Factors, and I've asked counsel

25   previously today to put on the settlement and to go through

1    the Grinnell Factors as to why the court should approve this

2    settlement as fair and reasonable.  I'm going to take a brief

3    walk through the Grinnell Factors with my finding right now.

4         The settlement discussions in this case did not begin

5    until after Judge Seybert's decision on Cablevision's motion

6    to dismiss, after the class had been certified, after the

7    close of both fact and expert discovery, after extensive

8    motion practice on the admissibility of testimony and reports

9    of fact and expert witnesses, and after the parties briefed

10   their cross motions for summary judgment.  In other words,

11   this case was very far along the continuum of pre-trial tasks

12   and was approaching trial.  In fact, the proposed joint pre-

13   trial order had already been submitted when the parties

14   notified the court that they were going to attempt to settle

15   this case.

16        A settlement was reached after arm's length negotiations

17   by counsel for both plaintiffs and Cablevision.  The parties

18   engaged the Honorable Richard Holwell, a retired judge

19   formerly from the Southern District of New York and now a

20   senior partner at Holwell, Shuster & Goldberg, LLP, to act as

21   mediator.  Judge Holwell explained that he was retained by the

22   parties in October 2016 to serve as an independent mediator.

23   He also provided a specific letter to me outlining the

24   mediation process and the result here, as well as his sense of

25   the achievements of counsel on both sides in that settlement.

1       The parties participated in five in-person mediation

2   sessions before Judge Holwell, as well as innumerable joint

3   and individual telephone conversations.  The parties also

4   briefed the issues of liability, damages, attorney's fees and

5   expenses.  Judge Holwell represents that, {quote} "The

6   negotiations proceeded at arm's length, in good faith and

7   involved hard and tenacious bargaining on both sides by well

8   prepared and able counsel" {close quote}.  According to the

9   joint declaration, the proposed settlement agreement was

10   executed on June 27th of 2017.  Therefore, the settlement was

11   reached after plaintiffs had conducted a thorough

12   investigation, evaluated the claims, and engaged in extensive

13   negotiations.  The plaintiffs also obtained, reviewed and

14   analyzed hundreds of thousands of pages of documents and

15   conducted depositions of fact and expert witnesses.  Moreover,

16   through the preliminary approval process, this court has

17   already determined that plaintiff's co-counsel, the law firm

18   of Stone, Bonner & Rocco, LLP, the law office of Todd J.

19   Krouner, PC and CSS Legal Group, PLLC are experienced counsel.

20   Based on this analysis, the court concludes that the

21   settlement is procedurally fair and is entitled to a

22   presumption of being fair, reasonable and adequate and not a

23   product of collusion, see Joel A. v. Giuliani, 218 F.3d 132 at

24   138-139 (2d Cir. 2000), as well as Wal-Mart Stores, Inc. v.

25   Visa, USA, Inc. 396 F.3d 96 at 116 (2d Cir. 2005).

1      As noted in the Second Circuit, courts look to a non-
2    exhaustive list of factors set forth in Grinnell when
3    considering whether a proposed class action settlement on
4    substantive grounds is fair, reasonable and adequate.  As an
5    initial premise on the first Grinnell Factor, the complexity,
6    expense and likely duration of the litigation, class actions
7    are generally complex.  This case was on the brink of trial
8    when negotiations commenced.  All discovery had been
9    completed, which left the parties in an optimum position to
10    calculate the risks attendant in continuing to trial vis-a-vis
11    the reasonableness of this settlement.  Further litigation at
12    trial would require a resolution of complex issues pertaining
13    to liability and damages.  The case involves complex contract
14    interpretation questions, including whether Cablevision's
15    conduct constituted a {quote, unquote} "programming change"
16    under paragraph 17 of Cablevision's terms of service or
17    {quote, unquote} "an interruption" under paragraph 4 of those
18    terms, which would entitle subscribers to a pro rata credit.
19      With regard to damages, both sides retained experts or
20    utilized complex and competing economic theories in support of
21    their respective positions.  Each party moved to strike the
22    other's expert reports as those motions were denied it would
23    be left to the jury to decide which side's damages theory is
24    more credible.  Preparing and putting on evidence to support
25    the parties' differing theories would consume tremendous time

1  and financial resources, including extensive live testimony

2  and cross examination, as well as expert testimony.  This case

3  has been going on for eight years now.  In light of how

4  vigorously contested the claims and defenses have been in this

5  case, without this settlement, several more years of

6  litigation would be likely for both trial and a lengthy

7  appeals process and would further delay any resolution to the

8  class members, which is a further element this court takes

9  into account.  Settlement at this point results in a

10  substantial and tangible present recovery without the

11  attendant risk and delay of trial, and that is from a case

12  called <u>Maley</u>, M-A-L-E-Y, <u>v. Del Global Techs Corp.</u>, 186 F.

13  Supp. 2d 358 at 362 (S.D.N.Y. 2002).  The court finds,

14  therefore that the complexity expense and likely duration,

15  those elements weigh in favor of the proposed settlement.

16       As to the second factor, reaction of the class to

17  settlement, it's well settled that the reaction of the class

18  to this settlement is perhaps the most significant factor to

19  be weighed in considering its adequacy.  That is from the

20  <u>Maley</u> case.  In this case, the class reaction has been

21  generally favorable.  Only 23 of the approximately 3,160,000

22  class members opted out in response to the settlement notice.

23  The court notes that a total of 262 class members opted out of

24  the case before the settlement.  Moreover, only eight class

25  members have objected to the settlement, two of whom have not

1    set forth any basis for their objection, arguing instead only

2    that the proposed agreement should be disapproved.  The court

3    notes that {quote} "in class action settlements, the notice

4    and approval process generally solicits negative feedback

5    regarding the settlement because it is designed to solicit

6    opt-outs and objections by advising class members of the

7    procedures and deadlines for filing such responses with the

8    court."  That is from Charron, C-H-A-R-R-O-N, v. Pinnacle

9    Group, 874 F. Supp. 2d 179 at 197, Second Circuit -- excuse

10   me, Southern District 2012, affirmed 731 F.3d 241 (2d Cir.

11   2013).  In fact, a certain number of opt-outs and objections

12   are to be expected in a class action and in litigation

13   involving a large class, such as we have here.  It would be

14   extremely unusual not to encounter objections.  Taking these

15   factors into account, less than 1% of the class members have

16   objected to the settlement.  The primary objection raised is

17   that the objectors would prefer a credit to their bill rather

18   than the solution presented in the existing settlement

19   provisions.  The court finds that the second Grinnell Factor

20   weighs in favor of approving the proposed settlement.

21        As to the third factor, the stage of the proceedings and

22   the amount of discovery completed, settlement is especially

23   favored when {quote} "the litigation is at an advanced stage

24   and an extensive amount of discovery has been completed"

25   {close quote}.  That's from Velez, V-E-L-E-Z, 2010 Westlaw

1    4877852 at *13.  This factor relates to whether the plaintiffs
2    had sufficient information on the merits of the case to enter
3    into a settlement, and that is from <u>Parker v. Time Warner</u>
4    <u>Entertainment Company</u>, 631 F. Supp. 2d 242 at 259 (E.D.N.Y.
5    2009).  As described above, the parties vigorously litigated
6    this case for seven years prior to reaching a proposed
7    settlement agreement.  By the time the parties agreed to
8    settle the case, all fact and expert discovery had been
9    completed and class certification had been granted.  In fact,
10   the parties were on the eve of trial, with their joint
11   proposed pre-trial order having already been submitted, when
12   they notified the court that they resolved this case.
13   Plaintiff's counsel conducted an extensive investigation
14   regarding plaintiff's claims and Cablevision's defenses,
15   including reviewing more than 350,000 pages of documents and
16   undertaking extensive depositions.  Plaintiff's counsel
17   deposed Cablevision's Chief Operating Officer, Senior Vice
18   President of Programming, Senior Vice President of Government
19   and Public Affairs, Vice President of Video Product Management
20   and Vice President of Media Relations.  Moreover, plaintiff's
21   counsel defended the depositions of a large number of named
22   plaintiffs.  Also significant is the fact that each side
23   retained an industry expert and a damages expert to support
24   their positions.  Class counsel, along with the named
25   plaintiffs, were well able to assess their position, having

1    had sufficient time to realistically evaluate the strengths

2    and weaknesses of their claims and the fairness of the

3    proposed settlement.  Consequently, the plaintiffs here had

4    sufficient information to enter into the agreement, and this

5    factor weighs in favor of approving the settlement.

6        As to the fourth factor, risk of establishing liability,

7    litigation inherently involves risks.  One of the purposes of

8    the settlement is to avoid the uncertainty of a trial by the

9    merits.  The trial in the current action would have been

10   lengthy and complicated since both liability and damages have

11   been vigorously contested.  In this regard, Cablevision

12   insists that plaintiffs do not have any claim at all under the

13   circumstances of this case because the channels became

14   unavailable due to a dispute between Cablevision and its

15   service provider.  As such, defendants have argued that the

16   disruption in programming was not an interruption under the

17   terms of service but a programming change for which

18   subscribers are not entitled to a credit.

19       In addition to liability, the parties have also

20   vigorously contested the method for calculating damages.  In

21   this regard, Cablevision asserts the damages are minimal or

22   non-existent.  Moreover, Cablevision argued only a fraction of

23   the channels offered to subscribers were unavailable during

24   the two-week period at issue.  Therefore, the damages on a

25   proportional basis, according to the defendants, meaning 78 to

1    90 cents, would be far less than the retail value of the

2    services being provided in settlement, which is over $8.

3    Plaintiffs bear the burden of proving damages, which as

4    discussed above, would come down to a determination by the

5    jury as to which expert's approach is more rational and

6    credible.  Under the proposed settlement agreement, class

7    members will receive a significantly larger benefit than they

8    would under Cablevision's theory of damages.  In the absence

9    of a settlement, the plaintiffs face a long road to an

10   ultimate determination including trial, post-trial motions,

11   the adjudication of class members' individual claims, and the

12   inevitable appeal.  The fourth Grinnell Factor, therefore,

13   weighs in favor of final approval because the settlement

14   resolves this significant and cumulative uncertainty in a

15   manner favorable to all.

16        As to the fifth Grinnell Factor, the risks of

17   establishing damages, under the settlement, each of the class

18   members will receive an award that is reasonable given the

19   risks and time attendant upon a trial and appeals process.

20   The determination of a reasonable settlement is not

21   susceptible to a mathematical calculation yielding a

22   particular sum but turns on whether the settlement falls

23   within a range of reasonableness.  This range of

24   reasonableness recognizes the uncertainties in any particular

25   case, and that's from In Re: MetLife Demutualization

1   Litigation, 689 F. Supp. 2d 297 at 340 (E.D.N.Y. 2010).  One

2   purpose of a settlement is to avoid the uncertainty of a trial

3   on the merits, and in this case, the plaintiffs have to

4   surmount the liability issues before even getting to damages.

5   With regard to damages, this case likely would have ended up

6   in a classic battle of the experts.  Without that -- excuse

7   me, with that comes the inherent risk that a jury would be

8   swayed by an expert for the defendants who could minimize the

9   amount of plaintiff's losses, see In Re: Marsh and McLennan,

10  2009 Westlaw 5178546 at *6, as well as Maley, M-A-L-E-Y, which

11  I've already cited, at page 365.  Notwithstanding any success

12  that the plaintiffs might achieve in establishing a liability,

13  they have avoided substantial risks in proving damages by

14  virtue of this proposed settlement, and I find that factor

15  favors settlement as well.

16       As to the sixth Grinnell Factor, the risk of maintaining

17  the class action through the trial, the parties here have

18  already litigated the class action certification motion, which

19  was strongly contested.  Judge Seybert certified the class on

20  March 31st, 2014.  It would not be unusual if Cablevision were

21  to move for decertification before a trial; that's happened in

22  lots of other cases.  The settlement eliminates that risk, as

23  well as the expense and delay inherent in such process, and to

24  that extent, this factor weighs in favor of final approval.

25       As to the seventh factor, the ability of the defendants

1   to withstand a greater judgment, the court acknowledges that

2   the defendants may be able to withstand a judgment larger than

3   the benefits awarded under the settlement agreement here,

4   which are valued at $28.4 million.  Even if Cablevision could,

5   it is well settled that this factor standing alone does not

6   suggest that settlement is unfair, see In Re: <u>NASDAQ Market-</u>

7   <u>Makers Antitrust Litigation</u>, 187 F.R.D. 465 at 477-478

8   (S.D.N.Y. 1998) where the court stated, {quote} "While it

9   appears that defendants, which include some of Wall Streets

10  most successful firms would be able to pay a very substantial

11  judgment collectively, that fact does not militate against

12  settlement" {close quote}.  The court finds that this factor

13  neither weighs in favor of or against final approval of the

14  settlement.

15      The eighth and ninth factors regarding range of

16  reasonableness of the settlement funds in light of the best

17  possible recovery and all of the attendant risks of

18  litigation, the final two Grinnell Factors are typically

19  considered together, see <u>Dial Corporation v. News Corp</u>, 317

20  F.R.D. 426 at 432 (S.D.N.Y. 2016).  In analyzing these two

21  factors, a reviewing court considers and weighs the nature of

22  the claim, the possible defenses, the situation of the

23  parties, and the exercise of business judgment in determining

24  whether the proposed settlement is reasonable, see <u>Fleisher v.</u>

25  <u>Phoenix Life Insurance Company</u>, 2015 Westlaw 10847814 at *10

1  (S.D.N.Y. September 9th, 2015).  In doing so, a court need not

2  apply a mathematical formula, but rather must determine

3  whether the range adequately accounts for the uncertainties of

4  law and fact in the particular case and the concomitant risks

5  and costs necessarily inherent in taking the litigation to

6  completion.  Here the total value of the recovery in this case

7  is $28.4 million, not including attorney's fees.  Under

8  Cablevision's damages theory, damages range between 78 and 90

9  cents per subscriber.  Under the proposed settlement agreement

10 however, the average value is $8.29 per subscriber.

11       As set forth above, liability and damages were strongly

12 contested in this case.  Even if plaintiffs successfully

13 established liability at trial, the jury could decide to

14 credit the theory of Cablevision's expert over that of the

15 plaintiffs.  Under such circumstances, plaintiffs would be

16 faced with an award of little to no damages.  Moreover, even

17 if the jury were to adopt plaintiffs' damages theory,

18 Cablevision would likely appeal, reviving the damages dispute.

19 Based on this analysis, the court finds that the eighth and

20 ninth Grinnell Factors weigh in favor of final approval.

21       The court further points out that the negotiations here

22 resulted in a settlement that requires no claim forms and does

23 not require class members to purchase anything or pay any

24 consideration in order to receive the benefits.  The movies,

25 service protection and wi-fi passes will be made available to

1    class members automatically with appropriate messaging to

2    explain the benefits and how they may be utilized.

3         The court finds that on balance, therefore, the Grinnell

4    Factors weigh in favor of granting final approval of the

5    settlement.  For all of the foregoing reasons, I find that

6    not one objection, singular or in the aggregate, is sufficient

7    to prevent me from approving the settlement.  Moreover, I find

8    that the Class Action Fairness Act's coupon settlement

9    provisions do not apply here because the settlement components

10   are sufficiently different from coupons, as I've spent some

11   time explaining.

12        The court hereby grants final approval as to the

13   substantive provisions of the settlement agreement, but

14   reserves decision on the attorney's fee and expenses

15   applications.  Is there anything further from the plaintiffs

16   here?

17             MR. STONE:  No, thank you, Your Honor.

18             THE COURT:  Anything further from defendants'

19   counsel?

20             MR. BEZER:  Your Honor, Donovan Bezer for objectors.

21   I just want to again thank Your Honor for the court's time.

22             THE COURT:  All right.  Anything further from the

23   defendants?

24             MR. GENSER:  No, Your Honor, thank you very much.

25             THE COURT:  All right, we're concluded then.  Thank

1    you all.  We'll get the decision out to you as soon as we're

2    able on the attorney's fees and expenses.

3              MR. DICKERSON:  Thank you, Your Honor.

4         (Court adjourned)

5

6                       CERTIFICATION
7    I certify that the foregoing is a correct transcript from the
8    electronic sound recording of the proceedings in the above-
9    entitled matter.
10
11
12                                        6/18/18
13
14    _____          _____
15    Signature of Transcriber              Date